1  **DUANE MORRIS LLP**
   Gerald L. Maatman, Jr. (*pro hac vice* forthcoming)
2  GMaatman@duanemorris.com
   Justin R. Donoho (*pro hac vice* forthcoming)
3  JRDonoho@duanemorris.com
   Hayley H. Ryan (*pro hac vice* forthcoming)
4  HHRyan@duanemorris.com
   190 South LaSalle Street, Suite 3700
5  Chicago, IL 60603-3433
   Telephone:  +1 312 499 6700
6  Fax:        +1 312 499 6701

7  **DUANE MORRIS LLP**
   Jennifer A. Riley (SBN 360545)
8  JARiley@duanemorris.com
   865 South Figueroa Street, Suite 3100
9  Los Angeles, California 90017-5450
   Telephone:  +1 213 689 7400
10 Facsimile:  +1 213 689 7401

11 Attorneys for Defendant
   WAYFAIR LLC
12

13

14          **UNITED STATES DISTRICT COURT**

15   **CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

16

17 | JOSEPH LIMAS, individually and on | Case No. |
   | behalf of all others similarly situated, | |
18 | | **DEFENDANT WAYFAIR LLC'S** |
   |                Plaintiff, | **NOTICE OF REMOVAL OF** |
19 | | **CIVIL ACTION TO THE** |
   |        v. | **UNITED STATES DISTRICT** |
20 | | **COURT** |
   | WAYFAIR LLC, and DOES 1 to 20, | |
21 | inclusive, | [Removed from Los Angeles |
   | | Superior Court, Case No. |
22 | Defendants. | 25STCV30609] |

23                           [Filed concurrently with Declaration
                             of Samantha Fowler, Notice of
24                           Interested Parties, and Corporate
                             Disclosure Statement]
25
                             Complaint Filed: October 20, 2025
26

27

28

**TO THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA AND TO PLAINTIFF AND PLAINTIFF'S COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that Defendant Wayfair LLC ("Wayfair") hereby removes the above-captioned case from the Superior Court of the State of California, County of Los Angeles to the U.S. District Court for the Central District of California, asserting original diversity jurisdiction pursuant to 28 U.S.C. §§ 1332(d)(2) (the Class Action Fairness Act of 2005 ("CAFA")), 1441(a), and 1446.

## I.    BACKGROUND

1.    On October 20, 2025, Plaintiff Joseph Limas ("Plaintiff") filed a Class Action Complaint (the "Complaint") in the Superior Court of the State of California, County of Los Angeles (the "Superior Court"), captioned *Joseph Limas, et al. v. Wayfair, LLC., et al.*, Case Number 25STCV30609.  A true and correct copy of the Complaint is attached as **Exhibit A**.

2.    In the Complaint, Plaintiff asserts causes of action against Wayfair for alleged violations of the California Invasion of Privacy Act ("CIPA").  Specifically, Plaintiff alleges:  (1) violations of Cal. Penal Code § 631(a) for allegedly reading or attempting to read or learn the contents or meaning of electronic communications of Plaintiff and Class Members while the communications were in transit without consent and for allegedly aiding, agreeing with, conspiring, or employing third party "Tracking Entities" to accomplish the alleged wrongful conduct at issue; and (2) violations of Cal. Penal Code § 638.51 for allegedly using "pen register" and "trap and trace" devices on its website by deploying "Tracking Tools" without obtaining a court order and without consent.  (Compl. ¶¶ 183-186, 196-198.)

3.    Plaintiff seeks to represent a putative class (the "Class") consisting of: "All California citizens who visited Defendant's Website while physically in California and whose personal information was shared with Tracking Entities or

other third parties by Defendant without effective and informed prior consent." (*Id*. ¶ 169.)

4.      On October 22, 2025, Wayfair was served with a copy of the Summons, Complaint, Civil Case Cover Sheet, Notice of Case Assignment, and Alternative Dispute Resolution Packet.  (Declaration of Samantha Fowler ("Fowler Decl."), attached as **Exhibit B**, ¶ 8.)  True and correct copies of the pleadings and documents served on Wayfair on October 22, 2025, are attached as **Exhibit 1** to the Fowler Declaration.

5.      Exhibit 1 to the Fowler Declaration constitutes "all process, pleadings, and orders served upon" Wayfair in this action.

## II.     TIMELINESS OF REMOVAL

6.      This Notice of Removal is timely filed because it is filed within 30 days of service of the initial pleading.  *See* 28 U.S.C. § 1446(b)(1) & (b)(3).

## III.    REMOVAL UNDER THE CLASS ACTION FAIRNESS ACT

7.      Removal to this District is proper pursuant to 28 U.S.C. § 1441(a) because the Complaint was filed in the Superior Court of the State of California, for Los Angeles County, which is located within this District.  (*See* Ex. A.)

8.      This Court has original subject matter jurisdiction over this action under the CAFA, codified in relevant part at 28 U.S.C. § 1332(d)(2), because:  (1) the action involves 100 or more putative class members; (2) at least one putative class member is a citizen of a state different from that of at least one defendant; and (3) the amount in controversy exceeds $5,000,000, exclusive of interest and costs.  28 U.S.C. § 1332(d)(2), (d)(5), & (d)(6).

9.      Under the CAFA, a removing defendant need not submit any evidence of the facts establishing jurisdiction in its notice of removal.  *See Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 84 (2014) (holding notice of removal "need not contain evidentiary submissions").  Rather, "[a] defendant's notice of removal needs to include only a plausible allegation that the jurisdictional

facts exist." *Id.* at 89.  Evidence is required "only when plaintiff contests, or the court questions the defendant's allegation."  *Id.*  Accordingly, Defendant reserves their right to supplement and amend this Notice to the extent necessary.

10.    Following *Dart Cherokee*, the Ninth Circuit has directed district courts to "interpret CAFA's provisions under section 1332 broadly in favor of removal." *Jordan v. Nationstar Mortg. LLC,* 781 F.3d 1178, 1184 (9th Cir. 2015); *see Arias v. Residence Inn by Marriott*, 936 F.3d 920 (9th Cir. 2019) (holding that courts may not remand where notice of removal plausibly alleges the basis for removal).

### A.    The Putative Class Exceeds 100 Members

11.    While Wayfair denies that certification of any class is appropriate, as required under the CAFA, the number of putative class members in this action is greater than 100.  28 U.S.C. § 1332(d)(5)(B).  Wayfair estimates that there were approximately 1,847,758 online orders from unique customers with California billing addresses during the relevant time period.[1]  (*See* Fowler Decl. ¶¶ 9-10.)

### B.    Plaintiff and Wayfair Are Minimally Diverse

12.    The CAFA requires only minimal diversity for purposes of establishing federal jurisdiction.  Minimal diversity exists where at least one putative class member is a citizen of a state different from any named defendant.  28 U.S.C. § 1332(d)(2)(A).  Additionally, minimal diversity exists where any putative class member is a citizen of a foreign state, and any defendant is a citizen of a state.  28 U.S.C. § 1332(d)(2)(B).  In this case, Plaintiff is a citizen of the state of California (Compl. ¶ 4), and Wayfair is a citizen of Delaware and Massachusetts.  Thus, the Parties have minimal diversity under the CAFA.

### 1.    Plaintiff is A Citizen of California

---

[1] The statute of limitations for CIPA claims is one year.  Cal. Civ. Proc. Code § 340; *Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 134 (N.D. Cal. 2020) ("Under the CIPA, the applicable statute of limitations is one year.").  Thus, the relevant time period for purposes of the proposed class is October 20, 2024 (one year prior to the filing of the Complaint), to the present.

13.     For diversity purposes, a person is a "citizen" of the state in which he or she is domiciled.  *Kantor v. Wellesly Galleries, Ltd.*, 704 F.2d 1088, 1090 (9th Cir. 1983).  A person's domicile is the place where he or she resides with the intent to remain.  *Kanter v. Warner-Lambert Co.*, 265 F.3d 853, 857 (9th Cir. 2001) ("A person's domicile is her permanent home, where she resides with the intention to remain or to which she intends to return.").  Citizenship is determined by the individual's domicile at the time the lawsuit is filed.  *Armstrong v. Church of Scientology Int'l*, 243 F.3d 546, 546 (9th Cir. 2000) (citing *Lew v. Moss*, 797 F.2d 747, 750 (9th Cir. 1986)); *Zavala v. Deutsche Bank Trust Co. Americas*, 2013 WL 3474760, at *3 (N.D. Cal. July 10, 2013) (holding that, where complaint alleges plaintiff resides in California, "in the absence of evidence to the contrary, [plaintiff] is a California citizen for diversity purposes").  Additionally, to be considered a citizen of a state, a person must be a citizen of the United States.  *Kanter,* 265 F.3d at 857 ("To be a citizen of a State, a natural person must first be a citizen of the United States.").

14.     Plaintiff alleges he is a resident and citizen of the State of California.  (Compl. ¶ 4.)  Plaintiff further alleges that he was present in California at all relevant times while using Wayfair's website.  (*Id.*)  Accordingly, on information and belief, Plaintiff is a citizen of the State of California for purposes of removal.

2.     <u>Defendant Wayfair LLC is Not a Citizen of California</u>

15.     Plaintiff names Wayfair LLC as a Defendant.  As a general rule, a limited liability company is a citizen of every state of which its members are citizens.  *See Johnson v. Columbia Properties Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006) ("LLCs resemble both partnerships and corporations. Notwithstanding LLCs' corporate traits, however, every circuit that has addressed the question treats them like partnerships for the purposes of diversity jurisdiction … an LLC is a citizen of every state of which its owners/members are citizens.").

DUANE MORRIS LLP
ATTORNEYS AT LAW
LOS ANGELES

- 5 -

16.    For purposes of the CAFA's minimal diversity requirement, however, an "unincorporated association shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized." 28 U.S.C. § 1332(d)(10); *Davis v. HSBC Bank Nev., N.A.*, 557 F.3d 1026, 1032 n.13 (9th Cir. 2009) ("For qualifying class actions such as this one, CAFA abrogates the traditional rule that an unincorporated association shares the citizenship of each of its members for diversity purposes.").

17.    A corporation's principal place of business for diversity purposes is normally "the place where the corporation maintains its headquarters." *Hertz Corp. v. Friend*, 130 S. Ct. 1181, 1193 (2010).  In *Hertz,* the Supreme Court held that the "principal place of business" of a corporation is best interpreted as a corporation's "nerve center," which "ordinarily equates … with a corporation's headquarters." *Id*. The Court explained that "in practice [the nerve center] should normally be the place where the corporation maintains its headquarters – provided that the headquarters is the actual center of direction, control, and coordination … and not simply an office where the corporation holds its board meetings (for example, attended by directors and officers who have traveled there for the occasion)." *Id*. at 1192-93; *see id*. at 1195 (distinguishing situation where alleged "nerve center" is "nothing more than a mail drop box, a bare office with a computer, or the location of an annual executive retreat").

18.    For removal purposes, citizenship is measured both when the action is filed and when it is removed.  *Strotek Corp. v. Air Transport Ass'n of America*, 300 F.3d 1129, 1131 (9th Cir. 2002); *Kanter,* 265 F.3d at 857.

19.    At all times since Plaintiff commenced this lawsuit, Wayfair has been and is a limited liability company formed under the laws of the State of Delaware with its principal place of business in the State of Massachusetts.  (*See* Fowler Decl. ¶¶ 5-6.)  Wayfair has maintained its corporate headquarters in Boston, Massachusetts.  (*Id.* ¶ 6.)  Its corporate executives, including its senior leadership

team, have been and continue to be located in Massachusetts, have maintained and continue to maintain their offices in Massachusetts, and have performed and continue to perform their primary duties and job functions in Massachusetts.  (*Id.* ¶ 7.)  Because Defendant was formed under the laws of the State of Delaware and maintains its principal place of business in the State of Massachusetts, it is not a citizen of the State of California.

20.    Accordingly, the CAFA's diversity requirement is satisfied because at least one putative class member – here, Plaintiff – and Defendant Wayfair LLC are citizens of different states.

### 3.    Doe Defendants Have No Bearing on Diversity Jurisdiction

21.    Pursuant to 28 U.S.C. § 1441(a), the residence of fictitious and unknown defendants should be disregarded for purposes of establishing removal jurisdiction under 28 U.S.C. § 1332.  *Fristoe v. Reynolds Metals Co.*, 615 F.2d 1209, 1213 (9th Cir. 1980) (holding that unnamed defendants are not required to join in a removal petition); *Soliman v. Philip Morris Inc.*, 311 F.3d 966, 971 (9th Cir. 2002) ("[C]itizenship of fictitious defendants is disregarded for removal purposes and becomes relevant only if and when the plaintiff seeks leave to substitute a named defendant.").  Thus, the existence of Doe Defendants 1 through 20 does not deprive this Court of jurisdiction.  *Abrego v. The Dow Chemical Co.*, 443 F.3d 676, 679-80 n.4 (9th Cir. 2006).

### C.    The Amount In Controversy Exceeds The Statutory Minimum

22.    Under the CAFA, the claims of the individual members in a class action are aggregated to determine if the amount in controversy exceeds the sum or value of $5,000,000.  28 U.S.C. § 1332(d)(6).  Congress intended federal jurisdiction to be appropriate under CAFA "if the value of the matter in litigation exceeds $5,000,000 either from the viewpoint of the plaintiff or the viewpoint of the defendant, and regardless of the type of relief sought (e.g., damages, injunctive relief, or declaratory relief)."  Sen. Jud. Comm. Rep., S. Rep. 109-14, at 42.  Moreover, any doubts

regarding the maintenance of interstate class actions in state or federal court should be resolved in favor of federal jurisdiction.  S. Rep. 109-14 at 42-43 ("[I]f a federal court is uncertain about whether 'all matters in controversy' in a purported class action 'do not in the aggregate exceed the sum or value of $5,000,000, the court should err in favor of exercising jurisdiction over the case. . . . Overall, [the] new section 1332(d) is intended to expand substantially federal court jurisdiction over class actions.  Its provisions should be read broadly, with a strong preference that interstate class actions should be heard in a federal court if properly removed by any defendant.").

23.    To establish that the amount in controversy exceeds the jurisdictional amount, the defendant need make only a plausible claim that the amount in controversy exceeds that amount.  *Dart Cherokee Basin Operating Co.*, 574 U.S. at 84.  Where, as here, Plaintiff does not plead a specific amount of damages, a defendant need only "plausibly show that it is reasonably possible that the potential liability exceeds $5 million."  *Greene v. Harley-Davidson*, 965 F.3d 767, 772 (9th Cir. 2020).  A defendant can establish the amount in controversy by "providing only a short and plain statement of the grounds for removal."  *Ehrman v. Cox Commc'ns, Inc.*, 932 F.3d 1223, 1227 (9th Cir. 2019).

24.    "[T]he amount in controversy is the 'amount at stake in the underlying litigation,'" which "does not mean likely or probable liability; rather, it refers to possible liability."  *Ehrman*, 932 F.3d at 1227 (quoting *Gonzales v. CarMax Auto Superstores, LLC*, 840 F.3d 644, 648 (9th Cir. 2016) (emphasis omitted)).  "In determining the amount in controversy, the Court accepts the allegations contained in the complaint as true and assumes the jury will return a verdict in the plaintiff's favor on every claim."  *Henry v. Cent. Freight Lines, Inc.*, 692 F. App'x 806, 807 (9th Cir. 2017); *Coleman v. Estes Express Lines, Inc.*, 730 F. Supp. 2d 1141, 1148 (C.D. Cal. 2010) ("In deciding the amount in controversy the Court looks to what the plaintiff has alleged, not what the defendants will owe."), *aff'd,* 631 F.3d 1010

(9th Cir. 2011). Indeed, "[t]he amount in controversy includes all relief claimed at the time of removal to which the plaintiff would be entitled if she prevails." *Wise v. Long*, 668 F. Supp. 3d 1145, 1151 (W.D. Wash. 2023) (quoting *Chavez v. JPMorgan Chase & Co.*, 888 F.3d 413, 418 (9th Cir. 2018)).

25.    As the U.S. Supreme Court has explained, a defendant's amount-in-controversy allegations on removal are entitled to the same weight given those alleged by a plaintiff in its pleadings. *Dart Cherokee Basin Operating Co.*, 574 U.S. at 88. As a result, the effect of any affirmative defenses potentially reducing the amount in controversy cannot be considered when determining federal jurisdiction. *Geographic Expeditions, Inc. v. Estate of Lhotka ex rel. Lhotka*, 599 F.3d 1102, 1108 (9th Cir. 2010); *Scherer v. Equitable Life Assur. Soc.*, 347 F.3d 394, 397-98 (2d Cir. 2003) (holding that affirmative defenses may not be used to "whittle down the amount in controversy"); *Lara v. Trimac Transp. Servs. (Western), Inc.*, 2010 WL 3119366, at *3 (C.D. Cal. Aug. 6, 2010) ("[A]ffirmative defenses, counterclaims, and potential offsets may not be invoked to demonstrate the amount-in-controversy is actually less than the jurisdictional minimum.").

26.    "[C]ourts may consider the maximum statutory penalty available in determining whether the jurisdictional amount in controversy requirement is met." *Korn v. Polo Ralph Lauren Corp.*, 536 F. Supp. 2d 1199, 1205 (E.D. Cal. 2008); *Gershfield v. TeamViewer US, Inc.*, 2021 WL 839158, at *2 (C.D. Cal. Mar. 4, 2021) ("Because the CCPA authorizes statutory damages of up to $750 per consumer per incident, Defendant calculates that the amount in controversy is over $6.5 million. . . . the Court concludes that Defendant has relied on reasonable assumptions to prove by a preponderance of the evidence that the amount in controversy meets CAFA's $5 million requirement.").

27.    While Wayfair denies any liability as to Plaintiff's claims, the amount in controversy as alleged in the Complaint exceeds $5,000,000, exclusive of interest and costs. Wayfair bases all calculations supporting the amount in controversy on

the Complaint's allegations (along with other documents identified herein), assuming, without any admission, the truth of the allegations (which Wayfair disputes). Likewise, Wayfair bases these calculations on the putative class alleged in the Complaint, and in no way indicates or concedes that class treatment is appropriate in this case, that Plaintiff has standing to represent any class, or that the proposed class would meet the requirements set forth in Rule 23 of the Federal Rules of Civil Procedure. Wayfair expressly reserves the right to challenge Plaintiff's claims, adequacy, and standing to represent any class, Plaintiff's class definition, Plaintiff's ability to meet the requirements of Rule 23, and the calculation of damages or any other monetary relief in all respects.

28. Cal. Penal Code § 637.2 provides that a "person who has been injured by a violation of this chapter may bring an action against the person who committed the violation for the greater of the following amounts: (1) five thousand dollars ($5,000) per violation[;] (2) three times the amount of actual damages, if any, sustained by the plaintiff." Cal. Penal Code § 637.2(a). Further, "[i]t is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages." Cal. Penal Code § 637.2(c).

29. "A plaintiff may recover a minimum of $5,000 for a violation of the CIPA, or actual damages." *Romero v. Securus Techs., Inc.*, 331 F.R.D. 391, 411 (S.D. Cal. 2018); *CashCall, Inc. v. Superior Ct.*, 159 Cal. App. 4th 273, 293, 71 Cal. Rptr. 3d 441, 457 (2008) ("Penal Code § 637.2 provides for damages of not less than $5,000 per violation of Penal Code section 631 or 632. Therefore, were precertification discovery not allowed in this case and the class action subsequently dismissed, [defendant] would avoid paying a potential total damages amount of $2,755,000 (i.e., $5,000 multiplied by the 551 class members)."); *Moody v. C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072, 1078 (C.D. Cal. 2024) (holding that Cal. Penal Code § 637.2 provides a private right of action for all CIPA violations, including § 638.51).

30.     Plaintiff alleges that "CIPA imposes civil liability and statutory penalties" under "California Penal Code § 637.2." (Compl. ¶ 151.) The Complaint asserts two CIPA counts: one for alleged violations of Cal. Penal Code § 631 and one for alleged violations of Cal. Penal Code § 638.51. (*Id*. ¶¶ 177-201.) Plaintiff seeks statutory damages, not actual damages. (*See id*. ¶ 173 ("Common questions of fact and law . . . include . . . Whether Class Members are entitled to statutory penalties"); *id*. at Prayer ¶ 204 ("WHEREFORE, Plaintiff prays for the following relief against Defendant: . . . Statutory damages pursuant to CIPA.").) There is no mention of actual damages in the Complaint. Thus, Plaintiff and the putative class members are seeking a minimum of $10,000 in statutory damages each ($5,000 per alleged CIPA violation).

31.     For the purposes of removal, Wayfair relies on the following estimates: Between October 20, 2024, and November 18, 2025, there were approximately 1,847,758 orders made online via Wayfair's website by unique customers with California billing addresses. (*See* Fowler Decl. ¶ 10.) It is reasonable to assume that at least 501 of those 1,847,758 unique customers with California billing addresses are California citizens and were located in California when they visited Wayfair's website. Accordingly, the amount in controversy based on the claims alleged in Plaintiff's Complaint is at least approximately $5,010,000.[2]

32.     Accordingly, the amount in controversy exceeds the $5,000,000 minimum required under the CAFA.

**IV.    VENUE**

33.     Venue lies in the U.S. District Court for the Central District of California pursuant to 28 U.S.C. sections 1441, 1446(a), and 84(b). This action originally was brought in the Los Angeles County Superior Court of the State of California, which is located within the Central District of California. 28 U.S.C. § 84(d). Therefore, it is properly removed to this District.

---

[2] 501 times $10,000 in statutory damages equals $5,010,000.

DUANE MORRIS LLP
ATTORNEYS AT LAW
LOS ANGELES

NOTICE OF REMOVAL

## V.    NOTICE OF REMOVAL TO STATE COURT AND TO PLAINTIFF

34.    This Notice of Removal will be promptly served on Plaintiff and filed with the Clerk of the Los Angeles County Superior Court of the State of California, as required under 28 U.S.C. § 1446(d).

## VI.    PRAYER FOR REMOVAL

**WHEREFORE**, Defendant Wayfair LLC prays that this civil action be removed from the Los Angeles County Superior Court of the State of California to the U.S. District Court for the Central District of California.

Dated: November 21, 2025

Respectfully Submitted,

**DUANE MORRIS LLP**


By:  /s/ *Jennifer A. Riley*
Gerald L. Maatman, Jr. (*pro hac vice* forthcoming)
Jennifer A. Riley
Justin R. Donoho (*pro hac vice* forthcoming)
Hayley H. Ryan (*pro hac vice* forthcoming)

Attorneys for Defendant Wayfair LLC

# Exhibit A

Todd M. Friedman (216752)
Adrian R. Bacon (280332)
Law Offices of Todd M. Friedman, P.C.
23586 Calabasas Rd., Suite 105
Calabasas, CA 91302
Phone: 323-306-4234
tfriedman@toddflaw.com
abacon@toddflaw.com
Attorneys for Plaintiff

Electronically FILED by
Superior Court of California,
County of Los Angeles
10/20/2025 2:46 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By M. Aguirre, Deputy Clerk

## SUPERIOR COURT FOR THE STATE OF CALIFORNIA
## COUNTY OF LOS ANGELES
## UNLIMITED JURISDICTION

| | |
|---|---|
| JOSEPH LIMAS, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>WAYFAIR LLC, and DOES 1 to 20, inclusive,<br><br>Defendant. | Case No. 25STCV30609<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF CALIFORNIA INVASION OF PRIVACY ACT**<br><br>(Amount to Exceed $35,000) |

# INTRODUCTION

In argument before the United States Supreme Court on January 10th, 2025, America's Solicitor General called social media app TikTok a ***"grave threat to our nation***."[1]  Justice Kavanaugh went further, saying, "Just on the data collection, that seems like a huge concern for the future of the country[.]"[2]

TikTok's—and other social media giants'—ability to collect personal information from everyday Americans requires the active assistance of companies like Wayfair LLC ("Wayfair" or "Defendant"). Defendant created an online presence at **https://www.wayfair.com/** (the "Website"). Unbeknownst to its customers, Defendant begins tracking customers' journeys on the Website as soon as they land on any of its webpages through its use of various tracking pixels (the "Tracking Tools"), including those developed by TikTok, Facebook, Pinterest, Snapchat, Twitter, and Reddit (the "Tracking Entities"). Defendant tracks its customers' journeys across the web, eavesdropping on their conversations, and bombarding them with targeted advertising through its use of Tracking Tools. The California Legislature has made clear that this secret, invasive surveillance violates California law.

Joseph Limas ("Plaintiff") visited the Website,  as recently as May 2025, to search for furniture, home decor, appliances, and other home goods. Defendant de-anonymized Plaintiff by using electronic impulses generated from Plaintiff's device and helped the Tracking Entities track and eavesdrop on Plaintiff's personal life.  Defendant violated and continues to violate the California's Invasion of Privacy Act, codified at California Penal Code §§ 631, *et seq.* Plaintiff brings this class action on behalf of similarly situated users of the Website and was surveilled as a result of Defendant's implementation of the Tracking Tools on the Website.

## JURISDICTION AND VENUE

1. As a Court of general jurisdiction, this Court has jurisdiction over all matters presented to it per the mandates of the California Constitution.

2. Venue is proper in this County because some of the Class Members' claims arose in this county.

---

[1] Zach Schonfeld & Julia Shapero, *TikTok Gets Frosty Reception At Supreme Court In Fight To Stave Off Ban*, THE HILL (Jan. 10, 2025 1:42 PM), https://thehill.com/regulation/court-battles/5079608-supreme-court-tik-tok-ban/ (last visited Oct. 9, 2025).
[2] *Id.*

3.      Defendant is subject to jurisdiction under California's "long-arm" statute found at California Code of Civil Procedure Section 410.10 because the exercise of jurisdiction over Defendant is not "inconsistent with the Constitution of this state or the United States."

## **PARTIES**

4.      Plaintiff Joseph Limas is a resident and citizen of California. Plaintiff is genuinely interested in the goods, services, and information on Defendant's Website. Plaintiff used Defendant's Website for its intended purpose of browsing for furniture, home decor, appliances, and other home goods. For example, Plaintiff recently used the Website to search for furniture, home decor, lighting fixtures, bedding & bath accessories, outdoor furniture, storage and organization products, and appliances. Plaintiff accessed the Website on the same devices and same browser he accessed TikTok, Facebook, Pinterest, Snapchat, Twitter, and Reddit. Plaintiff was in California at all relevant times while using Defendant's Website. Plaintiff's personal information was thus shared with TikTok and other third-party social media companies as a result of Defendant's implementation of Tracking Tools on the Website.

5.      Defendant Wayfair LLC is in the business of selling furniture, home decor, appliances, and other home goods. Defendant operates the Website. It serves as an online marketplace offering millions of products from thousands of suppliers, enabling customers to find items for every part of their home, from the kitchen and living room to outdoor spaces to consumers across the United States. Defendant is a limited liability corporation formed in Delaware and headquartered in Boston, Massachusetts.

## **FACTUAL ALLEGATIONS**

### **A. Legislative Background: The California Invasion of Privacy Act (CIPA)**

6.      The California Invasion of Privacy Act ("CIPA") was enacted in 1967 for the expressly stated purpose "to protect the right of privacy of the people of [California]."[3]

7.      California legislators were concerned about emergent technologies that allowed for the "eavesdropping upon private communications," believing such technologies "created a serious threat to the free exercise of personal liabilities and cannot be tolerated in a free and civilized society."[4]

---

[3] Cal. Penal Code § 630.
[4] *Id.*

8.    To protect people's privacy, California legislators broadly protected communications being sent from or received in California through the enactment of CIPA.[5]  Indeed, CIPA "is a declaration of legislative finding and intent; it speaks of preventing eavesdropping and other invasions of privacy . . . ."

9.    Section 638 of CIPA prohibits the installation or use of "a pen register or a trap and trace device without first obtaining a court order . . . ."[6]

10.    "Pen register" is defined as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."[7]

11.    "Trap and trace device" is defined as a "device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."[8]

12.    Given CIPA's purpose to protect Californians' privacy, "it seems very unlikely that the state Legislature meant to permit the installation and implementation of pen registers 'so long as those devices also record the contents of third party's communications." *Gabrielli v. Haleon US Inc.*, No. 25-cv-02555-WHO, 2025 U.S. Dist. LEXIS 169503, at *34 (N.D. Cal. Aug. 29, 2025).

13.    Defendant was not authorized by any court order to use Tracking Tools, including the TikTok Pixel, to record and capture Plaintiff's and Class Members' communications with the Website in violation of CIPA § 638.

**B.  How Websites Function**

14.    Websites are hosted on servers, in the sense that their files are stored on and accessed from servers. Websites are, in part, "run" on a user's internet browser, as the browser loads and processes the website's code to display the webpage.

---

[5] Cal. Penal Code §§ 631-32.
[6] Cal. Penal Code § 638.51.
[7] *Id.* § 638.50(b).
[8] *Id.* § 638.50(c).

15.     Websites are a collection of webpages. A webpage is essentially a document containing text written in HyperText Markup Language (HTML) code.[9]

16.     Each webpage has a unique address, and two webpages cannot be stored at the same address.[10]

17.     When a user navigates to a webpage (by entering a URL address directly or clicking a hyperlink containing the address), that user's browser contacts the DNS (Domain Name System) server, which translates the web address of that website into a unique IP (Internet Protocol) address.[11]

18.     An IP address is "a unique address that identifies a device on the internet or a local network."[12] Essentially, an IP address is:

> The identifier that allows information to be sent between devices on a network: they contain location information and make devices accessible for communication. The internet needs a way to differentiate between different computers, routers, and websites. IP addresses provide a way of doing so and form an essential part of how the internet works. *Id.*

19.     When a user's browser navigates to a webpage, it sends an HTTP request to the server identified by the webpage's IP address (the "Request URL"). This request is for the specific resource located at the URL. If the server fulfils this request, it issues an HTTP response, which includes the status of the request and, typically, the requested content. This content is then transmitted in small chunks, known as data packets, and reassembled into the complete webpage upon arrival by the user's browser.[13]

20.     This Request URL includes a domain name and path, which identify the specific content being accessed on a website and its location within the website's structure.

---

[9] *What is the difference between webpage, website, web server, and search engine?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/Web_mechanics/Pages_sites_servers_and_search_engines (last visited Oct. 9, 2025).
[10] *Id.*
[11] *How the web works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited Oct. 9, 2025).
[12] *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited Oct. 9, 2025).
[13] *Id.*

21.    The Request URL typically contains parameters. Parameters are values added to a URL to transmit data to the recipient, prefaced by a question mark to signal the use of parameters. Parameters direct a web server to provide additional context-sensitive services,[14] as depicted below:



*Figure 1 - Mozilla's diagram of a URL, including parameters[15]*

22.    Website owners or web developers write and manage the URLs for their websites.

23.    URL encoding is an essential process to ensure that data is safely transmitted via URLs. URL encoding converts characters into a format that can be transmitted over the Internet.[16] For example, URLs cannot contain spaces; URL encoding normally replaces a space with a plus (+) sign or with %20.

24.    The American Standard Code for Information Interchange (ASCII) was designed in the early 1960s as a standard character set for computers and electronic devices.[17] Today, UTF-8 is the Internet's most common character encoding.[18]

25.    URL decoding is the process of URL encoding in reverse so that the URL is in a more readable format.[19] To demonstrate:



*Figure 22 – Demonstrating URL encoding and decoding[20]*

---

[14] To see examples of how Defendant used parameters to provide additional information here, *see, infra,* Section C(2).
[15] *What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Oct. 9, 2025).
[16] *Id.*
[17] *HTML ASCII Reference*, W3 SCHOOLS, https://www.w3schools.com/charsets/ref_html_ascii.asp (last visited Oct. 9, 2025).
[18] *UFT-8*, MOZILLA, https://developer.mozilla.org/en-US/docs/Glossary/UTF-8 (last visited Oct. 9, 2025).
[19] *What IS URL Decoding and URL Encoding?*, GOCHYU (Oct. 18, 2020), https://gochyu.com/blog/url-encode-decode (last visited Oct. 9, 2025).
[20]    Viraj    Shetty,    *URL    Encoding    in    a    few    minutes*,    YOUTUBE    (Sept.    5,    2023), https://www.youtube.com/watch?v=ru0iCHsmsLc (last visited Oct. 9, 2025).

26.    Similarly, parameters and metadata can be parsed and separated into easily reviewed, searchable formats.



*Figure 33 – Sample webpage used to demonstrate a webpage URL*

*Figure 44 – Request URL of sample webpage from Figure 3, encoded for transmission (compare with decoded URL in Figure 3)*

CLASS ACTION COMPLAINT

*Figure 55 – Decoded, parsed data from Request URL in Figure 4, showing easy-to-read parameters and metadata*

27.    After sending the Request URL, and after the server responds to the Request URL, the user's browser assembles the packets sent by the server back into the HTML code that of the webpage, which is then processed by the user's browser and "rendered" into a visual display according to the instructions of the HTML code.[21] This is the visible, and usually interactable, website that most people think of.

28.    To provide more complex website functionalities, website developers will include more complex commands written in other computer programming languages such as JavaScript snippets within the HTML documents.[22]

29.    In short, the Internet relies on a constant back and forth stream of requests.

30.    Unbeknownst to users, as they browse the Website, the Tracking Tools capture and record both incoming and outgoing requests that make up their experience on the Website.

**C.  Defendant's Website and the Tracking Tools Spy on Consumers Like Plaintiff.**

31.    Defendant operates the Website and has installed on the Website software created by third-party social media companies. These Tracking Tools operate invisibly, tracking Defendant's site visitors' activity surreptitiously.

---

[21] *What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Oct. 9, 2025).

[22] *See JavaScript Basics*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited Oct. 9, 2025).

CLASS ACTION COMPLAINT

32.     Generally, the Tracking Tools collect information about users' site activity when events specified by Defendant—like adding a product to the shopping cart—are triggered. Parameters added to events by Defendant determine just how much data is collected, and how specific that data is.

33.     Parameters are strings of text that website owners add to a URL to track and organize their webpages.[23] URL parameters include key-value pairs formatted as "key=value":

    a.   The "key" is what the website owner wants to adjust or track (e.g., "color" or "ev" for event)

    b.   The "value" is the specific setting or data for that parameter (e.g., "yellow" or "AddToCart" for a user taking the action of adding a product to their online shopping cart)



*Figure 6 - Diagram of a URL displaying how parameters function[24]*

34.     For instance, the Facebook Pixel (discussed and defined herein) transmission below shows that Defendant added a parameter to track events being triggered ("ev") and the event triggered here was the "AddToCart" event (*see* Section C(2)), among other parameters.

---

[23] *URL Parameters: What They Are and How to Use Them Properly*, BACKLINKO (Mar. 13, 2025), https://backlinko.com/url-parameters (last visited Oct. 9, 2025).
[24] *Id.*

- 9 -

*Figure 7 - Facebook Pixel transmission displaying event parameter being collected and disclosed to Facebook*

### *1. The TikTok Pixel*

35.     TikTok offers software – known as a "tracking pixel" – to track users' actions, behavior, and conversions across the Website (the "TikTok Pixel").

36.     The TikTok Pixel is a snippet of code that begins to collect information the moment a user lands on the Website.

37.     The TikTok Pixel shares information when an action is taken on the Website, based on events set up by Defendant.[25] These events can include adding an item to a cart, making a purchase, when a specific button or element is clicked (like the search field), and when a URL with a specified keyword is visited.[26]

38.     TikTok Pixel users, including Defendant, add parameters to events to collect even more data on users' activities, including parameters for the currency used for the purchase, the value of the purchase, and the type of content purchased.[27]

39.     The TikTok Pixel also collects:

a.     The time website actions took place;

b.     The IP address (which is used to determine the geographic location of an event);

c.     Device information, including make, model, operating system, and browser information);

d.     Cookies that can be used to identify users; and

---

[25] *About TikTok Pixel*, ᴛɪᴋᴛᴏᴋ, https://ads.tiktok.com/help/article/tiktok-pixel (last visited Oct. 9, 2025).
[26] *About Standard and Custom events*, ᴛɪᴋᴛᴏᴋ, https://ads.tiktok.com/help/article/standard-events-parameters?lang=en (last visited Oct. 9, 2025) (describing standard "events"); *How to Set Up Events and Parameters with Events Builder*, ᴛɪᴋᴛᴏᴋ, https://ads.tiktok.com/help/article/how-to-set-up-events-and-parameters (last visited Oct. 9, 2025) (describing how to designate events).
[27] *How to Set Up Events and Parameters with Events Builder*, ᴛɪᴋᴛᴏᴋ, https://ads.tiktok.com/help/article/how-to-set-up-events-and-parameters (last visited Oct. 9, 2025) (describing how to designate events).

CLASS ACTION COMPLAINT

e.  Metadata and button clicks.[28]

40.    The information the TikTok Pixel collects provides Defendant with a better understanding of who its customers are and how they navigate around the Website.

41.    TikTok's "Advanced Matching" features allows Defendant to "match customer information such as email and phone number along with actions people take on [the Website]."[29] Once Advanced Matching is active, the TikTok Pixel "will automatically find customer information and match it with people on TikTok."[30] TikTok then provides Defendant with custom audiences based on website visitor events, like page views or purchases, to model lookalike audiences.[31]  Lookalike audiences allow Defendant to retarget users who have already visited or made purchases on the Website and serve them with relevant ads on TikTok based on how they interacted with the Website.[32]

42.    Put simply, the TikTok Pixel collects as much data as it can about otherwise anonymous visitors to the Website and matches it with existing data TikTok has acquired and accumulated about hundreds of millions of Americans to improve Defendant's conversion rates and reduce overall advertising costs.[33]

43.    Using the TikTok Pixel benefits Defendant by allowing Defendant to effectively track conversions, optimize the delivery of its ad campaigns, create and target its own custom audiences, and access tons of data to run successful ad campaigns.[34]

44.    TikTok benefits, in turn, by using data collected by the TikTok Pixel to improve their own products and services and to generate their own benchmarking reports to share with other TikTok customers.[35]

---

[28] *About TikTok Pixel*, TikTok, https://ads.tiktok.com/help/article/tiktok-pixel (Sept. 25, 2025).

[29] *About Advanced Matching for Web*, TikTok, https://ads.tiktok.com/help/article/advanced-matching-web?lang=en (last visited Oct. 9, 2025).

[30] *How to set up Automatic Advanced Matching*, TikTok, https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en (last visited Oct. 9, 2025).

[31] *Get started with the TikTok Pixel: a small business guide*, TikTok (Sept. 6, 2024), https://ads.tiktok.com/business/en-US/blog/get-started-with-tiktok-pixel (last visited Oct. 9, 2025) (benefits of using the TikTok Pixel).

[32] *See How to use TikTok Pixel: TikTok conversions tracking*, LeadsBridge (May 2, 2025), https://leadsbridge.com/blog/tiktok-pixel/ (last visited Oct. 9, 2025).

[33] *Id.*

[34] *See Benefits of using the TikTok Pixel*, TikTok, https://ads.tiktok.com/business/en-US/blog/get-started-with-tiktok-pixel?acq_banner_version=73412989 (last visited Sept. 25, 2025).

[35] *TikTok Business Products (Data) Terms*, TikTok (July 29, 2024), http://ads.tiktok.com/i18n/official/policy/business-products-terms.

45.     According to a leading data security firm, the TikTok Pixel secretly installed on Defendant's Website is particularly invasive.  The TikTok Pixel "immediately links to data harvesting platforms that pick off usernames and passwords, credit card and banking information and details about users' personal health."[36]  The TikTok Pixel also collects "names, passwords and authentication codes" and "transfer the data to locations around the globe," and does so "before users have a chance to accept cookies or otherwise grant consent."[37]

46.     An image of the invasive TikTok code secretly embedded on Defendant's Website can be seen here, which shows the Website instantly sending communications to TikTok to add to its collection of user behavior:



*Figure 8 – Home page of Website*

---

[36]    *See Aaron Katersky, TikTok Has Your Data Even If You've Never Used The App: Report*, ABC NEWS (Mar. 16, 2023 1:59 PM), https://abcnews.go.com/Business/tiktok-data-app-report/story?id=97913249.

[37] *Id.*

*Figure 9 – Using a browser's "developer tools" on a Vrai webpage shows the Website loading TikTok Pixel's code onto the user's browser*

*Figure 10 – Defendant's TikTok Pixel code on the Website displaying the active features of the TikTok Pixel on the Website*

47.    The Website instantly sends communications to TikTok when a user views the page and tracks page interactions. In the screenshots below, the sample webpage being viewed is depicted, along with the webpage code showing the various TikTok scripts being run by Defendant, and the electronic impulses being sent to TikTok to add to their collection of user behavior:

CLASS ACTION COMPLAINT



*Figure 11 – Sample product on the Website*

**CLASS ACTION COMPLAINT**

*Figure 12 – Information collected via the TikTok Pixel when a user visits the sample webpage from Figure 11*

48.    To use the TikTok Pixel, Defendant agreed to TikTok's Business Products (Data) Terms (the "TikTok Terms").

49.    The TikTok Terms inform website owners using the TikTok Pixel that their use of the TikTok Pixel shares or enables TikTok to access their website users' contact details, developer data, and/or event data.[38]

50.    The TikTok Terms are transparent that TikTok will process users' data to match contact details against corresponding accounts, and subsequently match those accounts with the users' corresponding event data.[39]

51.    TikTok obligates TikTok Pixel users, such as Defendant, that they "must only share with us or enable us to access Business Products Data in a manner that is transparent and lawful."[40] TikTok makes clear that the onus is on Defendant to provide all necessary transparency notices, and obtain all necessary rights, permissions, and lawful bases, including consent, to share information with TikTok.

---

[38] *TikTok Business Products (Data) Terms*, TikTok (July 29, 2024), https://ads.tiktok.com/i18n/official/policy/business-products-terms.

[39] *Id.*

[40] *Id.*

- 15 -

CLASS ACTION COMPLAINT

52. TikTok educates or reminds TikTok Pixel users of their obligation not to share any data "from or about Children or that includes health or financial information, or other categories of sensitive information."[41]

53. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the TikTok Pixel, and ignored TikTok's warnings to safely handle its users' data and warn its users' that the Website would disclose their information in a manner that threatened their private information.

### 2. The Facebook Pixel

54. Facebook offers its own tracking pixel (the "Facebook Pixel") to website owners for the purpose of monitoring user interactions on their websites, which can then be shared with Facebook.

55. The Facebook Pixel is a marketing tool that can only be added to a webpage by website developers. A website operator must sign up for a business account or link a related Facebook account with its Pixel, and then add code to the website to make use of the Pixel.[42]

56. As Facebook notes, the Pixel must be added to each individual page that a website owner wishes to be tracked.[43]

57. Once added to a webpage, the Pixel begins intercepting information as soon as a user visits the webpage and the Pixel loads onto the user's browser.[44]

58. The Pixel is employed by Defendant to gather, collect, and then share user information with Facebook.[45] Receiving this information enables Facebook and Defendant to build valuable personal profiles for Website users to inform its targeted advertising campaigns, enhancing marketing effectiveness and increasing the chance of converting users into paying customers.[46]

---

[41] *Id.*
[42] *Set up and install the Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited Oct. 9, 2025).
[43] *Get Started*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Oct. 9, 2025) ("To install the Pixel, add its base code . . . on every page where you will be tracking website visitor actions.").
[44] *See* Mario Neto, *What is the Facebook Pixel – Different ways to collect data to boost your ads performance*, BIRCH BLOG (May 13, 2025), https://bir.ch/blog/what-is-the-facebook-pixel#:~:text=Putting%20it%20simply%2C%20the%20Meta,all%20from%20a%20single%20snippet.
[45] The Facebook Pixel allows websites to track visitor activity by monitoring user actions ("events") that websites want tracked and share a tracked user's data with Facebook. *See Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited Oct. 9, 2025).
[46] *See Meta Pixel*, FACEBOOK, https://www.facebook.com/business/tools/meta-pixel (last visited Oct. 9, 2025).

59.    The harvested data improves Defendant's advertising by pinpointing audience demographics by interests, gender, or location and finding the people who are most likely to take action and view content.[47]

60.    Once implemented on a website, the Facebook Pixel begins to share users' information the moment a user lands on the website.

61.    When a Facebook user logs onto Facebook, tracking cookies, including the c_user cookie, the data cookie, and the fr cookie, are automatically created and stored on the user's device.[48] These cookies allow Facebook to link the data it receives through the Facebook Pixel to individual Facebook users.

62.    The c_user cookie, for example, contains a series of numbers (the user's Facebook ID, or "FID") to identify a user's profile.

*Figure 13 – Sample c_user cookie, containing FID of test account created by Plaintiff's counsel to investigate the Facebook Pixel*

63.    The FID can simply be appended to www.facebookcom/ to navigate to the user's profile (e.g., www.facebook.com/[FID]). Using the FID from *Figure 13*, appending it to the Facebook URL in a standard internet browser (here, www.facebook.com/100091959850832) will redirect the webpage straight to the Facebook profile associated with the FID, as depicted below:

---

[47] *See Audience ad targeting*, FACEBOOK, https://www.facebook.com/business/ads/ad-targeting (last visited Oct. 9, 2025).
[48] *Cookies Policy: What are cookies, and what does this policy cover*?, FACEBOOK (Dec. 12, 2023), https://www.facebook.com/policy/cookies/.

1

2

3

4

5

6

7

8

9

10

11

12

13

14



*Figure 14 – Sample Facebook account created by Plaintiff's counsel to investigate the Facebook Pixel, with FID highlighted in URL*

15

16      64.    The Pixel tracks user-activity on web pages by monitoring events,[49] which when

17   triggered, causes the Pixel to automatically send data – here, users' sensitive information – directly to

18   Facebook.[50] Examples of events utilized by websites include: (i) a user loading a page with a Pixel

19   installed (the "PageView event");[51] (ii) when a user views pre-designated content, like products for

20   sale (the "ViewContent" event);[52] (iii) when a user clicks a pre-designated button, like "Add to Cart"

21   and adds a product to their shopping cart (the "AddToCart" event, collectively with PageView event,

22   and ViewContent event, the "Pixel Events").[53] The Website utilizes all four Pixel Events.[54]

23      65.    Defendant uses the Facebook Pixel to monetize its Website users' sensitive information.

24   ───────────────

[49] *About Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last
visited Oct. 9, 2025).

25   [50] *See generally id.*

[51] *Specifications for Meta Pixel standard events*, FACEBOOK,

26   https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Oct. 9, 2025).

[52] *Reference: standard events*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/reference/ (last visited Oct. 9,

27   2025).

[53] *Id.*

28   [54] The presence of Pixel events can be confirmed by using the publicly available and free Meta Pixel Helper tool. *See About
the Meta Pixel Helper*, FACEBOOK,  https://www.facebook.com/business/help/198406697184603?id=1205376682832142
(last visited Oct. 9, 2025).

CLASS ACTION COMPLAINT

66.    Facebook independently benefits from the data collected through the Facebook Pixel by using the harvested data to sell targeted advertising services. Through the use of users' sensitive information, Facebook refines its marketing algorithms, profiting from the ability to more accurately target potential customers.

67.    Defendant's nefarious use of the Facebook Pixel on the Website is demonstrated by the screenshots below, which follow a user's journey to purchasing the sample product on the Website from *Figure 11*.



*Figure 15 – Facebook Pixel tracking a user landing on the webpage from Figure 11 through the "PageView" event*

CLASS ACTION COMPLAINT

*Figure 16 – Facebook Pixel tracking a user viewing the product from Figure 11 through the "ViewContent" event*

CLASS ACTION COMPLAINT



*Figure 17 – Facebook Pixel tracking a user adding the product from Figure 11 to their cart through the "AddToCart" event*

68.    When a business applies with Facebook to use the Facebook Pixel, it is provided with detail about its functionality, including with respect to private information.[55]

69.    To make use of the Facebook Pixel, Defendant agreed to Facebook's Business Tool Terms (the "Facebook Terms").

70.    The Facebook Terms informs website owners using Facebook's Pixel that the employment of the Pixel will result in data sharing, including with Facebook, through the automatic sharing of Pixel Event information and contact information.[56]

---

[55] *See Get Started*, META, https://developers.facebook.com/docs/meta-pixel/get-started (last visited Oct. 9, 2025) (The Pixel "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts. Once matched, we can their actions in the Facebook Ads Manager so you can use the data . . . . By default, the Pixel will track URLs visited [and] domains visited . . . .").

[56] *Meta Business Tools Terms*, FACEBOOK (Apr. 25, 2023), https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJII&_rdr (last visited Oct. 9, 2025).

CLASS ACTION COMPLAINT

71.    The Facebook Terms are transparent that Meta will use the Pixel Event information and contact information "to match the contact information against user IDs, as well as to combine those user IDs with corresponding [Pixel Event information]."[57]

72.    Facebook directs parties implementing the Facebook Pixel—here, Defendant—to encrypt request information[58] before data can be shared.[59]

73.    Facebook further provides Facebook Pixel users, such as Defendant, guidance on responsible data handling, and details how data is acquired, used, and stored, including which information is shared with Facebook.

74.    Facebook educates or reminds Facebook Pixel users of their responsibility to inform their users of their website's data sharing, and specifically guides website owners to obtain the requisite rights, permissions, or consents, before sharing information with any third-party.[60]

75.    As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Facebook Pixel, and ignored Facebook's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' private information.

### 3.   The Pinterest Tag

76.    Defendant has also installed a tracking pixel on its Website created by social media site, Pinterest (the "Pinterest Tag").

77.    The Pinterest Tag is a piece of code that can be added to a website by a website owner to track visitors on the website and record the actions they take, and later target these visitors with ads on Pinterest.[61]

---

[57] *Id.*
[58] This contrasts with Facebook's JavaScript Pixel, which automatically encrypts the data being sent. Defendant has specifically chosen the Facebook Pixel method which makes users' information visible. *See id.*
[59] *Id.*
[60] *Best practices for privacy and data use for Meta Business Tools*, META,
https://www.facebook.com/business/help/363303621411154?id=818859032317965 (last visited Oct. 9, 2025).
[61] *Install the Pinterest tag*, PINTEREST, https://help.pinterest.com/en/business/article/install-the-pinterest-tag (last visited Oct. 9, 2025).

78.    Once a website owner adds the base code of the Pinterest Tag, website owners can add "event codes" so the Pinterest Tag tracks specific actions that visitors take on their websites, such as viewing a page, viewing a video, checking out, and other specified events.[62]

79.    Website owners like Defendant then send the collected information to Pinterest. Pinterest recommends that website owners transmit the IP address of website visitors for all conversion events.[63]

80.    Without the implementation of any other features, the Pinterest Tag tracks and transmits the URL currently being viewed by the website visitor. Additionally, the Pinterest Tag reads and uses first-party cookies to identify the Pinterest user currently viewing the website through a personalized Pinterest "User ID," even when the user is logged out of Pinterest.[64]

81.    Website owners can also, in conjunction with the Pinterest Tag, enable a feature known as "automatic enhanced match" to determine the exact identity of Pinterest users who visit the website.[65]

82.    When used in conjunction with automatic enhanced match, the Pinterest Tag collects and transmits to Pinterest users':

a.    Emails;

b.    First and last names;

c.    Phone numbers;

d.    Genders;

e.    Birth dates;

f.    External IDs; and

g.    Cities, States, zip codes and countries.[66]

---

[62] *Add event* codes, PINTEREST, https://help.pinterest.com/en/business/article/add-event-codes (last visited October 09, 2025).
[63] *Track conversion events*, PINTEREST, https://developers.pinterest.com/docs/api-features/track-conversion-events/ (last visited Oct. 9, 2025).
[64] *View tag parameters and cookies*, PINTEREST, https://help.pinterest.com/en/business/article/pinterest-tag-parameters-and-cookies (last visited Oct. 9, 2025).
[65] *Enable automatic enhanced match*, PINTEREST, https://help.pinterest.com/en/business/article/automatic-enhanced-match (last visited Oct. 9, 2025).
[66] *Id.*

83.    This data can be used by Pinterest to "match more of [a] website['s] visitors and conversions to people on Pinterest, which can lead to improvements in [ad] campaign performance . . . and audience reach." [67]

84.    Pinterest uses this data to help advertisers like Defendant gauge the effectiveness of their ad campaigns, optimize the return on their ad spending, and broaden their audience reach.[68]

85.    Additionally, unless websites make use of a specific "limited data processing flag," Pinterest employs this data, such as names, phones numbers, emails and IP addresses, to conduct research on Pinterest usage and to market its own services.[69]

86.    Pinterest also sends the data to its business partners and other vendors.[70]

87.    Defendant's use of the Pinterest tag on the Website is demonstrated below:



*Figure 18 – Pinterest Tag tracking a user landing on the webpage for the sample product from Figure 11*



*Figure 19 - Pinterest Tag tracking a user adding the sample product from Figure 4 to their online shopping cart through the "addtocart" event*

---

[67] *Id.*
[68] *Id.*
[69] *Limited data processing*, PINTEREST, https://help.pinterest.com/en/business/article/limited-data-processing (last visited Oct. 9, 2025).
[70] *California Privacy Statement and Notice at Collection*, PINTEREST, https://policy.pinterest.com/en/notice-at-collection (last visited Oct. 9, 2025).

CLASS ACTION COMPLAINT

88.     When a website owner applies with Pinterest to use the Pinterest Tag, the website owner must agree to Pinterest's Developer and API Terms of Service (the "Pinterest Terms"), part of which requires agreeing that Pinterest may collect and use website users' information.[71]

89.     The Pinterest Terms further provides Pinterest Tag users, like Defendant, guidance on their responsibilities regarding privacy.

90.     Pinterest directs parties implementing the Pinterest Tag, such as Defendant, to clearly disclose its data practices and obtain its users' consent where required by law.[72]

91.     As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Pinterest Tag, and ignored Pinterest's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' private information.

### 4.   The Snap Pixel

92.     Defendant also installed code on the Website created by Snapchat that tracks Website visitors' actions, behavior, and conversions across the Website (the "Snap Pixel").

93.     To make use of the Snap Pixel, Defendant must create a Snapchat Ads manager account, create a pixel, select the information to be collected, follow specific guides for integration with third party software like Spotify or Google Tag Manager, and determine whether to enable automated matching for the Snap Pixel.[73]

94.     The Snap Pixel is a piece of JavaScript code provided by Snapchat that allows advertisers, such as Defendant, to track user actions and behavior on websites for the purpose of measuring ad performance, optimizing ad campaigns, and building targeted audiences for better advertising results.[74]

---

[71] *Developer and API Terms of Service*, PINTEREST, https://developers.pinterest.com/terms/ (last visited Oct. 9, 2025).
[72] *Id.*
[73] *Getting Started with Enabling the Pixel*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/pixel-website-install?language=en_US&r=692&ui-knowledge-components-aura-actions.KnowledgeArticleVersionCreateDraftFromOnlineAction.createDraftFromOnlineArticle=1 (last visited Oct. 9, 2025).
[74] *Using the Snap Pixel*, SNAPCHAT (July 11, 2023), https://forbusiness.snapchat.com/blog/the-snap-pixel-how-it-works-and-how-to-install-it; *see also Snapchat Pixels*, SPRINKLR, https://www.sprinklr.com/help/articles/snapchat-pixel/snapchat-pixels/640739d87517d84a3aaf2d26 (last visited Oct. 9, 2025); Marialuisa Aldeghi, *How to set up the Snap Pixel: A step-by-step guide*, LEADSBRIDGE (Dec. 18, 2024), https://leadsbridge.com/blog/snap-pixel/.

95.     This software may be automatically or manually added to a website's webpages, but in either case, the software must be added to each webpage being tracked.[75]

96.     Key features of the Snap Pixel include tracking user actions ("events") designated by advertisers, such as page views, add-to-cart actions, purchases, and sign-ups.[76] Advertisers, such as Defendant, can add additional parameters to these events for more granular insights, like purchase value or product type information.[77] The information is collected immediately as users land on the website where the pixel is installed.[78]

97.     The Snap Pixel also allows cross-device tracking, enabling tracking across multiple devices to provide a comprehensive view of a customer's journey.[79]

98.     The Snap Pixel collects:

    a.   The time the website actions occurred;[80]

    b.   Device information such as the hardware model, operating system, and browser type used;[81]

    c.   Cookies;[82]

    d.   Metadata such as button clicks, time spent on the site, conversations and page visits;[83] and

    e.   IP addresses for general geographic data.[84]

---

[75] *See Directly Implement the Pixel On Your Website*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/pixel-direct-implementation?language=en_US (last visited Oct. 9, 2025).

[76] *Pixel Event Examples*, SNAPCHAT, https://businesshelp.snapchat.com/s/topic/0TO8b000000P8xxGAC/pixel-event-examples?language=en_US (last visited Oct. 9, 2025).

[77] *Additional Parameters Example*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/additional-parameters?language=en_US (last visited Oct. 9, 2025).

[78] *Using the Snap Pixel*, SNAPCHAT (July 11, 2023), https://forbusiness.snapchat.com/blog/the-snap-pixel-how-it-works-and-how-to-install-it; *see also* Marialuisa Aldeghi, *How to set up the Snap Pixel: A step-by-step guide*, LEADSBRIDGE (Dec. 18, 2024), https://leadsbridge.com/blog/snap-pixel/.

[79] *About Snap Pixel*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/snap-pixel-about?language=en_US#:~:text=The%20Snap%20Pixel%20is%20a,to%20manage%20your%20privacy%20settings.

[80] *Snap Pixel: Power Your Ad Performance*, SNAPCHAT, https://forbusiness.snapchat.com/advertising/snap-pixel (last visited Oct. 9, 2025).

[81] *Privacy Policy*, SNAP (Apr. 21, 2025), https://values.snap.com/privacy/privacy-policy.

[82] *Cookie information*, SNAP (Apr. 8, 2025), https://www.snap.com/privacy/cookie-information.

[83] Ate Keurentjes, *How do you install the Snap Pixel via Google Tag Manager*, TAGGRS (Oct. 23, 2025), https://taggrs.io/en/snap-pixel/.

[84] *Directly Implement the Pixel On Your Website*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/pixel-direct-implementation?language=en_US (last visited Oct. 9, 2025); *see also Privacy Policy*, SNAP (Apr. 21, 2025), https://values.snap.com/privacy/privacy-policy; *Data Processing* Agreement, SNAP (July 25, 2025), https://www.snap.com/terms/data-processing-agreement.

CLASS ACTION COMPLAINT

99.    The Snap Pixel enables website owners, such as Defendant, to understand how users navigate to their site. This data helps Defendant refine their advertising strategies by identifying high-performing campaigns and optimizing ad spending.[85]

100.    The information the Snap Pixel collects provides Defendant with a better understanding of who its customers are, and how they navigate around the Website.

101.    Snap also independently benefits from non-customer list audience information.[86]

102.    The harvested data collected by the Snap Pixel is used by Defendant to create custom audiences.[87] Defendant can retarget users who viewed specific pages or made purchases and build lookalike audiences to reach new users with similar characteristics.[88]

103.    Put simply, the Snap Pixel collects as much data as it can about otherwise anonymous visitors to the Website and matches it with existing data Snapchat has acquired and accumulated about millions of Americans to improve Defendant's conversion rates and reduce overall advertising costs.

104.    Snap Pixel requires advertisers, such as Defendant, to integrate code into their website's header or use tools like Google Tag Manager for a seamless setup.[89] Advertisers, such as Defendant, are encouraged to use tools like Snap Pixel Helper to verify proper installation and ensure accurate event tracking and track user activity.[90]

105.    Defendant, through the Snap Pixel, uses data and cookies to track users and serve them relevant ads on Snapchat based on how they interacted with the Website.[91] The data received from Snapchat conversion tracking allows Defendant to serve highly targeted ad campaigns to the right people.[92]

106.    Using Snap Pixel helps Defendant collect important information about the people who buy from them so that Defendant, in turn, can benefit. Here are some of the biggest benefits:

---

[85] Marialuisa Aldeghi, *How to set up the Snap Pixel: A step-by-step guide*, LEADSBRIDGE (Dec. 18, 2024), https://leadsbridge.com/blog/snap-pixel/
[86] *See Privacy Policy, Section 2(g),* SNAP (Apr. 21, 2025), https://values.snap.com/privacy/privacy-policy.
[87] Marialuisa Aldeghi, *How to set up the Snap Pixel: A step-by-step guide*, LEADSBRIDGE (Dec. 18, 2024), https://leadsbridge.com/blog/snap-pixel/
[88] *Id.*
[89] *Id.*
[90] *Snap Pixel: Power Your Ad Performance*, SNAPCHAT, https://forbusiness.snapchat.com/advertising/snap-pixel (last visited Oct. 9, 2025).
[91] *Id.*
[92] *Id.*

CLASS ACTION COMPLAINT

1      a.  **Measure conversion events that matter**: See all the actions users take on the

2          Website, across all devices, and attribute conversions back to ad campaigns.

3      b.  **Reach the perfect audience**: Defendant can create custom audiences and

4          lookalike audiences based on the specific actions users have taken on the

5          Website.

6      c.  **Optimize advertising campaigns**: Use real-time insights to optimize delivery of

7          Defendant's campaigns for more effective results.[93]

8      107.  An image of the invasive Snap Pixel code secretly embedded on Defendant's Website

9   can be seen here:



*Figure 20 - Snap Pixel active on the Website*

18      108.  When the Snap Pixel triggers, it captures the relevant data and sends a transmission to

19   Snapchat's servers as depicted in the picture above, which shows Defendant's Snap Pixel instantly

20   sending communications to Snapchat as users take certain actions on the Website, like viewing a page.

21      109.  The Snap Pixel's functionality is not disclosed on the Website.

22      110.  By using the Snap Pixel and providing Snapchat with users' information, Defendant had

23   to agree to Snapchat's Personal Data Terms (the "Snap Terms"), among other agreements governing

24   the use of the Snap Pixel.

---

[93] *Benefits of Using the Snap Pixel*, SNAPCHAT, https://forbusiness.snapchat.com/blog/the-snap-pixel-how-it-works-and-how-to-install-it (last visited Oct. 9, 2025).

- 28 -

111.    By agreeing to the Snap Terms, Defendant represented and warranted that the personal data it shares with Snapchat will not contain any information about individuals under the age of 13 or any sensitive information or special category data.[94]

112.    The Snap Terms further requires Snap Pixel users, such as Defendant, of their responsibility to secure and maintain "all necessary rights, licenses and consents required to provide or make available the personal data" shared through the Snap Pixel.[95]

113.    As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from the use of the Snap Pixel, and ignored Snapchat's warnings to safely handle its users' data and to warn its users that the Website would disclose their information in a manner that threatened their private information.

### 5.  *The Twitter Pixel*

114.    X Corp. f/k/a Twitter ("Twitter") also offers its own website tag that can be implemented into websites to track users' site actions or conversions (the "Twitter Pixel").

115.    To make use of the Twitter Pixel, website owners, such as Defendant, must take several affirmative steps: They must generate the Twitter Pixel and create events to track, implement the Twitter Pixel base code across their website, and implement event code in key locations on their website, like when a user makes a purchase.[96]

116.    With each event, website owners like Defendant can select the user action they want to track and the parameters to share about the action.

117.    Events can include viewing a page, making a purchase, adding an item to the shopping cart, using the search bar, adding a product to the wish list, adding payment information, and customizing a product.[97]

---

[94] *Snap Business Tools Terms*, SNAP (Nov. 1, 2021), https://www.snap.com/terms/snap-business-tools.
[95] *Id.*
[96] *X Pixel*, X BUSINESS, https://business.x.com/en/help/campaign-measurement-and-analytics/conversion-tracking-for-websites (last visited Oct. 9, 2025).
[97] *Event Types and Parameters*, X BUSINESS, https://business.x.com/en/help/campaign-measurement-and-analytics/conversion-tracking-for-websites (last visited Oct. 9, 2025).

CLASS ACTION COMPLAINT

118.   Parameters can include the contents of the action, the search terms used on the website, the email address of the user taking the action, the value of the product purchased, and the currency the purchase was made in.[98]

119.   As soon as the Twitter Pixel is placed on a website, it begins to collect information, including the cookie IDs of users, to match them to Twitter users for the purpose of developing custom audiences to market and advertise to.[99]

120.   Twitter allows website owners, such as Defendant, to create "Website Activity Audiences," a type of custom audience, which enables Twitter to collect and analyze user activity for users who have visited or taken certain actions on Defendant's website. Once an audience is created and the Twitter Pixel collects 100 Twitter users, the audience will be ready to use for targeting in ad campaigns.[100]

121.   The data collected by the Twitter Pixel informs both Defendant and Twitter how best to optimize target custom audiences with advertising based on the geo, gender, age, and device criteria specified by Defendant.[101]

122.   An image of the invasive Twitter code secretly embedded on Defendant's Website can be seen here, which shows the Website instantly sending communications to Twitter to add to its collection of user behavior when a user visits the sample webpage in *Figure 11*:



*Figure 21 - Twitter Pixel active on the Website*

---

[98] *Id.*
[99] *Website Activity Custom Audiences*, X BUSINESS, https://business.x.com/en/help/campaign-setup/campaign-targeting/custom-audiences/website-activity (last visited Oct. 9, 2025).
[100] *Id.*
[101] *Id.*

CLASS ACTION COMPLAINT

123. To use the Twitter Pixel, Defendant agreed to Twitter's policies for conversion tracking and custom audiences (the "Twitter Terms").

124. The Twitter Terms are transparent that Twitter will process users' data to match contact details against corresponding accounts and subsequently match those accounts with the users' corresponding event data.[102]

125. Twitter obligates Twitter Pixel users, such as Defendant, that they "must provide their application customers with legally sufficient notice that they are working with third parties to collect customer data through their application for purposes of conversion tracking and serving ads targeted to customers' interests and obtain legally sufficient consent from their customers for these activities."[103]

126. Twitter makes clear that the onus is on Defendant to provide all necessary transparency notices, and obtain all necessary rights, permissions, and lawful bases, including consent, to share information with Twitter.

127. TikTok educates or reminds TikTok Pixel users of their obligation to be honest with their consumers and not to select "targeting criteria that could reveal sensitive information" about consumers.[104]

128. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Twitter Pixel, and ignored Twitter's warnings to safely handle its users' data and warn its users' that the Website would disclose their information in a manner that threatened their sensitive information.

### 6. *The Reddit Pixel*

129. Additionally, Defendant installed a tracking pixel on its Website created by social media platform, Reddit (the "Reddit Pixel").

---

[102] *Policies for conversion tracking and custom audiences*, X Business, https://business.x.com/en/help/ads-policies/campaign-considerations/policies-for-conversion-trackin… (last visited Oct. 9, 2025).
[103] *Id.*
[104] *Id.*

- 31 -

130.    The Reddit Pixel is a piece of code that can be added to a website by a website owner to track visitors on the website and record the actions the visitors take.[105] The harvested data is subsequently used by the website owner to serve targeted ads to website visitors on Reddit.

131.    The Reddit Pixel is also used in conjunction with Reddit's Conversion API to track specific actions that visitors take on the websites ("events"), such as viewing a page, submitting a search in the website's search bar, adding a product to the visitor's cart, checking out, and other specified events.[106]

132.    Website owners, like Defendant, can enable a feature of the Reddit Pixel known as "Auto-Advanced Matching" to determine the exact identity of Reddit users who visit the website.

133.    Auto-Advanced Matching automatically scrapes a website for any email addresses typed or inserted by a visitor and sends that email information to Reddit.[107]

134.    In addition to email addresses, a website owner can enable the Reddit Pixel and the Conversion API to send additional personal information to Reddit, known as "match keys," to identify website visitors.[108]

135.    IP addresses are match keys website owners are *required* to send to Reddit, while other match keys are optional, including:

       a.    Email addresses;

       b.    Phone numbers;

       c.    Mobile Advertising IDs (a unique identifier for a mobile user);

       d.    Reddit Click IDs (to attribute click conversions more accurately);

       e.    External IDs (an advertiser-assigned identifier that enhances match accuracy);

       f.    Reddit UUIDs (a unique ID generated by the Reddit Pixel);

---

[105] *About the Reddit Pixel*, REDDIT, https://business.reddithelp.com/s/article/reddit-pixel (last visited Apr. 9, 2025); *Install the Reddit Pixel Directly*, REDDIT, https://business.reddithelp.com/s/article/Install-the-Reddit-Pixel-on-your-website (last visited Apr. 9, 2025).
[106] *Conversion Events*, REDDIT, https://business.reddithelp.com/articles/Knowledge/supported-conversion-events (last visited Apr. 9, 2025).
[107] *Auto-Advanced Matching*, REDDIT, https://business.reddithelp.com/s/article/automated-advanced-matching (last visited Apr. 9, 2025).
[108] *About Match Keys*, REDDIT, https://business.reddithelp.com/s/article/about-match-keys#customer-match-keys-and-identifiers (last visited Apr. 9, 2025).

CLASS ACTION COMPLAINT

g.  User Agents (which identifies the software the user is using to access the website);
and

h.  The visitor's screen dimensions.[109]

136.  This data can be used by Reddit to match an otherwise anonymous website visitor to their Reddit account, or even to identify them outright, associating their identity with their activity on the website.

137.  Defendant's website code implicated the use of the advanced auto match feature, as depicted below:

```
16: [function(t, n, r) {
    "use strict";
    var i = t("./constants")
      , o = t("./helper")
      , u = t("./pageEventsListeners")
      , a = t("./automaticAdvancedMatching/index");
    n.exports = {
        getPixelConfig: function(t) {
            var n = "".concat(i.EVENT_CONFIG.EVENT_CONFIGS_URL, "/").concat(t, "/config")
              , r = new XMLHttpRequest;
            r.open("GET", n);
            var e = function() {
```

*Figure 22 - Advanced Auto Matching present in Defendant's Reddit Pixel code*

138.  Reddit uses this data to help advertisers, including Defendant, gauge the effectiveness of their ad campaigns, improve their ability to attribute activity to specific ad campaigns, track visitors across devices, and help them create more precisely targeted ad campaigns.[110]

139.  Additionally, Reddit employs this data to optimize their own ad placements and to develop new services.[111]

140.  Defendant's nefarious use of the Reddit Pixel on the Website is demonstrated by the screenshots below, which followed a user's journey to purchasing a product on the Website.

---

[109] *Id*
[110] *Id*.
[111] *Reddit Privacy Policy*, REDDIT (Aug. 16, 2024), https://www.reddit.com/policies/privacy-policy#policy-h2-4.

- 33 -

CLASS ACTION COMPLAINT



*Figure 23 – Reddit Pixel tracking a user visiting the webpage from Figure 11 through the "PageVisit" event*



*Figure 16 – Reddit Pixel tracking a user viewing the product from Figure 11 through the "ViewContent" event*

*Figure 17 – Reddit Pixel tracking a user adding the product from Figure 11 to their cart through the "AddToCart" event*

141.   To utilize the Reddit Pixel, Defendant agreed to Reddit's Business Tool Terms (the "Reddit Terms").

142.   The Reddit Terms informs website owners, such as Defendant, that the employment of the Reddit Pixel will result in data sharing, including with Reddit, of users' website actions, email addresses, cookie IDs, and device IDs, among other "matching parameters."[112]

---

[112] *Reddit Business Tool Terms*, REDDIT (Jan. 1, 2025), https://business.reddithelp.com/s/article/Reddit-Business-Tool-Terms.

CLASS ACTION COMPLAINT

143. The Reddit Terms make clear that the onus was on Defendant to provide all necessary transparency notices, and obtain all necessary rights, permissions, and lawful bases, including consent, to share information with Reddit.

144. The Reddit Terms explicitly conditions the use of the Reddit Pixel on website owners' warranties that they: (i) provide "prominent and legally-sufficient notice" of the Reddit Pixel's data sharing to users; (ii) provide "clear, prominent and legally sufficient instructions regarding how to opt out of data collection and use of such data collection and use;" and (iii) do not share "any data related to users who have not provided consent[.]"[113]

145. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Reddit Pixel, and ignored Reddit's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' private information.

**D. The Tracking Tools are Pen Registers or Trap and Trace Devices.**

146. California law defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

147. A "trap and trace device" is defined as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

148. The Tracking Tools are processes to record and identify the source of electronic communication by capturing incoming and outgoing electronic impulses and identifying dialing, routing, addressing, and signaling information generated by users, who are never informed that the website is collaborating with the Tracking Entities to obtain their phone number and other identifying information.

---

[113] *Id.*

149.    The Tracking Tools are "reasonably likely" to identify the source of incoming electronic impulses.  In fact, it is designed specifically for that purpose.

150.    Defendant did not obtain Plaintiff's express or implied consent to be subjected to data sharing with the Tracking Tools for the purposes of fingerprinting and de-anonymization.

151.    CIPA imposes civil liability and statutory penalties for the installation of pen register or trap and trace software without a court order. California Penal Code § 637.2; *see Greenley v. Kochava*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023).  No court order to install a pen register or trap and trace device via the Tracking Tools was obtained by Defendant.

152.    Defendant did not obtain Plaintiff's or Class Members' express or implied consent to be subjected to data collecting and data sharing with the Tracking Entities for the purposes of fingerprinting and de-anonymization, nor did Defendant obtain a court order.

**E.    To the extent the Tracking Tools do not legally qualify as Trap and Trace Devices, Defendant nonetheless facilitated the unauthorized interception of or access to the contents of Plaintiff's communications.**

153.    CIPA § 631(a) prohibits "three distinct and mutually independent patterns of conduct: (1) intentional wiretapping, (2) willfully attempting to learn the contents or meaning of a communication in transit over a wire, and (3) attempting to use or communicate information obtained as a result of engaging in either of the two previous activities." *Rodriguez v. Ford Motor Company*, 722 F. Supp. 3d 1104, 1113 (S.D. Cal. 2024) (citations omitted). Section 631(a)(iv) contains a fourth basis for liability for anyone "who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the other three bases for liability." *Id.*

154.    The analysis for a violation of CIPA is the same as that under the federal Wiretap Act. *Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020).

155.    The Ninth Circuit has held that the "contents" of an online communication under federal wiretap law "refers to the intended message conveyed by the communication, and does not include record information regarding the characteristics of the message that is generated in the course of the communication." *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014).

156.  Transmitted URLs that include both the path and the query string concern the intended message, or the substance of a communication. *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 796 (N.D. Cal. 2022).

157.  Here, the network requests intercepted by the Tracking Entities include Request URLs that include the names of the products users browse and/or purchase.

158.  The contents of Plaintiff's communications with Defendant were intercepted by the Tracking Entities while communicating with Defendant in real time. The Tracking Tools begin intercepting information to the Tracking Entities as soon as the Tracking Tools load onto users' browsers.[114] The Tracking Tools send information to the Tracking Tools contemporaneously with users submitting the information via their browsers.

159.  The interception, duplication, and sending to the Tracking Entities occurred inside Plaintiff's browser before reaching any destination, therefore occurring while in transit. *See Esparza v. UAG Escondido A1 Inc.*, Case No. 23cv0102 DMS(KSC), 2024 U.S. Dist. LEXIS 24429, at *9 (S.D. Cal. Feb. 12, 2024).

160.  The Tracking Entities were third parties to Plaintiff's communications with Defendant.

161.  Defendant's use of the Tracking Tools enabled the Tracking Entities to intercept Request URLs that specify the content users accessed on webpages on the Website in violation of CIPA.

162.  "[A] conversationalist is betrayed equally by a wiretapper and by the willing conversation participant who surreptitiously allows that third party to wiretap." *Yoon v. Lululemon USA, Inc.*, 549 F. Supp. 3d 1073, 1083 (C.D. Cal. 2021) (citing *Revitch v. New Moosejaw, LLC*, No., 2019 WL 5485440, at *2 (N.D. Cal. Oct. 23, 2019)).

163.  Defendant did not obtain Plaintiff's express or implied consent to allow the Tracking Entities to intercept the contents of their communications with the Website.

---

[114] *See* Aaron Katersky, *TikTok has your data even if you've never used the app: Report*, ABCNEWS (Mar. 16, 2023, 1:59 PM), https://abcnews.go.com/Business/tiktok-data-app-report/story?id=97913249#:~:text=Webpages%20associated%20with%20everything%20from,consent%2C%20the%20Feroot%20report%20said; Mario Neto, *What is the Facebook Pixel – Different ways to collect data to boost your ads performance*, BIRCH BLOG (May 13, 2025), https://bir.ch/blog/what-is-the-facebook-pixel#:~:text=Putting%20it%20simply%2C%20the%20Meta,all%20from%20a%20single%20snippet; *Pinterest tag*, PINTEREST, https://developers.pinterest.com/docs/api-features/pinterest-tag/#:~:text=The%20Pinterest%20Tag%20allows%20you,Pinterest%20Tag%20has%20two%20components: (last visited Oct. 9, 2025).

164.    Section 631(a) requires the prior consent of all parties to the communication. *Javier v. Assurance IQ, LLC*, No. 21-16351, 2022 WL 1744107, at *2 (9th Cir. May 31, 2022).

165.    Investigation by Plaintiff's Counsel revealed that the Website's cookie settings were set to allow tracking by default. Therefore, unbeknownst to users, users are being tracked as soon as they land on the Website home page.

166.    Plaintiff visited the Website while its default settings were set by Defendant to track users before obtaining prior consent.

167.    Defendant and the Tracking Entities benefitted from the interception of Plaintiff's communications by reading and subsequently using the intercepted communications to build detailed profiles based on Plaintiff's browsing habits, and using that profile to target Plaintiff with advertising.[115]

168.    The Tracking Entities independently benefit from the interception of Plaintiff's communications by using data collected by the Tracking Tools to improve their own products and advertising services, and marketing those advertising capabilities to other potential businesses seeking to market to users, including Plaintiff.[116]

## **CLASS ALLEGATIONS**

169.    Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

> **All California citizens who visited Defendant's Website while physically in California and whose personal information was shared with the Tracking Entities or other third parties by Defendant without effective and informed prior consent.**

170.    Specifically excluded from the Class is Defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related

---

[115] *See About Advanced Matching for Web*, TikTok, https://ads.tiktok.com/help/article/advanced-matching-web?lang=en (last visited Oct. 9, 2025); *Meta Pixel*, Facebook, https://www.facebook.com/business/tools/meta-pixel (last visited Oct. 9, 2025); *Enable automatic enhanced match*, Pinterest, https://help.pinterest.com/en/business/article/automatic-enhanced-match (last visited Oct. 9, 2025).
[116] *See, e.g., TikTok Business Products (Data) Terms*, TikTok (July 29, 2024), http://ads.tiktok.com/i18n/official/policy/business-products-terms; *Meta Business Tools Terms*, Facebook (Apr. 25, 2023), https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJII&_rdr.

- 38 -

to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

171.    Plaintiff reserves the right to amend the Class definition above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

172.    <u>NUMEROSITY</u>: At this time, Plaintiff does not know the number of Class Members but believes the number to be at least fifty given the popularity of Defendant's Website. The number of persons within the Class is believed to be so numerous that joinder of all members is impractical.  The exact identities of Class Members may be ascertained by the records maintained by Defendant.

173.    <u>COMMONALITY</u>: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class.  Such common legal and factual questions, which do not vary between Class Members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

        a.      Whether Defendant shared Class Members' personal information with the Tracking Entities or other third parties;

        b.      Whether Defendant obtain effective and informed consent to do so;

        c.      Whether Class Members are entitled to statutory penalties; and

        d.      Whether Class Members are entitled to injunctive relief.

174.    <u>TYPICALITY</u>: As a person who visited Defendant's Website and whose personal information was shared by Defendant, Plaintiff is asserting claims that are typical of the Class.

175.    <u>ADEQUACY</u>: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in the class action litigation.  All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

176.    <u>SUPERIORITY</u>: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would

proceed. If Class treatment of these claims is not available, Defendant will likely continue their wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Violation of the California Invasion of Privacy Act

### Cal. Penal Code § 631

177.   Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

178.   Plaintiff brings this cause of action on behalf of herself and all Class Members.

179.   CIPA was enacted to curb "the invasion of privacy resulting from the continual and increasing use of" certain technologies determined to pose "a serious threat to the free exercise of personal liberties."   CIPA extends civil liability for various means of surveillance using technology.

180.   CIPA provides that a person is liable to another where, "by means of any machine, instrument, contrivance, or in any other manner," committed any of the following: (i) intentionally tapped, or made any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, cable, or instrument of any internal telephonic communication system; or (ii) willfully and without consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state; or (iii) uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or (iv) aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit or cause to be done any of the acts or things mentioned above in this section.   Cal. Penal Code § 631(a).

181.   The Ninth Circuit has confirmed that one of the purposes of wiretapping statutes is to "prevent the acquisition of the contents of a message by an unauthorized third-party . . . ."   *In re*

*Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020). In dealing specifically with CIPA, the California Supreme Court has similarly concluded that the objective of CIPA is to protect a person's communications "from a situation where the other person on the other end of the line permits an outsider" to monitor the communication. Ribas v. Clark, 38 Cal. 3d 355, 364 (1985); *see Smith v. LoanMe*, 11 Cal. 5th 183, 200 (2021).

182. The Website, including the Tracking Tools placed upon it, is a "machine, instrument, contrivance, or . . . other manner" used to engage in the prohibited conduct at issue here.

183. Within the relevant time period, Defendant, without the consent of all parties to the communication, or in any unauthorized manner, willfully read or attempted to read or learn the contents or meaning of electronic communications of Plaintiff and Class Members, contemporaneous with the communications transit through or passing over any wire, line or cable or with the communications sending from or being received at any place within California.

184. The information collected by the Tracking Tools, including the TikTok Pixel, was not for the sole benefit of Defendant.

185. Within the relevant time period, Defendant aided, agreed with, conspired with, and employed the Tracking Entities to implement the Tracking Tools and to violate CIPA § 631.

186. Within the relevant time period, Defendant aided, agreed with, conspired with, and employed the Tracking Entities, including the TikTok Pixel, to accomplish the wrongful conduct at issue here.

187. Plaintiff and Class Members did not authorize or consent to the tracking, interception, and collection of any of their electronic communications.

188. The violation of section 631 constitutes an invasion of privacy sufficient to confer Article III standing.

## SECOND CAUSE OF ACTION

### Violation of the California Invasion of Privacy Act

### Cal. Penal Code § 638.51

189. Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

190. Plaintiff brings this cause of action on behalf of herself and all Class Members.

191.   California's Pen Register and Trap and Trace Law is part of the California Invasion of Privacy Act ("CIPA") codified at Cal. Penal Code 630, et seq.

192.   A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." California Penal Code § 638.50(b).

193.   A "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."   California Penal Code § 638.50(c).

194.   "Process" includes "software that identifies consumers, gathers data, and correlates that data through unique 'fingerprinting.'" Greenley v. Kochava, Inc., 684 F.Supp.3d 1024, 1050 (S.D. Cal. 2023).

195.   California Penal Code § 638.51 provides that "a person may not install or use a pen register or a trap and trace device without first obtaining a court order…" § 638.51(a).  No court order to install trap and trace devices via the Tracking Tools was obtained by Defendant.

196.   Defendant uses pen register and trap and trace processes on its Website by deploying the Tracking Tools on its Website, because the Tracking Tools are designed to capture the phone number, email, routing, addressing and other signaling information of website visitors. The Tracking Tools identify the source of the incoming electronic and wire communications to the Website.

197.   Defendant was not authorized by any court order to use trap and trace devices to track Plaintiff's and Class Members' activity on the Website.

198.   Defendant did not obtain consent from Plaintiff and Class Members before using pen register or trap and trace technology to identify users of its Website, and has violated Section 638.51.

199.   As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members suffered losses and were damaged in an amount to be determined at trial.

200.   CIPA imposes civil liability and statutory penalties for violations of § 638.51.

201.   Therefore, Plaintiff and Class Members are entitled to the relief set forth below.

## **PRAYER**

WHEREFORE, Plaintiff prays for the following relief against Defendant:

202.   An order certifying the class and making all appropriate class management orders;

203.   Statutory damages pursuant to CIPA;

204.   Reasonable attorneys' fees and costs; and

205.   All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

## **PLAINTIFF HEREBY REQUESTS A TRIAL BY JURY**

Dated:  October 20, 2025                **LAW OFFICES OF TODD M. FRIEDMAN, P.C.**

By:   *Todd M. Friedman*
_____
Todd M. Friedman, Esq.

Mark S. Reich*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 17th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com

*Counsel for Plaintiffs*

*\*pro hac vice* forthcoming

- 43 -

# Exhibit B

1  **DUANE MORRIS LLP**
   Gerald L. Maatman, Jr. (*pro hac vice* forthcoming)
2  GMaatman@duanemorris.com
   Justin R. Donoho (*pro hac vice* forthcoming)
3  JRDonoho@duanemorris.com
   Hayley H. Ryan (*pro hac vice* forthcoming)
4  HHRyan@duanemorris.com
   190 South LaSalle Street, Suite 3700
5  Chicago, IL 60603-3433
   Telephone:  +1 312 499 6700
6  Fax:        +1 312 499 6701

7  **DUANE MORRIS LLP**
   Jennifer A. Riley (SBN 360545)
8  JARiley@duanemorris.com
   865 South Figueroa Street, Suite 3100
9  Los Angeles, California 90017-5450
   Telephone:  +1 213 689 7400
10 Facsimile:  +1 213 689 7401

11 Attorneys for Defendant
   WAYFAIR LLC
12

13

14              **UNITED STATES DISTRICT COURT**

15      **CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

16

17 JOSEPH LIMAS, individually and on          Case No.
   behalf of all others similarly situated,
18                                             **DECLARATION OF SAMANTHA**
              Plaintiff,                       **FOWLER IN SUPPORT OF**
19                                             **DEFENDANT WAYFAIR LLC'S**
          v.                                   **NOTICE OF REMOVAL OF**
20                                             **CIVIL ACTION TO THE**
   WAYFAIR LLC, and DOES 1 to 20,              **UNITED STATES DISTRICT**
21 inclusive,                                  **COURT**

22              Defendants.                    [Removed from Los Angeles
                                               Superior Court, Case No.
23                                             25STCV30609]

24                                             [Filed concurrently with Notice of
                                               Removal, Notice of Interested
25                                             Parties, and Corporate Disclosure
                                               Statement]
26
                                               Complaint Filed: October 20, 2025
27

28

## <u>DECLARATION OF SAMANTHA FOWLER</u>

I, Samantha Fowler declare:

1.    I am over the age of eighteen years. I have personal knowledge of the facts set forth herein and am competent to testify thereto.

2.    I make this declaration in support of Defendant Wayfair LLC's ("Wayfair") Notice of Removal of Civil Action to the U.S. District Court in the above-captioned matter.

3.    I am a Counsel at Wayfair. I have held this position since 2023.

4.    In my position, I have regular access to the records regarding Wayfair's websites, including records showing the number of online orders received from customers with California billing addresses. These records are kept in the ordinary course of business. Also, in my position, I am familiar with the corporate and organizational structure as well as the operations of Wayfair.

5.    Wayfair is now, and since this action commenced has been, a limited liability company formed under the laws of the State of Delaware.

6.    Prior to the filing of this action, and continuing through present, Wayfair's headquarters has been located at 4 Copley Place, Boston, Massachusetts 02116.

7.    Wayfair's business is directed and coordinated from Boston, Massachusetts. Wayfair's corporate executives, including its senior leadership team, are located in and work out of Boston, Massachusetts.  They have maintained and continue to maintain their offices in Boston, Massachusetts, and they have performed and continue to perform their primary duties and job functions in Massachusetts.

8.    On October 22, 2025, Wayfair was served with a copy of the Summons, Complaint, Civil Case Cover Sheet, Notice of Case Assignment, and Alternative

Dispute Resolution Packet.  True and correct copies of the documents that were served on Wayfair are attached hereto as **Exhibit 1.**

9.    It is my understanding that the relevant time period alleged in Plaintiff's Complaint is October 20, 2024, to the present.  To determine the total number of online orders Wayfair received from customers with billing addresses in California since October 20, 2024, our Customer Identity team retrieved information from Wayfair's online order records for the period of time from October 20, 2024, to November 18, 2025.

10.    Based on my review of the data retrieved, and to the best of my knowledge, there were approximately 1,847,758 orders made online via Wayfair's website by unique customers with California billing addresses from October 20, 2024, to November 18, 2025.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 20, 2025, at 4 Copley Place, Suite 7000, Boston, Massachusetts.

_Samantha Fowler_

# Exhibit 1

**Wolters Kluwer**

**CT Corporation**
**Service of Process Notification**
10/22/2025
CT Log Number 550437157

## Service of Process Transmittal Summary

**TO:**   Michael Licker, Litigation & Investigations Head
Wayfair LLC
4 COPLEY PLACE, STE 7000
BOSTON, MA 02116-6513

**RE:**   **Process Served in California**

**FOR:**   Wayfair LLC  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | JOSEPH LIMAS, individually and on behalf of all others similarly situated vs. WAYFAIR LLC |
| **CASE #:** | 25STCV30609 |
| **PROCESS SERVED ON:** | C T Corporation System, GLENDALE, CA |
| **DATE/METHOD OF SERVICE:** | By Process Server on 10/22/2025 at 10:41 |
| **JURISDICTION SERVED:** | California |
| **ACTION ITEMS:** | CT will retain the current log |
| | Image SOP |
| | Email Notification,  Michael Licker  mlicker1@wayfair.com |
| | Email Notification,  Susan Tvrdy  stvrdy@wayfair.com |
| | Email Notification,  Legal Team  legal@wayfair.com |
| | Email Notification,  Samantha Fowler  sfowler1@wayfair.com |
| | Email Notification,  Laura Gradel  lgradel@wayfair.com |
| | Email Notification,  Brianna Bongiovanni  bbongiovanni@wayfair.com |
| **REGISTERED AGENT CONTACT:** | C T Corporation System |
| | 330 N BRAND BLVD |
| | STE 700 |
| | GLENDALE, CA 91203 |
| | 866-401-8252 |
| | LargeCorporationTeam@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.



# PROCESS SERVER DELIVERY DETAILS

**Date:**                          Wed, Oct 22, 2025
**Server Name:**                   Jim Sands

| Entity Served | WAYFAIR LLC |
|---|---|
| Case Number | 25STCV30609 |
| Jurisdiction | CA |

| Inserts |
|---|
|  |



**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

| | |
|---|---|
| **NOTICE TO DEFENDANT:**<br>*(AVISO AL DEMANDADO):*<br><br>WAYFAIR LLC, and DOES 1 to 20, inclusive<br><br><br>**YOU ARE BEING SUED BY PLAINTIFF:**<br>*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*<br><br>JOSEPH LIMAS, individually and on behalf of all others similarly situated | **FOR COURT USE ONLY**<br>*(SOLO PARA USO DE LA CORTE)*<br><br>**Electronically FILED by<br>Superior Court of California,<br>County of Los Angeles<br>10/20/2025 2:46 PM<br>David W. Slayton,<br>Executive Officer/Clerk of Court,<br>By M. Aguirre, Deputy Clerk** |

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es:)*  Stanley Mosk Courthouse<br><br>111 North Hill Street<br>Los Angeles, CA 90012 | **CASE NUMBER:**<br>*(Número del Caso:)*<br><br>25STCV30609 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es:)*
Todd M. Friedman, Adrian R Bacon, 23586 Calabasas Rd., Suite 105, Calabasas, CA 91302, 323-306-4234

| | | |
|---|---|---|
| DATE: 10/20/2025<br>*(Fecha)* | Clerk, by  David W. Slayton, Executive Officer/Clerk of Court<br>*(Secretario)*     M. Aguirre | , Deputy<br>*(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):*   **Wayfair LLC**

under: ☐ CCP 416.10 (corporation)     ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
☒ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

**Page 1 of 1**

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>www.courtinfo.ca.gov<br><br>American LegalNet, Inc.<br>www.FormsWorkflow.com |

Todd M. Friedman (216752)
Adrian R. Bacon (280332)
Law Offices of Todd M. Friedman, P.C.
23586 Calabasas Rd., Suite 105
Calabasas, CA 91302
Phone: 323-306-4234
tfriedman@toddflaw.com
abacon@toddflaw.com
Attorneys for Plaintiff

**Electronically FILED by**
**Superior Court of California,**
**County of Los Angeles**
**10/20/2025 2:46 PM**
**David W. Slayton,**
**Executive Officer/Clerk of Court,**
**By M. Aguirre, Deputy Clerk**

## SUPERIOR COURT FOR THE STATE OF CALIFORNIA
## COUNTY OF LOS ANGELES
## UNLIMITED JURISDICTION

| | |
|---|---|
| JOSEPH LIMAS, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>WAYFAIR LLC, and DOES 1 to 20, inclusive,<br><br>Defendant. | Case No.  25STCV30609<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF CALIFORNIA INVASION OF PRIVACY ACT**<br><br>(Amount to Exceed $35,000) |

**INTRODUCTION**

In argument before the United States Supreme Court on January 10th, 2025, America's Solicitor General called social media app TikTok a *"grave threat to our nation."*[1] Justice Kavanaugh went further, saying, "Just on the data collection, that seems like a huge concern for the future of the country[.]"[2]

TikTok's—and other social media giants'—ability to collect personal information from everyday Americans requires the active assistance of companies like Wayfair LLC ("Wayfair" or "Defendant"). Defendant created an online presence at **https://www.wayfair.com/** (the "Website"). Unbeknownst to its customers, Defendant begins tracking customers' journeys on the Website as soon as they land on any of its webpages through its use of various tracking pixels (the "Tracking Tools"), including those developed by TikTok, Facebook, Pinterest, Snapchat, Twitter, and Reddit (the "Tracking Entities"). Defendant tracks its customers' journeys across the web, eavesdropping on their conversations, and bombarding them with targeted advertising through its use of Tracking Tools. The California Legislature has made clear that this secret, invasive surveillance violates California law.

Joseph Limas ("Plaintiff") visited the Website, as recently as May 2025, to search for furniture, home decor, appliances, and other home goods. Defendant de-anonymized Plaintiff by using electronic impulses generated from Plaintiff's device and helped the Tracking Entities track and eavesdrop on Plaintiff's personal life. Defendant violated and continues to violate the California's Invasion of Privacy Act, codified at California Penal Code §§ 631, *et seq.* Plaintiff brings this class action on behalf of similarly situated users of the Website and was surveilled as a result of Defendant's implementation of the Tracking Tools on the Website.

**JURISDICTION AND VENUE**

1.    As a Court of general jurisdiction, this Court has jurisdiction over all matters presented to it per the mandates of the California Constitution.

2.    Venue is proper in this County because some of the Class Members' claims arose in this county.

---

[1] Zach Schonfeld & Julia Shapero, *TikTok Gets Frosty Reception At Supreme Court In Fight To Stave Off Ban*, THE HILL (Jan. 10, 2025 1:42 PM), https://thehill.com/regulation/court-battles/5079608-supreme-court-tik-tok-ban/ (last visited Oct. 9, 2025).
[2] *Id.*

3.     Defendant is subject to jurisdiction under California's "long-arm" statute found at California Code of Civil Procedure Section 410.10 because the exercise of jurisdiction over Defendant is not "inconsistent with the Constitution of this state or the United States."

## PARTIES

4.     Plaintiff Joseph Limas is a resident and citizen of California. Plaintiff is genuinely interested in the goods, services, and information on Defendant's Website. Plaintiff used Defendant's Website for its intended purpose of browsing for furniture, home decor, appliances, and other home goods. For example, Plaintiff recently used the Website to search for furniture, home decor, lighting fixtures, bedding & bath accessories, outdoor furniture, storage and organization products, and appliances. Plaintiff accessed the Website on the same devices and same browser he accessed TikTok, Facebook, Pinterest, Snapchat, Twitter, and Reddit. Plaintiff was in California at all relevant times while using Defendant's Website. Plaintiff's personal information was thus shared with TikTok and other third-party social media companies as a result of Defendant's implementation of Tracking Tools on the Website.

5.     Defendant Wayfair LLC is in the business of selling furniture, home decor, appliances, and other home goods. Defendant operates the Website. It serves as an online marketplace offering millions of products from thousands of suppliers, enabling customers to find items for every part of their home, from the kitchen and living room to outdoor spaces to consumers across the United States. Defendant is a limited liability corporation formed in Delaware and headquartered in Boston, Massachusetts.

## FACTUAL ALLEGATIONS

**A. Legislative Background: The California Invasion of Privacy Act (CIPA)**

6.     The California Invasion of Privacy Act ("CIPA") was enacted in 1967 for the expressly stated purpose "to protect the right of privacy of the people of [California]."[3]

7.     California legislators were concerned about emergent technologies that allowed for the "eavesdropping upon private communications," believing such technologies "created a serious threat to the free exercise of personal liabilities and cannot be tolerated in a free and civilized society."[4]

---

[3] Cal. Penal Code § 630.
[4] *Id.*

8.    To protect people's privacy, California legislators broadly protected communications being sent from or received in California through the enactment of CIPA.[5] Indeed, CIPA "is a declaration of legislative finding and intent; it speaks of preventing eavesdropping and other invasions of privacy . . . ."

9.    Section 638 of CIPA prohibits the installation or use of "a pen register or a trap and trace device without first obtaining a court order . . . ."[6]

10.    "Pen register" is defined as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."[7]

11.    "Trap and trace device" is defined as a "device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."[8]

12.    Given CIPA's purpose to protect Californians' privacy, "it seems very unlikely that the state Legislature meant to permit the installation and implementation of pen registers 'so long as those devices also record the contents of third party's communications." *Gabrielli v. Haleon US Inc.*, No. 25-cv-02555-WHO, 2025 U.S. Dist. LEXIS 169503, at *34 (N.D. Cal. Aug. 29, 2025).

13.    Defendant was not authorized by any court order to use Tracking Tools, including the TikTok Pixel, to record and capture Plaintiff's and Class Members' communications with the Website in violation of CIPA § 638.

**B. How Websites Function**

14.    Websites are hosted on servers, in the sense that their files are stored on and accessed from servers. Websites are, in part, "run" on a user's internet browser, as the browser loads and processes the website's code to display the webpage.

---

[5] Cal. Penal Code §§ 631-32.
[6] Cal. Penal Code § 638.51.
[7] *Id.* § 638.50(b).
[8] *Id.* § 638.50(c).

CLASS ACTION COMPLAINT

15. Websites are a collection of webpages. A webpage is essentially a document containing text written in HyperText Markup Language (HTML) code.[9]

16. Each webpage has a unique address, and two webpages cannot be stored at the same address.[10]

17. When a user navigates to a webpage (by entering a URL address directly or clicking a hyperlink containing the address), that user's browser contacts the DNS (Domain Name System) server, which translates the web address of that website into a unique IP (Internet Protocol) address.[11]

18. An IP address is "a unique address that identifies a device on the internet or a local network."[12] Essentially, an IP address is:

> The identifier that allows information to be sent between devices on a network: they contain location information and make devices accessible for communication. The internet needs a way to differentiate between different computers, routers, and websites. IP addresses provide a way of doing so and form an essential part of how the internet works. *Id.*

19. When a user's browser navigates to a webpage, it sends an HTTP request to the server identified by the webpage's IP address (the "Request URL"). This request is for the specific resource located at the URL. If the server fulfils this request, it issues an HTTP response, which includes the status of the request and, typically, the requested content. This content is then transmitted in small chunks, known as data packets, and reassembled into the complete webpage upon arrival by the user's browser.[13]

20. This Request URL includes a domain name and path, which identify the specific content being accessed on a website and its location within the website's structure.

---

[9] *What is the difference between webpage, website, web server, and search engine?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/Web_mechanics/Pages_sites_servers_and_search_engines (last visited Oct. 9, 2025).
[10] *Id.*
[11] *How the web works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited Oct. 9, 2025).
[12] *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited Oct. 9, 2025).
[13] *Id.*

21.    The Request URL typically contains parameters. Parameters are values added to a URL to transmit data to the recipient, prefaced by a question mark to signal the use of parameters. Parameters direct a web server to provide additional context-sensitive services,[14] as depicted below:



*Figure 1 - Mozilla's diagram of a URL, including parameters[15]*

22.    Website owners or web developers write and manage the URLs for their websites.

23.    URL encoding is an essential process to ensure that data is safely transmitted via URLs. URL encoding converts characters into a format that can be transmitted over the Internet.[16] For example, URLs cannot contain spaces; URL encoding normally replaces a space with a plus (+) sign or with %20.

24.    The American Standard Code for Information Interchange (ASCII) was designed in the early 1960s as a standard character set for computers and electronic devices.[17] Today, UTF-8 is the Internet's most common character encoding.[18]

25.    URL decoding is the process of URL encoding in reverse so that the URL is in a more readable format.[19] To demonstrate:



*Figure 22 – Demonstrating URL encoding and decoding[20]*

---

[14] To see examples of how Defendant used parameters to provide additional information here, *see, infra,* Section C(2).
[15] *What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Oct. 9, 2025).
[16] *Id.*
[17] *HTML ASCII Reference*, W3 SCHOOLS, https://www.w3schools.com/charsets/ref_html_ascii.asp (last visited Oct. 9, 2025).
[18] *UFT-8*, MOZILLA, https://developer.mozilla.org/en-US/docs/Glossary/UTF-8 (last visited Oct. 9, 2025).
[19] *What IS URL Decoding and URL Encoding?*, GOCHYU (Oct. 18, 2020), https://gochyu.com/blog/url-encode-decode (last visited Oct. 9, 2025).
[20] Viraj Shetty, *URL Encoding in a few minutes*, YOUTUBE (Sept. 5, 2023), https://www.youtube.com/watch?v=ru0iCHsmsLc (last visited Oct. 9, 2025).

26.    Similarly, parameters and metadata can be parsed and separated into easily reviewed, searchable formats.



Figure 33 – Sample webpage used to demonstrate a webpage URL.

Figure 44 – Request URL of sample webpage from Figure 3, encoded for transmission (compare with decoded URL in Figure 3)

CLASS ACTION COMPLAINT

*Figure 55 – Decoded, parsed data from Request URL in Figure 4, showing easy-to-read parameters and metadata*

27.     After sending the Request URL, and after the server responds to the Request URL, the user's browser assembles the packets sent by the server back into the HTML code that of the webpage, which is then processed by the user's browser and "rendered" into a visual display according to the instructions of the HTML code.[21] This is the visible, and usually interactable, website that most people think of.

28.     To provide more complex website functionalities, website developers will include more complex commands written in other computer programming languages such as JavaScript snippets within the HTML documents.[22]

29.     In short, the Internet relies on a constant back and forth stream of requests.

30.     Unbeknownst to users, as they browse the Website, the Tracking Tools capture and record both incoming and outgoing requests that make up their experience on the Website.

**C. Defendant's Website and the Tracking Tools Spy on Consumers Like Plaintiff.**

31.     Defendant operates the Website and has installed on the Website software created by third-party social media companies. These Tracking Tools operate invisibly, tracking Defendant's site visitors' activity surreptitiously.

---

[21] *What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Oct. 9, 2025).
[22] *See JavaScript Basics*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited Oct. 9, 2025).

CLASS ACTION COMPLAINT

32. Generally, the Tracking Tools collect information about users' site activity when events specified by Defendant—like adding a product to the shopping cart—are triggered. Parameters added to events by Defendant determine just how much data is collected, and how specific that data is.

33. Parameters are strings of text that website owners add to a URL to track and organize their webpages.[23] URL parameters include key-value pairs formatted as "key=value":

    a. The "key" is what the website owner wants to adjust or track (e.g., "color" or "ev" for event)

    b. The "value" is the specific setting or data for that parameter (e.g., "yellow" or "AddToCart" for a user taking the action of adding a product to their online shopping cart)



Figure 6 - Diagram of a URL displaying how parameters function[24]

34. For instance, the Facebook Pixel (discussed and defined herein) transmission below shows that Defendant added a parameter to track events being triggered ("ev") and the event triggered here was the "AddToCart" event (*see* Section C(2)), among other parameters.

---

[23] *URL Parameters: What They Are and How to Use Them Properly*, BACKLINKO (Mar. 13, 2025), https://backlinko.com/url-parameters (last visited Oct. 9, 2025).
[24] *Id.*

- 9 -

*Figure 7 - Facebook Pixel transmission displaying event parameter being collected and disclosed to Facebook*

### 1. The TikTok Pixel

35.     TikTok offers software – known as a "tracking pixel" – to track users' actions, behavior, and conversions across the Website (the "TikTok Pixel").

36.     The TikTok Pixel is a snippet of code that begins to collect information the moment a user lands on the Website.

37.     The TikTok Pixel shares information when an action is taken on the Website, based on events set up by Defendant.[25] These events can include adding an item to a cart, making a purchase, when a specific button or element is clicked (like the search field), and when a URL with a specified keyword is visited.[26]

38.     TikTok Pixel users, including Defendant, add parameters to events to collect even more data on users' activities, including parameters for the currency used for the purchase, the value of the purchase, and the type of content purchased.[27]

39.     The TikTok Pixel also collects:

   a.   The time website actions took place;

   b.   The IP address (which is used to determine the geographic location of an event);

   c.   Device information, including make, model, operating system, and browser information);

   d.   Cookies that can be used to identify users; and

---

[25] *About TikTok Pixel*, TikTok, https://ads.tiktok.com/help/article/tiktok-pixel (last visited Oct. 9, 2025).

[26] *About Standard and Custom events*, TikTok, https://ads.tiktok.com/help/article/standard-events-parameters?lang=en (last visited Oct. 9, 2025) (describing standard "events"); *How to Set Up Events and Parameters with Events Builder*, TikTok, https://ads.tiktok.com/help/article/how-to-set-up-events-and-parameters (last visited Oct. 9, 2025) (describing how to designate events).

[27] *How to Set Up Events and Parameters with Events Builder*, TikTok, https://ads.tiktok.com/help/article/how-to-set-up-events-and-parameters (last visited Oct. 9, 2025) (describing how to designate events).

- 10 -

CLASS ACTION COMPLAINT

e.  Metadata and button clicks.[28]

40.    The information the TikTok Pixel collects provides Defendant with a better understanding of who its customers are and how they navigate around the Website.

41.    TikTok's "Advanced Matching" features allows Defendant to "match customer information such as email and phone number along with actions people take on [the Website]."[29] Once Advanced Matching is active, the TikTok Pixel "will automatically find customer information and match it with people on TikTok."[30] TikTok then provides Defendant with custom audiences based on website visitor events, like page views or purchases, to model lookalike audiences.[31] Lookalike audiences allow Defendant to retarget users who have already visited or made purchases on the Website and serve them with relevant ads on TikTok based on how they interacted with the Website.[32]

42.    Put simply, the TikTok Pixel collects as much data as it can about otherwise anonymous visitors to the Website and matches it with existing data TikTok has acquired and accumulated about hundreds of millions of Americans to improve Defendant's conversion rates and reduce overall advertising costs.[33]

43.    Using the TikTok Pixel benefits Defendant by allowing Defendant to effectively track conversions, optimize the delivery of its ad campaigns, create and target its own custom audiences, and access tons of data to run successful ad campaigns.[34]

44.    TikTok benefits, in turn, by using data collected by the TikTok Pixel to improve their own products and services and to generate their own benchmarking reports to share with other TikTok customers.[35]

---

[28] *About TikTok Pixel*, TikTok, https://ads.tiktok.com/help/article/tiktok-pixel (Sept. 25, 2025).

[29] *About Advanced Matching for Web*, TikTok, https://ads.tiktok.com/help/article/advanced-matching-web?lang=en (last visited Oct. 9, 2025).

[30] *How to set up Automatic Advanced Matching*, TikTok, https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en (last visited Oct. 9, 2025).

[31] *Get started with the TikTok Pixel: a small business guide*, TikTok (Sept. 6, 2024), https://ads.tiktok.com/business/en-US/blog/get-started-with-tiktok-pixel (last visited Oct. 9, 2025) (benefits of using the TikTok Pixel).

[32] *See How to use TikTok Pixel: TikTok conversions tracking*, LeadsBridge (May 2, 2025), https://leadsbridge.com/blog/tiktok-pixel/ (last visited Oct. 9, 2025).

[33] *Id.*

[34] *See Benefits of using the TikTok Pixel*, TikTok, https://ads.tiktok.com/business/en-US/blog/get-started-with-tiktok-pixel?acq_banner_version=73412989 (last visited Sept. 25, 2025).

[35] *TikTok Business Products (Data) Terms*, TikTok (July 29, 2024), http://ads.tiktok.com/i18n/official/policy/business-products-terms.

45.    According to a leading data security firm, the TikTok Pixel secretly installed on Defendant's Website is particularly invasive. The TikTok Pixel "immediately links to data harvesting platforms that pick off usernames and passwords, credit card and banking information and details about users' personal health."[36] The TikTok Pixel also collects "names, passwords and authentication codes" and "transfer the data to locations around the globe," and does so "before users have a chance to accept cookies or otherwise grant consent."[37]

46.    An image of the invasive TikTok code secretly embedded on Defendant's Website can be seen here, which shows the Website instantly sending communications to TikTok to add to its collection of user behavior:



*Figure 8 – Home page of Website*

---

[36]    *See Aaron Katersky, TikTok Has Your Data Even If You've Never Used The App: Report*, ABC NEWS (Mar. 16, 2023 1:59 PM), https://abcnews.go.com/Business/tiktok-data-app-report/story?id=97913249.
[37] *Id.*

CLASS ACTION COMPLAINT

*Figure 9 – Using a browser's "developer tools" on a Vrai webpage shows the Website loading TikTok Pixel's code onto the user's browser*

*Figure 10 – Defendant's TikTok Pixel code on the Website displaying the active features of the TikTok Pixel on the Website*

47.     The Website instantly sends communications to TikTok when a user views the page and tracks page interactions. In the screenshots below, the sample webpage being viewed is depicted, along with the webpage code showing the various TikTok scripts being run by Defendant, and the electronic impulses being sent to TikTok to add to their collection of user behavior:

- 13 -



*Figure 11 – Sample product on the Website*

*Figure 12 – Information collected via the TikTok Pixel when a user visits the sample webpage from Figure 11*

48.     To use the TikTok Pixel, Defendant agreed to TikTok's Business Products (Data) Terms (the "TikTok Terms").

49.     The TikTok Terms inform website owners using the TikTok Pixel that their use of the TikTok Pixel shares or enables TikTok to access their website users' contact details, developer data, and/or event data.[38]

50.     The TikTok Terms are transparent that TikTok will process users' data to match contact details against corresponding accounts, and subsequently match those accounts with the users' corresponding event data.[39]

51.     TikTok obligates TikTok Pixel users, such as Defendant, that they "must only share with us or enable us to access Business Products Data in a manner that is transparent and lawful."[40] TikTok makes clear that the onus is on Defendant to provide all necessary transparency notices, and obtain all necessary rights, permissions, and lawful bases, including consent, to share information with TikTok.

---

[38] *TikTok Business Products (Data) Terms*, TIKTOK (July 29, 2024), https://ads.tiktok.com/i18n/official/policy/business-products-terms.
[39] *Id.*
[40] *Id.*

CLASS ACTION COMPLAINT

52.    TikTok educates or reminds TikTok Pixel users of their obligation not to share any data "from or about Children or that includes health or financial information, or other categories of sensitive information."[41]

53.    As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the TikTok Pixel, and ignored TikTok's warnings to safely handle its users' data and warn its users' that the Website would disclose their information in a manner that threatened their private information.

### 2. *The Facebook Pixel*

54.    Facebook offers its own tracking pixel (the "Facebook Pixel") to website owners for the purpose of monitoring user interactions on their websites, which can then be shared with Facebook.

55.    The Facebook Pixel is a marketing tool that can only be added to a webpage by website developers. A website operator must sign up for a business account or link a related Facebook account with its Pixel, and then add code to the website to make use of the Pixel.[42]

56.    As Facebook notes, the Pixel must be added to each individual page that a website owner wishes to be tracked.[43]

57.    Once added to a webpage, the Pixel begins intercepting information as soon as a user visits the webpage and the Pixel loads onto the user's browser.[44]

58.    The Pixel is employed by Defendant to gather, collect, and then share user information with Facebook.[45] Receiving this information enables Facebook and Defendant to build valuable personal profiles for Website users to inform its targeted advertising campaigns, enhancing marketing effectiveness and increasing the chance of converting users into paying customers.[46]

---

[41] *Id.*

[42] *Set up and install the Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited Oct. 9, 2025).

[43] *Get Started*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Oct. 9, 2025) ("To install the Pixel, add its base code . . . on every page where you will be tracking website visitor actions.").

[44] *See* Mario Neto, *What is the Facebook Pixel – Different ways to collect data to boost your ads performance*, BIRCH BLOG (May 13, 2025), https://bir.ch/blog/what-is-the-facebook-pixel#:~:text=Putting%20it%20simply%2C%20the%20Meta,all%20from%20a%20single%20snippet.

[45] The Facebook Pixel allows websites to track visitor activity by monitoring user actions ("events") that websites want tracked and share a tracked user's data with Facebook. *See Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited Oct. 9, 2025).

[46] *See Meta Pixel*, FACEBOOK, https://www.facebook.com/business/tools/meta-pixel (last visited Oct. 9, 2025).

59.    The harvested data improves Defendant's advertising by pinpointing audience demographics by interests, gender, or location and finding the people who are most likely to take action and view content.[47]

60.    Once implemented on a website, the Facebook Pixel begins to share users' information the moment a user lands on the website.

61.    When a Facebook user logs onto Facebook, tracking cookies, including the c_user cookie, the data cookie, and the fr cookie, are automatically created and stored on the user's device.[48] These cookies allow Facebook to link the data it receives through the Facebook Pixel to individual Facebook users.

62.    The c_user cookie, for example, contains a series of numbers (the user's Facebook ID, or "FID") to identify a user's profile.

*Figure 13 – Sample c_user cookie, containing FID of test account created by Plaintiff's counsel to investigate the Facebook Pixel*

63.    The FID can simply be appended to www.facebookcom/ to navigate to the user's profile (e.g., www.facebook.com/[FID]). Using the FID from *Figure 13*, appending it to the Facebook URL in a standard internet browser (here, www.facebook.com/100091959850832) will redirect the webpage straight to the Facebook profile associated with the FID, as depicted below:

---

[47] *See Audience ad targeting*, FACEBOOK, https://www.facebook.com/business/ads/ad-targeting (last visited Oct. 9, 2025).
[48] *Cookies Policy: What are cookies, and what does this policy cover?*, FACEBOOK (Dec. 12, 2023), https://www.facebook.com/policy/cookies/.

CLASS ACTION COMPLAINT

*Figure 14 -- Sample Facebook account created by Plaintiff's counsel to investigate the Facebook Pixel, with FID highlighted in URL*

64.     The Pixel tracks user-activity on web pages by monitoring events,[49] which when triggered, causes the Pixel to automatically send data – here, users' sensitive information – directly to Facebook.[50] Examples of events utilized by websites include: (i) a user loading a page with a Pixel installed (the "PageView event");[51] (ii) when a user views pre-designated content, like products for sale (the "ViewContent" event);[52] (iii) when a user clicks a pre-designated button, like "Add to Cart" and adds a product to their shopping cart (the "AddToCart" event, collectively with PageView event, and ViewContent event, the "Pixel Events").[53] The Website utilizes all four Pixel Events.[54]

65.     Defendant uses the Facebook Pixel to monetize its Website users' sensitive information.

---

[49] *About Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Oct. 9, 2025).

[50] *See generally id.*

[51] *Specifications for Meta Pixel standard events*, FACEBOOK, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Oct. 9, 2025).

[52] *Reference: standard events*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/reference/ (last visited Oct. 9, 2025).

[53] *Id.*

[54] The presence of Pixel events can be confirmed by using the publicly available and free Meta Pixel Helper tool. *See About the Meta Pixel Helper*, FACEBOOK, https://www.facebook.com/business/help/198406697184603?id=1205376682832142 (last visited Oct. 9, 2025).

66.    Facebook independently benefits from the data collected through the Facebook Pixel by using the harvested data to sell targeted advertising services. Through the use of users' sensitive information, Facebook refines its marketing algorithms, profiting from the ability to more accurately target potential customers.

67.    Defendant's nefarious use of the Facebook Pixel on the Website is demonstrated by the screenshots below, which follow a user's journey to purchasing the sample product on the Website from *Figure 11*.

*Figure 15 – Facebook Pixel tracking a user landing on the webpage from Figure 11 through the "PageView" event*

CLASS ACTION COMPLAINT

*Figure 16 – Facebook Pixel tracking a user viewing the product from Figure 11 through the "ViewContent" event*

*Figure 17 – Facebook Pixel tracking a user adding the product from Figure 11 to their cart through the "AddToCart" event*

68.     When a business applies with Facebook to use the Facebook Pixel, it is provided with detail about its functionality, including with respect to private information.[55]

69.     To make use of the Facebook Pixel, Defendant agreed to Facebook's Business Tool Terms (the "Facebook Terms").

70.     The Facebook Terms informs website owners using Facebook's Pixel that the employment of the Pixel will result in data sharing, including with Facebook, through the automatic sharing of Pixel Event information and contact information.[56]

---

[55] *See Get Started*, META, https://developers.facebook.com/docs/meta-pixel/get-started (last visited Oct. 9, 2025) (The Pixel "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts. Once matched, we can their actions in the Facebook Ads Manager so you can use the data . . . . By default, the Pixel will track URLs visited [and] domains visited . . . .").

[56] *Meta Business Tools Terms*, FACEBOOK (Apr. 25, 2023), https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403DsPEkei KEyrj7rKyf5_t2I8wFEEUZUJII&_rdr (last visited Oct. 9, 2025).

- 21 -

71.    The Facebook Terms are transparent that Meta will use the Pixel Event information and contact information "to match the contact information against user IDs, as well as to combine those user IDs with corresponding [Pixel Event information]."[57]

72.    Facebook directs parties implementing the Facebook Pixel—here, Defendant—to encrypt request information[58] before data can be shared.[59]

73.    Facebook further provides Facebook Pixel users, such as Defendant, guidance on responsible data handling, and details how data is acquired, used, and stored, including which information is shared with Facebook.

74.    Facebook educates or reminds Facebook Pixel users of their responsibility to inform their users of their website's data sharing, and specifically guides website owners to obtain the requisite rights, permissions, or consents, before sharing information with any third-party.[60]

75.    As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Facebook Pixel, and ignored Facebook's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' private information.

### 3.  *The Pinterest Tag*

76.    Defendant has also installed a tracking pixel on its Website created by social media site, Pinterest (the "Pinterest Tag").

77.    The Pinterest Tag is a piece of code that can be added to a website by a website owner to track visitors on the website and record the actions they take, and later target these visitors with ads on Pinterest.[61]

---

[57] *Id.*
[58] This contrasts with Facebook's JavaScript Pixel, which automatically encrypts the data being sent. Defendant has specifically chosen the Facebook Pixel method which makes users' information visible. *See id.*
[59] *Id.*
[60] *Best practices for privacy and data use for Meta Business Tools*, META, https://www.facebook.com/business/help/363303621411154?id=818859032317965 (last visited Oct. 9, 2025).
[61] *Install the Pinterest tag*, PINTEREST, https://help.pinterest.com/en/business/article/install-the-pinterest-tag (last visited Oct. 9, 2025).

78.    Once a website owner adds the base code of the Pinterest Tag, website owners can add "event codes" so the Pinterest Tag tracks specific actions that visitors take on their websites, such as viewing a page, viewing a video, checking out, and other specified events.[62]

79.    Website owners like Defendant then send the collected information to Pinterest. Pinterest recommends that website owners transmit the IP address of website visitors for all conversion events.[63]

80.    Without the implementation of any other features, the Pinterest Tag tracks and transmits the URL currently being viewed by the website visitor. Additionally, the Pinterest Tag reads and uses first-party cookies to identify the Pinterest user currently viewing the website through a personalized Pinterest "User ID," even when the user is logged out of Pinterest.[64]

81.    Website owners can also, in conjunction with the Pinterest Tag, enable a feature known as "automatic enhanced match" to determine the exact identity of Pinterest users who visit the website.[65]

82.    When used in conjunction with automatic enhanced match, the Pinterest Tag collects and transmits to Pinterest users':

a.    Emails;

b.    First and last names;

c.    Phone numbers;

d.    Genders;

e.    Birth dates;

f.    External IDs; and

g.    Cities, States, zip codes and countries.[66]

---

[62] *Add event* codes, PINTEREST, https://help.pinterest.com/en/business/article/add-event-codes (last visited October 09, 2025).
[63] *Track conversion events*, PINTEREST, https://developers.pinterest.com/docs/api-features/track-conversion-events/ (last visited Oct. 9, 2025).
[64] *View tag parameters and cookies*, PINTEREST, https://help.pinterest.com/en/business/article/pinterest-tag-parameters-and-cookies (last visited Oct. 9, 2025).
[65] *Enable automatic enhanced match*, PINTEREST, https://help.pinterest.com/en/business/article/automatic-enhanced-match (last visited Oct. 9, 2025).
[66] *Id.*

83.     This data can be used by Pinterest to "match more of [a] website['s] visitors and conversions to people on Pinterest, which can lead to improvements in [ad] campaign performance . . . and audience reach." [67]

84.     Pinterest uses this data to help advertisers like Defendant gauge the effectiveness of their ad campaigns, optimize the return on their ad spending, and broaden their audience reach.[68]

85.     Additionally, unless websites make use of a specific "limited data processing flag," Pinterest employs this data, such as names, phones numbers, emails and IP addresses, to conduct research on Pinterest usage and to market its own services.[69]

86.     Pinterest also sends the data to its business partners and other vendors.[70]

87.     Defendant's use of the Pinterest tag on the Website is demonstrated below:

*Figure 18 – Pinterest Tag tracking a user landing on the webpage for the sample product from Figure 11*

*Figure 19 - Pinterest Tag tracking a user adding the sample product from Figure 4 to their online shopping cart through the "addtocart" event*

---

[67] *Id.*

[68] *Id.*

[69] *Limited data processing*, PINTEREST, https://help.pinterest.com/en/business/article/limited-data-processing (last visited Oct. 9, 2025).

[70] *California Privacy Statement and Notice at Collection*, PINTEREST, https://policy.pinterest.com/en/notice-at-collection (last visited Oct. 9, 2025).

CLASS ACTION COMPLAINT

88.     When a website owner applies with Pinterest to use the Pinterest Tag, the website owner must agree to Pinterest's Developer and API Terms of Service (the "Pinterest Terms"), part of which requires agreeing that Pinterest may collect and use website users' information.[71]

89.     The Pinterest Terms further provides Pinterest Tag users, like Defendant, guidance on their responsibilities regarding privacy.

90.     Pinterest directs parties implementing the Pinterest Tag, such as Defendant, to clearly disclose its data practices and obtain its users' consent where required by law.[72]

91.     As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Pinterest Tag, and ignored Pinterest's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' private information.

### 4. The Snap Pixel

92.     Defendant also installed code on the Website created by Snapchat that tracks Website visitors' actions, behavior, and conversions across the Website (the "Snap Pixel").

93.     To make use of the Snap Pixel, Defendant must create a Snapchat Ads manager account, create a pixel, select the information to be collected, follow specific guides for integration with third party software like Spotify or Google Tag Manager, and determine whether to enable automated matching for the Snap Pixel.[73]

94.     The Snap Pixel is a piece of JavaScript code provided by Snapchat that allows advertisers, such as Defendant, to track user actions and behavior on websites for the purpose of measuring ad performance, optimizing ad campaigns, and building targeted audiences for better advertising results.[74]

---

[71] *Developer and API Terms of Service*, PINTEREST, https://developers.pinterest.com/terms/ (last visited Oct. 9, 2025).
[72] *Id.*
[73] *Getting Started with Enabling the Pixel*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/pixel-website-install?language=en_US&r=692&ui-knowledge-components-aura-actions.KnowledgeArticleVersionCreateDraftFromOnlineAction.createDraftFromOnlineArticle=1 (last visited Oct. 9, 2025).
[74] *Using the Snap Pixel*, SNAPCHAT (July 11, 2023), https://forbusiness.snapchat.com/blog/the-snap-pixel-how-it-works-and-how-to-install-it; *see also Snapchat Pixels*, SPRINKLR, https://www.sprinklr.com/help/articles/snapchat-pixel/snapchat-pixels/640739d87517d84a3aaf2d26 (last visited Oct. 9, 2025); Marialuisa Aldeghi, *How to set up the Snap Pixel: A step-by-step guide*, LEADSBRIDGE (Dec. 18, 2024), https://leadsbridge.com/blog/snap-pixel/.

95.    This software may be automatically or manually added to a website's webpages, but in either case, the software must be added to each webpage being tracked.[75]

96.    Key features of the Snap Pixel include tracking user actions ("events") designated by advertisers, such as page views, add-to-cart actions, purchases, and sign-ups.[76] Advertisers, such as Defendant, can add additional parameters to these events for more granular insights, like purchase value or product type information.[77] The information is collected immediately as users land on the website where the pixel is installed. [78]

97.    The Snap Pixel also allows cross-device tracking, enabling tracking across multiple devices to provide a comprehensive view of a customer's journey.[79]

98.    The Snap Pixel collects:

    a.    The time the website actions occurred;[80]

    b.    Device information such as the hardware model, operating system, and browser type used;[81]

    c.    Cookies;[82]

    d.    Metadata such as button clicks, time spent on the site, conversations and page visits;[83] and

    e.    IP addresses for general geographic data.[84]

---

[75] *See Directly Implement the Pixel On Your Website*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/pixel-direct-implementation?language=en_US (last visited Oct. 9, 2025).

[76] *Pixel Event Examples*, SNAPCHAT, https://businesshelp.snapchat.com/s/topic/0TO8b000000P8xxGAC/pixel-event-examples?language=en_US (last visited Oct. 9, 2025).

[77] *Additional Parameters Example*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/additional-parameters?language=en_US (last visited Oct. 9, 2025).

[78] *Using the Snap Pixel*, SNAPCHAT (July 11, 2023), https://forbusiness.snapchat.com/blog/the-snap-pixel-how-it-works-and-how-to-install-it; *see also* Marialuisa Aldeghi, *How to set up the Snap Pixel: A step-by-step guide*, LEADSBRIDGE (Dec. 18, 2024), https://leadsbridge.com/blog/snap-pixel/.

[79] *About Snap Pixel*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/snap-pixel-about?language=en_US#:~:text=The%20Snap%20Pixel%20is%20a,to%20manage%20your%20privacy%20settings.

[80] *Snap Pixel: Power Your Ad Performance*, SNAPCHAT, https://forbusiness.snapchat.com/advertising/snap-pixel (last visited Oct. 9, 2025).

[81] *Privacy Policy*, SNAP (Apr. 21, 2025), https://values.snap.com/privacy/privacy-policy.

[82] *Cookie information*, SNAP (Apr. 8, 2025), https://www.snap.com/privacy/cookie-information.

[83] Ate Keurentjes, *How do you install the Snap Pixel via Google Tag Manager*, TAGGRS (Oct. 23, 2025), https://taggrs.io/en/snap-pixel/.

[84] *Directly Implement the Pixel On Your Website*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/pixel-direct-implementation?language=en_US (last visited Oct. 9, 2025); *see also Privacy Policy*, SNAP (Apr. 21, 2025), https://values.snap.com/privacy/privacy-policy; *Data Processing* Agreement, SNAP (July 25, 2025), https://www.snap.com/terms/data-processing-agreement.

99.    The Snap Pixel enables website owners, such as Defendant, to understand how users navigate to their site. This data helps Defendant refine their advertising strategies by identifying high-performing campaigns and optimizing ad spending.[85]

100.    The information the Snap Pixel collects provides Defendant with a better understanding of who its customers are, and how they navigate around the Website.

101.    Snap also independently benefits from non-customer list audience information.[86]

102.    The harvested data collected by the Snap Pixel is used by Defendant to create custom audiences.[87] Defendant can retarget users who viewed specific pages or made purchases and build lookalike audiences to reach new users with similar characteristics.[88]

103.    Put simply, the Snap Pixel collects as much data as it can about otherwise anonymous visitors to the Website and matches it with existing data Snapchat has acquired and accumulated about millions of Americans to improve Defendant's conversion rates and reduce overall advertising costs.

104.    Snap Pixel requires advertisers, such as Defendant, to integrate code into their website's header or use tools like Google Tag Manager for a seamless setup.[89] Advertisers, such as Defendant, are encouraged to use tools like Snap Pixel Helper to verify proper installation and ensure accurate event tracking and track user activity.[90]

105.    Defendant, through the Snap Pixel, uses data and cookies to track users and serve them relevant ads on Snapchat based on how they interacted with the Website.[91] The data received from Snapchat conversion tracking allows Defendant to serve highly targeted ad campaigns to the right people.[92]

106.    Using Snap Pixel helps Defendant collect important information about the people who buy from them so that Defendant, in turn, can benefit. Here are some of the biggest benefits:

---

[85] Marialuisa Aldeghi, *How to set up the Snap Pixel: A step-by-step guide*, LEADSBRIDGE (Dec. 18, 2024), https://leadsbridge.com/blog/snap-pixel/
[86] *See Privacy Policy, Section 2(g)*, SNAP (Apr. 21, 2025), https://values.snap.com/privacy/privacy-policy.
[87] Marialuisa Aldeghi, *How to set up the Snap Pixel: A step-by-step guide*, LEADSBRIDGE (Dec. 18, 2024), https://leadsbridge.com/blog/snap-pixel/
[88] *Id.*
[89] *Id.*
[90] *Snap Pixel: Power Your Ad Performance*, SNAPCHAT, https://forbusiness.snapchat.com/advertising/snap-pixel (last visited Oct. 9, 2025).
[91] *Id.*
[92] *Id.*

a.  **Measure conversion events that matter**: See all the actions users take on the Website, across all devices, and attribute conversions back to ad campaigns.

b.  **Reach the perfect audience**: Defendant can create custom audiences and lookalike audiences based on the specific actions users have taken on the Website.

c.  **Optimize advertising campaigns**: Use real-time insights to optimize delivery of Defendant's campaigns for more effective results.[93]

107.  An image of the invasive Snap Pixel code secretly embedded on Defendant's Website can be seen here:

| ✕  Headers | Payload | Preview | Response | Initiator | Timing | Cookies |

▼ General

| Request URL: | https://tr.snapchat.com, p?v=2.3&pid=80e0cc57-badc-4895-b9dd-30594e8325a5&pl=https%3A% 2F%2Fwayfair.com%2Foutdoor%2Fpdp%2Fallmodern farrah-patio-bar-stool w004578983.html%3 Fpiid%3D1091776886%252C1151400819&rf=https%3A%2F%2Fwayfair.com%2Foutdoor%2Fpdp% 2Fallmodern-farrah-patio-bar-stool-w004578983.html%3Fpiid%3D1091776886%252C1151400819 &ev=PAGE_VIEW&u_c1=30afe66b-d235-41a6-acd2-6b95552d6b9a |
| Request Method: | GET |
| Status Code: | ◯ 200 OK |
| Remote Address: | 35.190.43.134:443 |
| Referrer Policy: | no-referrer-when-downgrade |

*Figure 20 - Snap Pixel active on the Website*

108.  When the Snap Pixel triggers, it captures the relevant data and sends a transmission to Snapchat's servers as depicted in the picture above, which shows Defendant's Snap Pixel instantly sending communications to Snapchat as users take certain actions on the Website, like viewing a page.

109.  The Snap Pixel's functionality is not disclosed on the Website.

110.  By using the Snap Pixel and providing Snapchat with users' information, Defendant had to agree to Snapchat's Personal Data Terms (the "Snap Terms"), among other agreements governing the use of the Snap Pixel.

---

[93] *Benefits of Using the Snap Pixel*, SNAPCHAT, https://forbusiness.snapchat.com/blog/the-snap-pixel-how-it-works-and-how-to-install-it (last visited Oct. 9, 2025).

CLASS ACTION COMPLAINT

111.    By agreeing to the Snap Terms, Defendant represented and warranted that the personal data it shares with Snapchat will not contain any information about individuals under the age of 13 or any sensitive information or special category data.[94]

112.    The Snap Terms further requires Snap Pixel users, such as Defendant, of their responsibility to secure and maintain "all necessary rights, licenses and consents required to provide or make available the personal data" shared through the Snap Pixel.[95]

113.    As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from the use of the Snap Pixel, and ignored Snapchat's warnings to safely handle its users' data and to warn its users that the Website would disclose their information in a manner that threatened their private information.

### 5. *The Twitter Pixel*

114.    X Corp. f/k/a Twitter ("Twitter") also offers its own website tag that can be implemented into websites to track users' site actions or conversions (the "Twitter Pixel").

115.    To make use of the Twitter Pixel, website owners, such as Defendant, must take several affirmative steps: They must generate the Twitter Pixel and create events to track, implement the Twitter Pixel base code across their website, and implement event code in key locations on their website, like when a user makes a purchase.[96]

116.    With each event, website owners like Defendant can select the user action they want to track and the parameters to share about the action.

117.    Events can include viewing a page, making a purchase, adding an item to the shopping cart, using the search bar, adding a product to the wish list, adding payment information, and customizing a product.[97]

---

[94] *Snap Business Tools Terms*, SNAP (Nov. 1, 2021), https://www.snap.com/terms/snap-business-tools.
[95] *Id.*
[96] *X Pixel*, X BUSINESS, https://business.x.com/en/help/campaign-measurement-and-analytics/conversion-tracking-for-websites (last visited Oct. 9, 2025).
[97] *Event Types and Parameters*, X BUSINESS, https://business.x.com/en/help/campaign-measurement-and-analytics/conversion-tracking-for-websites (last visited Oct. 9, 2025).

118. Parameters can include the contents of the action, the search terms used on the website, the email address of the user taking the action, the value of the product purchased, and the currency the purchase was made in.[98]

119. As soon as the Twitter Pixel is placed on a website, it begins to collect information, including the cookie IDs of users, to match them to Twitter users for the purpose of developing custom audiences to market and advertise to.[99]

120. Twitter allows website owners, such as Defendant, to create "Website Activity Audiences," a type of custom audience, which enables Twitter to collect and analyze user activity for users who have visited or taken certain actions on Defendant's website. Once an audience is created and the Twitter Pixel collects 100 Twitter users, the audience will be ready to use for targeting in ad campaigns.[100]

121. The data collected by the Twitter Pixel informs both Defendant and Twitter how best to optimize target custom audiences with advertising based on the geo, gender, age, and device criteria specified by Defendant.[101]

122. An image of the invasive Twitter code secretly embedded on Defendant's Website can be seen here, which shows the Website instantly sending communications to Twitter to add to its collection of user behavior when a user visits the sample webpage in *Figure 11*:



*Figure 21 - Twitter Pixel active on the Website*

---

[98] *Id.*
[99] *Website Activity Custom Audiences*, X BUSINESS, https://business.x.com/en/help/campaign-setup/campaign-targeting/custom-audiences/website-activity (last visited Oct. 9, 2025).
[100] *Id.*
[101] *Id.*

123.   To use the Twitter Pixel, Defendant agreed to Twitter's policies for conversion tracking and custom audiences (the "Twitter Terms").

124.   The Twitter Terms are transparent that Twitter will process users' data to match contact details against corresponding accounts and subsequently match those accounts with the users' corresponding event data.[102]

125.   Twitter obligates Twitter Pixel users, such as Defendant, that they "must provide their application customers with legally sufficient notice that they are working with third parties to collect customer data through their application for purposes of conversion tracking and serving ads targeted to customers' interests and obtain legally sufficient consent from their customers for these activities."[103]

126.   Twitter makes clear that the onus is on Defendant to provide all necessary transparency notices, and obtain all necessary rights, permissions, and lawful bases, including consent, to share information with Twitter.

127.   TikTok educates or reminds TikTok Pixel users of their obligation to be honest with their consumers and not to select "targeting criteria that could reveal sensitive information" about consumers.[104]

128.   As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Twitter Pixel, and ignored Twitter's warnings to safely handle its users' data and warn its users' that the Website would disclose their information in a manner that threatened their sensitive information.

### 6.  The Reddit Pixel

129.   Additionally, Defendant installed a tracking pixel on its Website created by social media platform, Reddit (the "Reddit Pixel").

---

[102] *Policies for conversion tracking and custom audiences*, X BUSINESS, https://business.x.com/en/help/ads-policies/campaign-considerations/policies-for-conversion-trackin.... (last visited Oct. 9, 2025).
[103] *Id.*
[104] *Id.*

CLASS ACTION COMPLAINT

130.    The Reddit Pixel is a piece of code that can be added to a website by a website owner to track visitors on the website and record the actions the visitors take.[105] The harvested data is subsequently used by the website owner to serve targeted ads to website visitors on Reddit.

131.    The Reddit Pixel is also used in conjunction with Reddit's Conversion API to track specific actions that visitors take on the websites ("events"), such as viewing a page, submitting a search in the website's search bar, adding a product to the visitor's cart, checking out, and other specified events.[106]

132.    Website owners, like Defendant, can enable a feature of the Reddit Pixel known as "Auto-Advanced Matching" to determine the exact identity of Reddit users who visit the website.

133.    Auto-Advanced Matching automatically scrapes a website for any email addresses typed or inserted by a visitor and sends that email information to Reddit.[107]

134.    In addition to email addresses, a website owner can enable the Reddit Pixel and the Conversion API to send additional personal information to Reddit, known as "match keys," to identify website visitors.[108]

135.    IP addresses are match keys website owners are *required* to send to Reddit, while other match keys are optional, including:

    a.    Email addresses;

    b.    Phone numbers;

    c.    Mobile Advertising IDs (a unique identifier for a mobile user);

    d.    Reddit Click IDs (to attribute click conversions more accurately);

    e.    External IDs (an advertiser-assigned identifier that enhances match accuracy);

    f.    Reddit UUIDs (a unique ID generated by the Reddit Pixel);

---

[105] *About the Reddit Pixel*, REDDIT, https://business.reddithelp.com/s/article/reddit-pixel (last visited Apr. 9, 2025); *Install the Reddit Pixel Directly*, REDDIT, https://business.reddithelp.com/s/article/Install-the-Reddit-Pixel-on-your-website (last visited Apr. 9, 2025).

[106] *Conversion Events*, REDDIT, https://business.reddithelp.com/articles/Knowledge/supported-conversion-events (last visited Apr. 9, 2025).

[107] *Auto-Advanced Matching*, REDDIT, https://business.reddithelp.com/s/article/automated-advanced-matching (last visited Apr. 9, 2025).

[108] *About Match Keys*, REDDIT, https://business.reddithelp.com/s/article/about-match-keys#customer-match-keys-and-identifiers (last visited Apr. 9, 2025).

g. User Agents (which identifies the software the user is using to access the website);
and

h. The visitor's screen dimensions.[109]

136. This data can be used by Reddit to match an otherwise anonymous website visitor to
their Reddit account, or even to identify them outright, associating their identity with their activity on
the website.

137. Defendant's website code implicated the use of the advanced auto match feature, as
depicted below:

```
16: [function(t, n, r) {
    "use strict";
    var i = t("./constants")
        , o = t("./helper")
        , u = t("./pageEventsListeners")
        , a = t("./automaticAdvancedMatching/index");
    n.exports = {
        getPixelConfig: function(t) {
            var n = "".concat(i.EVENT_CONFIG.EVENT_CONFIGS_URL, "/").concat(t, "/config")
                , r = new XMLHttpRequest;
            r.open("GET", n);
            var e = function() {
```

*Figure 22 - Advanced Auto Matching present in Defendant's Reddit Pixel code*

138. Reddit uses this data to help advertisers, including Defendant, gauge the effectiveness of
their ad campaigns, improve their ability to attribute activity to specific ad campaigns, track visitors
across devices, and help them create more precisely targeted ad campaigns.[110]

139. Additionally, Reddit employs this data to optimize their own ad placements and to
develop new services.[111]

140. Defendant's nefarious use of the Reddit Pixel on the Website is demonstrated by the
screenshots below, which followed a user's journey to purchasing a product on the Website.

---

[109] *Id*

[110] *Id.*

[111] *Reddit Privacy Policy*, REDDIT (Aug. 16, 2024), https://www.reddit.com/policies/privacy-policy#policy-h2-4.

- 33 -

CLASS ACTION COMPLAINT



Figure 23 – Reddit Pixel tracking a user visiting the webpage from Figure 11 through the "PageVisit" event

Figure 16 – Reddit Pixel tracking a user viewing the product from Figure 11 through the "ViewContent" event

Figure 17 – Reddit Pixel tracking a user adding the product from Figure 11 to their cart through the "AddToCart" event

141.    To utilize the Reddit Pixel, Defendant agreed to Reddit's Business Tool Terms (the "Reddit Terms").

142.    The Reddit Terms informs website owners, such as Defendant, that the employment of the Reddit Pixel will result in data sharing, including with Reddit, of users' website actions, email addresses, cookie IDs, and device IDs, among other "matching parameters."[112]

---

[112] *Reddit Business Tool Terms*, REDDIT (Jan. 1, 2025), https://business.reddithelp.com/s/article/Reddit-Business-Tool-Terms.

CLASS ACTION COMPLAINT

143.   The Reddit Terms make clear that the onus was on Defendant to provide all necessary transparency notices, and obtain all necessary rights, permissions, and lawful bases, including consent, to share information with Reddit.

144.   The Reddit Terms explicitly conditions the use of the Reddit Pixel on website owners' warranties that they: (i) provide "prominent and legally-sufficient notice" of the Reddit Pixel's data sharing to users; (ii) provide "clear, prominent and legally sufficient instructions regarding how to opt out of data collection and use of such data collection and use;" and (iii) do not share "any data related to users who have not provided consent[.]"[113]

145.   As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Reddit Pixel, and ignored Reddit's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' private information.

**D. The Tracking Tools are Pen Registers or Trap and Trace Devices.**

146.   California law defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

147.   A "trap and trace device" is defined as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."   Cal. Penal Code § 638.50(c).

148.   The Tracking Tools are processes to record and identify the source of electronic communication by capturing incoming and outgoing electronic impulses and identifying dialing, routing, addressing, and signaling information generated by users, who are never informed that the website is collaborating with the Tracking Entities to obtain their phone number and other identifying information.

---

[113] *Id.*

149.    The Tracking Tools are "reasonably likely" to identify the source of incoming electronic impulses. In fact, it is designed specifically for that purpose.

150.    Defendant did not obtain Plaintiff's express or implied consent to be subjected to data sharing with the Tracking Tools for the purposes of fingerprinting and de-anonymization.

151.    CIPA imposes civil liability and statutory penalties for the installation of pen register or trap and trace software without a court order. California Penal Code § 637.2; *see Greenley v. Kochava*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023). No court order to install a pen register or trap and trace device via the Tracking Tools was obtained by Defendant.

152.    Defendant did not obtain Plaintiff's or Class Members' express or implied consent to be subjected to data collecting and data sharing with the Tracking Entities for the purposes of fingerprinting and de-anonymization, nor did Defendant obtain a court order.

**E.    To the extent the Tracking Tools do not legally qualify as Trap and Trace Devices, Defendant nonetheless facilitated the unauthorized interception of or access to the contents of Plaintiff's communications.**

153.    CIPA § 631(a) prohibits "three distinct and mutually independent patterns of conduct: (1) intentional wiretapping, (2) willfully attempting to learn the contents or meaning of a communication in transit over a wire, and (3) attempting to use or communicate information obtained as a result of engaging in either of the two previous activities." *Rodriguez v. Ford Motor Company*, 722 F. Supp. 3d 1104, 1113 (S.D. Cal. 2024) (citations omitted). Section 631(a)(iv) contains a fourth basis for liability for anyone "who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the other three bases for liability." *Id.*

154.    The analysis for a violation of CIPA is the same as that under the federal Wiretap Act. *Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020).

155.    The Ninth Circuit has held that the "contents" of an online communication under federal wiretap law "refers to the intended message conveyed by the communication, and does not include record information regarding the characteristics of the message that is generated in the course of the communication." *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014).

156.   Transmitted URLs that include both the path and the query string concern the intended message, or the substance of a communication. *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 796 (N.D. Cal. 2022).

157.   Here, the network requests intercepted by the Tracking Entities include Request URLs that include the names of the products users browse and/or purchase.

158.   The contents of Plaintiff's communications with Defendant were intercepted by the Tracking Entities while communicating with Defendant in real time. The Tracking Tools begin intercepting information to the Tracking Entities as soon as the Tracking Tools load onto users' browsers.[114] The Tracking Tools send information to the Tracking Tools contemporaneously with users submitting the information via their browsers.

159.   The interception, duplication, and sending to the Tracking Entities occurred inside Plaintiff's browser before reaching any destination, therefore occurring while in transit. *See Esparza v. UAG Escondido A1 Inc.*, Case No. 23cv0102 DMS(KSC), 2024 U.S. Dist. LEXIS 24429, at *9 (S.D. Cal. Feb. 12, 2024).

160.   The Tracking Entities were third parties to Plaintiff's communications with Defendant.

161.   Defendant's use of the Tracking Tools enabled the Tracking Entities to intercept Request URLs that specify the content users accessed on webpages on the Website in violation of CIPA.

162.   "[A] conversationalist is betrayed equally by a wiretapper and by the willing conversation participant who surreptitiously allows that third party to wiretap." *Yoon v. Lululemon USA, Inc.*, 549 F. Supp. 3d 1073, 1083 (C.D. Cal. 2021) (citing *Revitch v. New Moosejaw, LLC*, No., 2019 WL 5485440, at *2 (N.D. Cal. Oct. 23, 2019)).

163.   Defendant did not obtain Plaintiff's express or implied consent to allow the Tracking Entities to intercept the contents of their communications with the Website.

---

[114] *See* Aaron Katersky, *TikTok has your data even if you've never used the app: Report*, ABCNEWS (Mar. 16, 2023, 1:59 PM), https://abcnews.go.com/Business/tiktok-data-app-report/story?id=97913249#:~:text=Webpages%20associated%20with%20everything%20from,consent%2C%20the%20Feroot%20report%20said; Mario Neto, *What is the Facebook Pixel – Different ways to collect data to boost your ads performance*, BIRCH BLOG (May 13, 2025), https://bir.ch/blog/what-is-the-facebook-pixel#:~:text=Putting%20it%20simply%2C%20the%20Meta,all%20from%20a%20single%20snippet; *Pinterest tag*, PINTEREST, https://developers.pinterest.com/docs/api-features/pinterest-tag/#:~:text=The%20Pinterest%20Tag%20allows%20you,Pinterest%20Tag%20has%20two%20components: (last visited Oct. 9, 2025).

164.    Section 631(a) requires the prior consent of all parties to the communication. *Javier v. Assurance IQ, LLC*, No. 21-16351, 2022 WL 1744107, at *2 (9th Cir. May 31, 2022).

165.    Investigation by Plaintiff's Counsel revealed that the Website's cookie settings were set to allow tracking by default. Therefore, unbeknownst to users, users are being tracked as soon as they land on the Website home page.

166.    Plaintiff visited the Website while its default settings were set by Defendant to track users before obtaining prior consent.

167.    Defendant and the Tracking Entities benefitted from the interception of Plaintiff's communications by reading and subsequently using the intercepted communications to build detailed profiles based on Plaintiff's browsing habits, and using that profile to target Plaintiff with advertising.[115]

168.    The Tracking Entities independently benefit from the interception of Plaintiff's communications by using data collected by the Tracking Tools to improve their own products and advertising services, and marketing those advertising capabilities to other potential businesses seeking to market to users, including Plaintiff.[116]

## CLASS ALLEGATIONS

169.    Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

**All California citizens who visited Defendant's Website while physically in California and whose personal information was shared with the Tracking Entities or other third parties by Defendant without effective and informed prior consent.**

170.    Specifically excluded from the Class is Defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related

---

[115] *See About Advanced Matching for Web*, TikTok, https://ads.tiktok.com/help/article/advanced-matching-web?lang=en (last visited Oct. 9, 2025); *Meta Pixel*, Facebook, https://www.facebook.com/business/tools/meta-pixel (last visited Oct. 9, 2025); *Enable automatic enhanced match*, Pinterest, https://help.pinterest.com/en/business/article/automatic-enhanced-match (last visited Oct. 9, 2025).
[116] *See, e.g., TikTok Business Products (Data) Terms*, TikTok (July 29, 2024), http://ads.tiktok.com/i18n/official/policy/business-products-terms; *Meta Business Tools Terms*, Facebook (Apr. 25, 2023), https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJII&_rdr.

to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

171. Plaintiff reserves the right to amend the Class definition above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

172. NUMEROSITY: At this time, Plaintiff does not know the number of Class Members but believes the number to be at least fifty given the popularity of Defendant's Website. The number of persons within the Class is believed to be so numerous that joinder of all members is impractical. The exact identities of Class Members may be ascertained by the records maintained by Defendant.

173. COMMONALITY: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class Members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

        a.    Whether Defendant shared Class Members' personal information with the Tracking Entities or other third parties;

        b.    Whether Defendant obtain effective and informed consent to do so;

        c.    Whether Class Members are entitled to statutory penalties; and

        d.    Whether Class Members are entitled to injunctive relief.

174. TYPICALITY: As a person who visited Defendant's Website and whose personal information was shared by Defendant, Plaintiff is asserting claims that are typical of the Class.

175. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in the class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

176. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. It would be unduly burdensome to the courts in which individual litigation of numerous cases would

1    proceed. If Class treatment of these claims is not available, Defendant will likely continue their

2    wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability

3    for its wrongdoing as asserted herein.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Violation of the California Invasion of Privacy Act**

**Cal. Penal Code § 631**

177.    Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

178.    Plaintiff brings this cause of action on behalf of herself and all Class Members.

179.    CIPA was enacted to curb "the invasion of privacy resulting from the continual and increasing use of" certain technologies determined to pose "a serious threat to the free exercise of personal liberties."  CIPA extends civil liability for various means of surveillance using technology.

180.    CIPA provides that a person is liable to another where, "by means of any machine, instrument, contrivance, or in any other manner," committed any of the following: (i) intentionally tapped, or made any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, cable, or instrument of any internal telephonic communication system; or (ii) willfully and without consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state; or (iii) uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or (iv) aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit or cause to be done any of the acts or things mentioned above in this section. Cal. Penal Code § 631(a).

181.    The Ninth Circuit has confirmed that one of the purposes of wiretapping statutes is to "prevent the acquisition of the contents of a message by an unauthorized third-party . . . ." *In re*

*Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020). In dealing specifically with CIPA, the California Supreme Court has similarly concluded that the objective of CIPA is to protect a person's communications "from a situation where the other person on the other end of the line permits an outsider" to monitor the communication. Ribas v. Clark, 38 Cal. 3d 355, 364 (1985); *see Smith v. LoanMe*, 11 Cal. 5th 183, 200 (2021).

182.   The Website, including the Tracking Tools placed upon it, is a "machine, instrument, contrivance, or . . . other manner" used to engage in the prohibited conduct at issue here.

183.   Within the relevant time period, Defendant, without the consent of all parties to the communication, or in any unauthorized manner, willfully read or attempted to read or learn the contents or meaning of electronic communications of Plaintiff and Class Members, contemporaneous with the communications transit through or passing over any wire, line or cable or with the communications sending from or being received at any place within California.

184.   The information collected by the Tracking Tools, including the TikTok Pixel, was not for the sole benefit of Defendant.

185.   Within the relevant time period, Defendant aided, agreed with, conspired with, and employed the Tracking Entities to implement the Tracking Tools and to violate CIPA § 631.

186.   Within the relevant time period, Defendant aided, agreed with, conspired with, and employed the Tracking Entities, including the TikTok Pixel, to accomplish the wrongful conduct at issue here.

187.   Plaintiff and Class Members did not authorize or consent to the tracking, interception, and collection of any of their electronic communications.

188.   The violation of section 631 constitutes an invasion of privacy sufficient to confer Article III standing.

### SECOND CAUSE OF ACTION
### Violation of the California Invasion of Privacy Act
### Cal. Penal Code § 638.51

189.   Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

190.   Plaintiff brings this cause of action on behalf of herself and all Class Members.

191.   California's Pen Register and Trap and Trace Law is part of the California Invasion of Privacy Act ("CIPA") codified at Cal. Penal Code 630, et seq.

192.   A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." California Penal Code § 638.50(b).

193.   A "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."   California Penal Code § 638.50(c).

194.   "Process" includes "software that identifies consumers, gathers data, and correlates that data through unique 'fingerprinting.'" Greenley v. Kochava, Inc., 684 F.Supp.3d 1024, 1050 (S.D. Cal. 2023).

195.   California Penal Code § 638.51 provides that "a person may not install or use a pen register or a trap and trace device without first obtaining a court order..." § 638.51(a).  No court order to install trap and trace devices via the Tracking Tools was obtained by Defendant.

196.   Defendant uses pen register and trap and trace processes on its Website by deploying the Tracking Tools on its Website, because the Tracking Tools are designed to capture the phone number, email, routing, addressing and other signaling information of website visitors. The Tracking Tools identify the source of the incoming electronic and wire communications to the Website.

197.   Defendant was not authorized by any court order to use trap and trace devices to track Plaintiff's and Class Members' activity on the Website.

198.   Defendant did not obtain consent from Plaintiff and Class Members before using pen register or trap and trace technology to identify users of its Website, and has violated Section 638.51.

199.   As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members suffered losses and were damaged in an amount to be determined at trial.

200.   CIPA imposes civil liability and statutory penalties for violations of § 638.51.

201.   Therefore, Plaintiff and Class Members are entitled to the relief set forth below.

**PRAYER**

WHEREFORE, Plaintiff prays for the following relief against Defendant:

202.    An order certifying the class and making all appropriate class management orders;

203.    Statutory damages pursuant to CIPA;

204.    Reasonable attorneys' fees and costs; and

205.    All other relief that would be just and proper as a matter of law or equity, as determined by the Court.


**PLAINTIFF HEREBY REQUESTS A TRIAL BY JURY**

Dated: October 20, 2025          **LAW OFFICES OF TODD M. FRIEDMAN, P.C.**

By:    *Todd M. Friedman*
          _____
          Todd M. Friedman, Esq.

          Mark S. Reich*
          **LEVI & KORSINSKY, LLP**
          33 Whitehall Street, 17th Floor
          New York, NY 10004
          Telephone: (212) 363-7500
          Facsimile: (212) 363-7171
          Email: mreich@zlk.com

          *Counsel for Plaintiffs*

          **pro hac vice* forthcoming

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Todd M. Friedman, SBN 216752<br>23586 Calabasas Rd., Suite 105, Calabasas, CA 91302<br><br>TELEPHONE NO.: 323-306-4234          FAX NO. :<br>EMAIL ADDRESS: tfriedman@toddflaw.com<br>ATTORNEY FOR *(Name):* Plaintiff Joseph Limas | **Electronically FILED by<br>Superior Court of California,<br>County of Los Angeles<br>10/20/2025 2:46 PM<br>David W. Slayton,<br>Executive Officer/Clerk of Court,<br>By M. Aguirre, Deputy Clerk** |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS: same
CITY AND ZIP CODE: Los Angeles, 90012
BRANCH NAME: Stanley Mosk Courthouse

CASE NAME:
Joseph Limas et al v. Wayfair LLC and DOES 1 to 20, inclusive

| **CIVIL CASE COVER SHEET** | **Complex Case Designation** | CASE NUMBER: |
|---|---|---|
| [x] Unlimited    [ ] Limited | [ ] Counter    [ ] Joinder | 25STCV30609 |
| (Amount demanded exceeds $35,000) | (Amount demanded is $35,000 or less) | Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) |
| | | JUDGE:<br><br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [x] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition *(not specified above)* (43)

2. This case [x] is   [ ] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [x] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [x] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [x] monetary   b. [x] nonmonetary; declaratory or injunctive relief   c. [ ] punitive
4. Number of causes of action *(specify):* 2
5. This case [x] is   [ ] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: October 20, 2025

Todd M. Friedman, Esq.
_____
(TYPE OR PRINT NAME)

▶ *Todd M. Friedman*
_____
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. January 1, 2024] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10 |

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET
CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
- Auto (22)–Personal Injury/Property Damage/Wrongful Death
- Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
- Asbestos (04)
  - Asbestos Property Damage
  - Asbestos Personal Injury/ Wrongful Death
- Product Liability *(not asbestos or toxic/environmental)* (24)
- Medical Malpractice (45)
  - Medical Malpractice– Physicians & Surgeons
  - Other Professional Health Care Malpractice
- Other PI/PD/WD (23)
  - Premises Liability (e.g., slip and fall)
  - Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  - Intentional Infliction of Emotional Distress
  - Negligent Infliction of Emotional Distress
  - Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
- Business Tort/Unfair Business Practice (07)
- Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
- Defamation (e.g., slander, libel) (13)
- Fraud (16)
- Intellectual Property (19)
- Professional Negligence (25)
  - Legal Malpractice
  - Other Professional Malpractice *(not medical or legal)*
- Other Non-PI/PD/WD Tort (35)

**Employment**
- Wrongful Termination (36)
- Other Employment (15)

**Contract**
- Breach of Contract/Warranty (06)
  - Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  - Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  - Negligent Breach of Contract/ Warranty
  - Other Breach of Contract/Warranty
- Collections (e.g., money owed, open book accounts) (09)
  - Collection Case–Seller Plaintiff
  - Other Promissory Note/Collections Case
- Insurance Coverage *(not provisionally complex)* (18)
  - Auto Subrogation
  - Other Coverage
- Other Contract (37)
  - Contractual Fraud
  - Other Contract Dispute

**Real Property**
- Eminent Domain/Inverse Condemnation (14)
- Wrongful Eviction (33)
- Other Real Property (e.g., quiet title) (26)
  - Writ of Possession of Real Property
  - Mortgage Foreclosure
  - Quiet Title
  - Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
- Commercial (31)
- Residential (32)
- Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
- Asset Forfeiture (05)
- Petition Re: Arbitration Award (11)
- Writ of Mandate (02)
  - Writ–Administrative Mandamus
  - Writ–Mandamus on Limited Court Case Matter
  - Writ–Other Limited Court Case Review
- Other Judicial Review (39)
  - Review of Health Officer Order
  - Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
- Antitrust/Trade Regulation (03)
- Construction Defect (10)
- Claims Involving Mass Tort (40)
- Securities Litigation (28)
- Environmental/Toxic Tort (30)
- Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
- Enforcement of Judgment (20)
  - Abstract of Judgment (Out of County)
- Confession of Judgment *(non-domestic relations)*
- Sister State Judgment
- Administrative Agency Award *(not unpaid taxes)*
- Petition/Certification of Entry of Judgment on Unpaid Taxes
- Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
- RICO (27)
- Other Complaint *(not specified above)* (42)
  - Declaratory Relief Only
  - Injunctive Relief Only *(non-harassment)*
  - Mechanics Lien
  - Other Commercial Complaint Case *(non-tort/non-complex)*
  - Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
- Partnership and Corporate Governance (21)
- Other Petition *(not specified above)* (43)
  - Civil Harassment
  - Workplace Violence
  - Elder/Dependent Adult Abuse
  - Election Contest
  - Petition for Name Change
  - Petition for Relief From Late Claim
  - Other Civil Petition

| SHORT TITLE | CASE NUMBER |
|---|---|
| Joseph Limas, et al v. Wayfair LLC, et al | 25STCV30609 |

# CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION

## (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

| This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court |
|---|

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

| Applicable Reasons for Choosing Courthouse Location (Column C) | |
|---|---|
| 1. Class Actions must be filed in the Stanley Mosk Courthouse, Central District. | 7. Location where petitioner resides. |
| 2. Permissive filing in Central District. | 8. Location wherein defendant/respondent functions wholly. |
| 3. Location where cause of action arose. | 9. Location where one or more of the parties reside. |
| 4. Location where bodily injury, death or damage occurred. | 10. Location of Labor Commissioner Office. |
| 5. Location where performance required, or defendant resides. | 11. Mandatory filing location (Hub Cases – unlawful detainer, limited non-collection, limited collection). |
| 6. Location of property or permanently garaged vehicle. | |

| | A<br>Civil Case Cover Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ 2201 Motor Vehicle – Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| | Uninsured Motorist (46) | ☐ 4601 Uninsured Motorist – Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| **Other Personal Injury/ Property Damage/ Wrongful Death** | Other Personal Injury/ Property Damage/ Wrongful Death (23) | ☐ 2301 Premise Liability (e.g., dangerous conditions of property, slip/trip and fall, dog attack, etc.) | 1, 4 |
| | | ☐ 2302 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, battery, vandalism, etc.) | 1, 4 |
| | | ☐ 2303 Intentional Infliction of Emotional Distress | 1, 4 |
| | | ☐ 2304 Other Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| | | ☐ 2305 Elder/Dependent Adult Abuse/Claims Against Skilled Nursing Facility | 1, 4 |
| | | ☐ 2306 Intentional Conduct – Sexual Abuse Case (in any form) | 1, 4 |

| SHORT TITLE | CASE NUMBER |
|---|---|
| Joseph Limas, et al v. Wayfair LLC, et al | |

| | A<br>Civil Case Cover Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Other Personal Injury/ Property Damage/ Wrongful Death** | | ☐ 2307 Construction Accidents | 1, 4 |
| | | ☐ 2308 Landlord – Tenant Habitability (e.g., bed bugs, mold, etc.) | 1, 4 |
| | Product Liability (24) | ☐ 2401 Product Liability (not asbestos or toxic/ environmental) | 1, 4 |
| | | ☐ 2402 Product Liability – Song-Beverly Consumer Warranty Act (CA Civil Code §§1790-1795.8) (Lemon Law) | 1, 3, 5 |
| | Medical Malpractice (45) | ☐ 4501 Medical Malpractice – Physicians & Surgeons | 1, 4 |
| | | ☐ 4502 Other Professional Health Care Malpractice | 1, 4 |
| **Non-Personal Injury/Property Damage/Wrongful Death Tort** | Business Tort (07) | ☐ 0701 Other Commercial/Business Tort (not fraud or breach of contract) | 1, 2, 3 |
| | Civil Rights (08) | ☐ 0801 Civil Rights/Discrimination | 1, 2, 3 |
| | Defamation (13) | ☐ 1301 Defamation (slander/libel) | 1, 2, 3 |
| | Fraud (16) | ☐ 1601 Fraud (no contract) | 1, 2, 3 |
| | Professional Negligence (25) | ☐ 2501 Legal Malpractice | 1, 2, 3 |
| | | ☐ 2502 Other Professional Malpractice (not medical or legal) | 1, 2, 3 |
| | Other (35) | ☑ 3501 Other Non-Personal Injury/Property Damage Tort | 1, 2, 3 |
| **Employment** | Wrongful Termination (36) | ☐ 3601 Wrongful Termination | 1, 2, 3 |
| | Other Employment (15) | ☐ 1501 Other Employment Complaint Case | 1, 2, 3 |
| | | ☐ 1502 Labor Commissioner Appeals | 10 |
| **Contract** | Breach of Contract / Warranty (06) (not insurance) | ☐ 0601 Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2, 5 |
| | | ☐ 0602 Contract/Warranty Breach – Seller Plaintiff (no fraud/negligence) | 2, 5 |
| | | ☐ 0603 Negligent Breach of Contract/Warranty (no fraud) | 1, 2, 5 |
| | | ☐ 0604 Other Breach of Contract/Warranty (no fraud/ negligence) | 1, 2, 5 |
| | | ☐ 0605 Breach of Rental/Lease Contract (COVID-19 Rental Debt) | 2, 5 |
| | Collections (09) | ☐ 0901 Collections Case – Seller Plaintiff | 5, 6, 11 |
| | | ☐ 0902 Other Promissory Note/Collections Case | 5, 11 |
| | | ☐ 0903 Collections Case – Purchased Debt (charged off consumer debt purchased on or after January 1, 2014) | 5, 6, 11 |
| | | ☐ 0904 Collections Case – COVID-19 Rental Debt | 5, 11 |
| | Insurance Coverage (18) | ☐ 1801 Insurance Coverage (not complex) | 1, 2, 5, 8 |

CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION

| SHORT TITLE | CASE NUMBER |
|---|---|
| Joseph Limas, et al v. Wayfair LLC, et al | |

| | **A** Civil Case Cover Sheet Case Type | **B** Type of Action (check only one) | **C** Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Contract** (Continued) | Other Contract (37) | ☐ 3701 Contractual Fraud | 1, 2, 3, 5 |
| | | ☐ 3702 Tortious Interference | 1, 2, 3, 5 |
| | | ☐ 3703 Other Contract Dispute (not breach/insurance/fraud/negligence) | 1, 2, 3, 8, 9 |
| **Real Property** | Eminent Domain/ Inverse Condemnation (14) | ☐ 1401 Eminent Domain/Condemnation     Number of Parcels _____ | 2, 6 |
| | Wrongful Eviction (33) | ☐ 3301 Wrongful Eviction Case | 2, 6 |
| | Other Real Property (26) | ☐ 2601 Mortgage Foreclosure | 2, 6 |
| | | ☐ 2602 Quiet Title | 2, 6 |
| | | ☐ 2603 Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6 |
| **Unlawful Detainer** | Unlawful Detainer – Commercial (31) | ☐ 3101 Unlawful Detainer – Commercial (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer – Residential (32) | ☐ 3201 Unlawful Detainer – Residential (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer – Post Foreclosure (34) | ☐ 3401 Unlawful Detainer – Post Foreclosure | 2, 6, 11 |
| | Unlawful Detainer – Drugs (38) | ☐ 3801 Unlawful Detainer – Drugs | 2, 6, 11 |
| **Judicial Review** | Asset Forfeiture (05) | ☐ 0501 Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☐ 1101 Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ 0201 Writ – Administrative Mandamus | 2, 8 |
| | | ☐ 0202 Writ – Mandamus on Limited Court Case Matter | 2 |
| | | ☐ 0203 Writ – Other Limited Court Case Review | 2 |
| | Other Judicial Review (39) | ☐ 3901 Other Writ/Judicial Review | 2, 8 |
| | | ☐ 3902 Administrative Hearing | 2, 8 |
| | | ☐ 3903 Parking Appeal | 2, 8 |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ 0301 Antitrust/Trade Regulation | 1, 2, 8 |
| | Asbestos (04) | ☐ 0401 Asbestos Property Damage | 1, 11 |
| | | ☐ 0402 Asbestos Personal Injury/Wrongful Death | 1, 11 |

| SHORT TITLE | CASE NUMBER |
|---|---|
| Joseph Limas, et al v. Wayfair LLC, et al | |

| | A<br>Civil Case Cover Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Provisionally Complex Litigation** (Continued) | Construction Defect (10) | ☐ 1001 Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ 4001 Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ 2801 Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort Environmental (30) | ☐ 3001 Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims from Complex Case (41) | ☐ 4101 Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ 2001 Sister State Judgment | 2, 5, 11 |
| | | ☐ 2002 Abstract of Judgment | 2, 6 |
| | | ☐ 2004 Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | | ☐ 2005 Petition/Certificate for Entry of Judgment Unpaid Tax | 2, 8 |
| | | ☐ 2006 Other Enforcement of Judgment Case | 2, 8, 9 |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ 2701 Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints (not specified above) (42) | ☐ 4201 Declaratory Relief Only | 1, 2, 8 |
| | | ☐ 4202 Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | | ☐ 4203 Other Commercial Complaint Case (non-tort/noncomplex) | 1, 2, 8 |
| | | ☐ 4204 Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ 2101 Partnership and Corporation Governance Case | 2, 8 |
| | Other Petitions (not specified above) (43) | ☐ 4301 Civil Harassment with Damages | 2, 3, 9 |
| | | ☐ 4302 Workplace Harassment with Damages | 2, 3, 9 |
| | | ☐ 4303 Elder/Dependent Adult Abuse Case with Damages | 2, 3, 9 |
| | | ☐ 4304 Election Contest | 2 |
| | | ☐ 4305 Petition for Change of Name/Change of Gender | 2, 7 |
| | | ☐ 4306 Petition for Relief from Late Claim Law | 2, 3, 8 |
| | | ☐ 4307 Other Civil Petition | 2, 9 |

**CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION**

| SHORT TITLE<br>Joseph Limas, et al v. Wayfair LLC, et al | CASE NUMBER |
|---|---|

**Step 4: Statement of Reason and Address:** Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected. Enter the address, which is the basis for the filing location including zip code. (No address required for class action cases.)

| REASON:<br>☑ 1. ☐ 2. ☐ 3. ☐ 4. ☐ 5. ☐ 6. ☐ 7. ☐ 8. ☐ 9. ☐ 10. ☐ 11 | | | ADDRESS: |
|---|---|---|---|
| CITY: | STATE: | ZIP CODE: | |

**Step 5: Certification of Assignment:** I certify that this case is properly filed in the ___Central___ District of the Superior Court of California, County of Los Angeles [Code of Civ. Proc., 392 et seq., and LASC Local Rule 2.3(a)(1)(E)]

Dated: __10/20/2025__

*Todd M. Friedman*

_____
(SIGNATURE OF ATTORNEY/FILING PARTY

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.
2. If filing a Complaint, a completed Summons form for issuance by the Clerk.
3. Civil Case Cover Sheet Judicial Council form CM-010.
4. Civil Case Cover Sheet Addendum and Statement of Location form LASC CIV 109 (01/23).
5. Payment in full of the filing fee, unless there is a court order for waiver, partial or schedule payments.
6. A signed order appointing a Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court to issue a Summons.
7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the Summons and Complaint, or other initiating pleading in the case.

| SUPERIOR COURT OF CALIFORNIA COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Spring Street Courthouse<br>312 North Spring Street, Los Angeles, CA 90012 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br>**10/20/2025**<br>David W. Slayton, Executive Officer / Clerk of Court<br>By: _____ M. Aguirre _____ Deputy |
| **NOTICE OF CASE ASSIGNMENT**<br>**UNLIMITED CIVIL CASE** | |
| Your case is assigned for all purposes to the judicial officer indicated below. | CASE NUMBER:<br>25STCV30609 |

### THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

| | ASSIGNED JUDGE | DEPT | ROOM | | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|---|---|
| ✔ | Carolyn B. Kuhl | 12 | | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record

on 10/21/2025
    (Date)

David W. Slayton, Executive Officer / Clerk of Court

By M. Aguirre , Deputy Clerk

LACIV 190 (Rev 6/18)
LASC Approved 05/06

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**

## INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

## APPLICATION
The Division 7 Rules were effective January 1, 2007. They apply to all general civil cases.

## PRIORITY OVER OTHER RULES
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

## CHALLENGE TO ASSIGNED JUDGE
A challenge under Code of Civil Procedure Section 170.6 must be made within **15** days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

## TIME STANDARDS
Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

## COMPLAINTS
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

## CROSS-COMPLAINTS
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed. Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

## STATUS CONFERENCE
A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint. Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

## FINAL STATUS CONFERENCE
The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date. All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference. These matters may be heard and resolved at this conference. At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

## SANCTIONS
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules. Such sanctions may be on a party, or if appropriate, on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction. Careful reading and compliance with the actual Chapter Rules is imperative.**

## Class Actions
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

## *Provisionally Complex Cases
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status. If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**

**Superior Court of California, County of Los Angeles**

---

# ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION PACKAGE

**THE PLAINTIFF MUST SERVE THIS ADR INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT.**

**CROSS-COMPLAINANTS** must serve this ADR Information Package on any new parties named to the action with the cross-complaint.

---

## What is ADR?

ADR helps people find solutions to their legal disputes without going to trial. The main types of ADR are negotiation, mediation, arbitration, and settlement conferences. When ADR is done by phone, videoconference or computer, it may be called Online Dispute Resolution (ODR). These alternatives to litigation and trial are described below.

## Advantages of ADR

- **Saves Time:** ADR is faster than going to trial.
- **Saves Money:** Parties can save on court costs, attorney's fees, and witness fees.
- **Keeps Control** (with the parties): Parties choose their ADR process and provider for voluntary ADR.
- **Reduces Stress/Protects Privacy:** ADR is done outside the courtroom, in private offices, by phone or online.

## Disadvantages of ADR

- **Costs:** If the parties do not resolve their dispute, they may have to pay for ADR, litigation, and trial.
- **No Public Trial:** ADR does not provide a public trial or a decision by a judge or jury.

## Main Types of ADR

1. **Negotiation**: Parties often talk with each other in person, or by phone or online about resolving their case with a settlement agreement instead of a trial. If the parties have lawyers, they will negotiate for their clients.

2. **Mediation**: In mediation, a neutral mediator listens to each person's concerns, helps them evaluate the strengths and weaknesses of their case, and works with them to try to create a settlement agreement that is acceptable to all. Mediators do not decide the outcome. Parties may go to trial if they decide not to settle.

    **Mediation may be appropriate when the parties**
    - want to work out a solution but need help from a neutral person.
    - have communication problems or strong emotions that interfere with resolution.
    
    **Mediation may <u>not</u> be appropriate when the parties**
    - want a public trial and want a judge or jury to decide the outcome.
    - lack equal bargaining power or have a history of physical/emotional abuse.

LASC CIV 271 Rev. 02/22
For Mandatory Use

**How to Arrange Mediation in Los Angeles County**

Mediation for **civil cases** is voluntary and parties may select any mediator they wish. Options include:

a. **The Civil Mediation Vendor Resource List**
If all parties in an active civil case agree to mediation, they may contact these organizations to request a "Resource List Mediation" for mediation at reduced cost or no cost (for selected cases).

- **ADR Services, Inc.** Case Manager Elizabeth Sanchez, elizabeth@adrservices.com (949) 863-9800
- **Mediation Center of Los Angeles** Program Manager info@mediationLA.org (833) 476-9145

**These organizations cannot accept every case and they may decline cases at their discretion.** They may offer online mediation by video conference for cases they accept. Before contacting these organizations, review important information and FAQs at www.lacourt.org/ADR.Res.List

**NOTE: The Civil Mediation Vendor Resource List program does not accept family law, probate or small claims cases.**

b. **Los Angeles County Dispute Resolution Programs**
https://hrc.lacounty.gov/wp-content/uploads/2020/05/DRP-Fact-Sheet-23October19-Current-as-of-October-2019-1.pdf

Day of trial mediation programs have been paused until further notice.

**Online Dispute Resolution (ODR).** Parties in small claims and unlawful detainer (eviction) cases should carefully review the Notice and other information they may receive about (ODR) requirements for their case.

c. Mediators and ADR and Bar organizations that provide mediation may be found on the internet.

3. **Arbitration:** Arbitration is less formal than trial, but like trial, the parties present evidence and arguments to the person who decides the outcome. In "binding" arbitration, the arbitrator's decision is final; there is no right to trial. In "nonbinding" arbitration, any party can request a trial after the arbitrator's decision. For more information about arbitration, visit http://www.courts.ca.gov/programs-adr.htm

4. **Mandatory Settlement Conferences (MSC):** MSCs are ordered by the Court and are often held close to the trial date or on the day of trial. The parties and their attorneys meet with a judge or settlement officer who does not make a decision but who instead assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. For information about the Court's MSC programs for civil cases, visit http://www.lacourt.org/division/civil/C10047.aspx

Los Angeles Superior Court ADR website: http://www.lacourt.org/division/civil/C10109.aspx
For general information and videos about ADR, visit http://www.courts.ca.gov/programs-adr.htm

## VOLUNTARY EFFICIENT LITIGATION STIPULATIONS



**Superior Court of California
County of Los Angeles**



**Los Angeles County
Bar Association
Litigation Section**

**Los Angeles County
Bar Association Labor and
Employment Law Section**



**Consumer Attorneys
Association of Los Angeles**



**Southern California
Defense Counsel**



**Association of
Business Trial Lawyers**



**California Employment
Lawyers Association**

   The Early Organizational Meeting Stipulation, Discovery Resolution Stipulation, and Motions in Limine Stipulation are voluntary stipulations entered into by the parties.  The parties may enter into one, two, or all three of the stipulations; however, they may not alter the stipulations as written, because the Court wants to ensure uniformity of application.  These stipulations are meant to encourage cooperation between the parties and to assist in resolving issues in a manner that promotes economic case resolution and judicial efficiency.

   *The following organizations endorse the goal of promoting efficiency in litigation and ask that counsel consider using these stipulations as a voluntary way to promote communications and procedures among counsel and with the court to fairly resolve issues in their cases.*

◆**Los Angeles County Bar Association Litigation Section**◆

◆ **Los Angeles County Bar Association
Labor and Employment Law Section**◆

◆**Consumer Attorneys Association of Los Angeles**◆

◆**Southern California Defense Counsel**◆

◆**Association of Business Trial Lawyers**◆

◆**California Employment Lawyers Association**◆

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.: FAX NO. (Optional): E-MAIL ADDRESS (Optional): ATTORNEY FOR (Name): | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **STIPULATION – EARLY ORGANIZATIONAL MEETING** | CASE NUMBER: |
|---|---|

**This stipulation is intended to encourage cooperation among the parties at an early stage in the litigation and to assist the parties in efficient case resolution.**

**The parties agree that:**

1. The parties commit to conduct an initial conference (in-person or via teleconference or via videoconference) within 15 days from the date this stipulation is signed, *to discuss and consider whether there can be agreement on the following*:

   a. Are motions to challenge the pleadings necessary? If the issue can be resolved by amendment as of right, or if the Court would allow leave to amend, could an amended complaint resolve most or all of the issues a demurrer might otherwise raise? If so, the parties agree to work through pleading issues so that a demurrer need only raise issues they cannot resolve. Is the issue that the defendant seeks to raise amenable to resolution on demurrer, or would some other type of motion be preferable? Could a voluntary targeted exchange of documents or information by any party cure an uncertainty in the pleadings?

   b. Initial mutual exchanges of documents at the "core" of the litigation. (For example, in an employment case, the employment records, personnel file and documents relating to the conduct in question could be considered "core." In a personal injury case, an incident or police report, medical records, and repair or maintenance records could be considered "core.");

   c. Exchange of names and contact information of witnesses;

   d. Any insurance agreement that may be available to satisfy part or all of a judgment, or to indemnify or reimburse for payments made to satisfy a judgment;

   e. Exchange of any other information that might be helpful to facilitate understanding, handling, or resolution of the case in a manner that preserves objections or privileges by agreement;

   f. Controlling issues of law that, if resolved early, will promote efficiency and economy in other phases of the case. Also, when and how such issues can be presented to the Court;

   g. Whether or when the case should be scheduled with a settlement officer, what discovery or court ruling on legal issues is reasonably required to make settlement discussions meaningful, and whether the parties wish to use a sitting judge or a private mediator or other options as

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

discussed in the "Alternative Dispute Resolution (ADR) Information Package" served with the complaint;

h.  Computation of damages, including documents, not privileged or protected from disclosure, on which such computation is based;

i.  Whether the case is suitable for the Expedited Jury Trial procedures (see information at *www.lacourt.org* under "*Civil*" and then under "*General Information*").

2.  The time for a defending party to respond to a complaint or cross-complaint will be extended to _____ for the complaint, and _____ for the cross-
      (INSERT DATE)                                                    (INSERT DATE)
complaint, which is comprised of the 30 days to respond under Government Code § 68616(b), and the 30 days permitted by Code of Civil Procedure section 1054(a), good cause having been found by the Civil Supervising Judge due to the case management benefits provided by this Stipulation. A copy of the General Order can be found at *www.lacourt.org* under "*Civil*", click on "*General Information*", then click on "*Voluntary Efficient Litigation Stipulations*".

3.  The parties will prepare a joint report titled "Joint Status Report Pursuant to Initial Conference and Early Organizational Meeting Stipulation, and if desired, a proposed order summarizing results of their meet and confer and advising the Court of any way it may assist the parties' efficient conduct or resolution of the case.  The parties shall attach the Joint Status Report to the Case Management Conference statement, and file the documents when the CMC statement is due.

4.  References to "days" mean calendar days, unless otherwise noted.  If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day

The following parties stipulate:

Date:

_____                    ➢  _____
        (TYPE OR PRINT NAME)                                                  (ATTORNEY FOR PLAINTIFF)
Date:

_____                    ➢  _____
        (TYPE OR PRINT NAME)                                                  (ATTORNEY FOR DEFENDANT)
Date:

_____                    ➢  _____
        (TYPE OR PRINT NAME)                                                  (ATTORNEY FOR DEFENDANT)
Date:

_____                    ➢  _____
        (TYPE OR PRINT NAME)                                                  (ATTORNEY FOR DEFENDANT)
Date:

_____                    ➢  _____
        (TYPE OR PRINT NAME)                                                  (ATTORNEY FOR _____)
Date:

_____                    ➢  _____
        (TYPE OR PRINT NAME)                                                  (ATTORNEY FOR _____)
Date:

_____                    ➢  _____
        (TYPE OR PRINT NAME)                                                  (ATTORNEY FOR _____)

LACIV 229 (Rev 02/15)              **STIPULATION – EARLY ORGANIZATIONAL MEETING**              Page 2 of 2
LASC Approved 04/11

| Print | Save | | Clear |
|---|---|---|---|

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:                    FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **STIPULATION – DISCOVERY RESOLUTION** | CASE NUMBER: |
|---|---|

**This stipulation is intended to provide a fast and informal resolution of discovery issues through limited paperwork and an informal conference with the Court to aid in the resolution of the issues.**

**The parties agree that:**

1. Prior to the discovery cut-off in this action, no discovery motion shall be filed or heard unless the moving party first makes a written request for an Informal Discovery Conference pursuant to the terms of this stipulation.

2. At the Informal Discovery Conference the Court will consider the dispute presented by parties and determine whether it can be resolved informally. Nothing set forth herein will preclude a party from making a record at the conclusion of an Informal Discovery Conference, either orally or in writing.

3. Following a reasonable and good faith attempt at an informal resolution of each issue to be presented, a party may request an Informal Discovery Conference pursuant to the following procedures:

   a. The party requesting the Informal Discovery Conference will:

      i. File a Request for Informal Discovery Conference with the clerk's office on the approved form (copy attached) and deliver a courtesy, conformed copy to the assigned department;

      ii. Include a brief summary of the dispute and specify the relief requested; and

      iii. Serve the opposing party pursuant to any authorized or agreed method of service that ensures that the opposing party receives the Request for Informal Discovery Conference no later than the next court day following the filing.

   b. Any Answer to a Request for Informal Discovery Conference must:

      i. Also be filed on the approved form (copy attached);

      ii. Include a brief summary of why the requested relief should be denied;

---

**STIPULATION – DISCOVERY RESOLUTION**

iii.   Be filed within two (2) court days of receipt of the Request; and

iv.   Be served on the opposing party pursuant to any authorized or agreed upon method of service that ensures that the opposing party receives the Answer no later than the next court day following the filing.

c.   No other pleadings, including but not limited to exhibits, declarations, or attachments, will be accepted.

d.   If the Court has not granted or denied the Request for Informal Discovery Conference within ten (10) days following the filing of the Request, then it shall be deemed to have been denied.  If the Court acts on the Request, the parties will be notified whether the Request for Informal Discovery Conference has been granted or denied and, if granted, the date and time of the Informal Discovery Conference, which must be within twenty (20) days of the filing of the Request for Informal Discovery Conference.

e.   If the conference is not held within twenty (20) days of the filing of the Request for Informal Discovery Conference, unless extended by agreement of the parties and the Court, then the Request for the Informal Discovery Conference shall be deemed to have been denied at that time.

4.   If (a) the Court has denied a conference or (b) one of the time deadlines above has expired without the Court having acted or (c) the Informal Discovery Conference is concluded without resolving the dispute, then a party may file a discovery motion to address unresolved issues.

5.   The parties hereby further agree that the time for making a motion to compel or other discovery motion is tolled from the date of filing of the Request for Informal Discovery Conference until (a) the request is denied or deemed denied or (b) twenty (20) days after the filing of the Request for Informal Discovery Conference, whichever is earlier, unless extended by Order of the Court.

It is the understanding and intent of the parties that this stipulation shall, for each discovery dispute to which it applies, constitute a writing memorializing a "specific later date to which the propounding [or demanding or requesting] party and the responding party have agreed in writing," within the meaning of Code Civil Procedure sections 2030.300(c), 2031.320(c), and 2033.290(c).

6.   Nothing herein will preclude any party from applying *ex parte* for appropriate relief, including an order shortening time for a motion to be heard concerning discovery.

7.   Any party may terminate this stipulation by giving twenty-one (21) days notice of intent to terminate the stipulation.

8.   References to "days" mean calendar days, unless otherwise noted.  If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day.

LACIV 036 (new)
LASC Approved 04/11
For Optional Use

**STIPULATION – DISCOVERY RESOLUTION**

| SHORT TITLE: | CASE NUMBER: |
|---|---|

**The following parties stipulate:**

Date: _____

_____
(TYPE OR PRINT NAME)

Date: _____

_____
(TYPE OR PRINT NAME)

Date: _____

_____
(TYPE OR PRINT NAME)

Date: _____

_____
(TYPE OR PRINT NAME)

Date: _____

_____
(TYPE OR PRINT NAME)

Date: _____

_____
(TYPE OR PRINT NAME)

Date: _____

_____
(TYPE OR PRINT NAME)

➢ _____
(ATTORNEY FOR PLAINTIFF)

➢ _____
(ATTORNEY FOR DEFENDANT)

➢ _____
(ATTORNEY FOR DEFENDANT)

➢ _____
(ATTORNEY FOR DEFENDANT)

➢ _____
(ATTORNEY FOR _____)

➢ _____
(ATTORNEY FOR _____)

➢ _____
(ATTORNEY FOR _____)

| Print | Save |   | Clear |
|---|---|---|---|

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|

TELEPHONE NO.:                          FAX NO. (Optional):
E-MAIL ADDRESS (Optional):
ATTORNEY FOR (Name):

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **INFORMAL DISCOVERY CONFERENCE**<br>(pursuant to the Discovery Resolution Stipulation of the parties) | CASE NUMBER: |
|---|---|

1.  This document relates to:

    ☐   Request for Informal Discovery Conference
    ☐   Answer to Request for Informal Discovery Conference

2.  Deadline for Court to decide on Request: _____ (insert date 10 calendar days following filing of the Request).

3.  Deadline for Court to hold Informal Discovery Conference: _____ (insert date 20 calendar days following filing of the Request).

4.  **For a Request for Informal Discovery Conference, <u>briefly</u> describe the nature of the discovery dispute, including the facts and legal arguments at issue.  For an Answer to Request for Informal Discovery Conference, <u>briefly</u> describe why the Court should deny the requested discovery, including the facts and legal arguments at issue.**

**INFORMAL DISCOVERY CONFERENCE**
(pursuant to the Discovery Resolution Stipulation of the parties)

[ Print ]   [ Save ]                                    [ Clear ]

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.: FAX NO. (Optional): E-MAIL ADDRESS (Optional): ATTORNEY FOR (Name): | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **STIPULATION AND ORDER – MOTIONS IN LIMINE** | CASE NUMBER: |
|---|---|

**This stipulation is intended to provide fast and informal resolution of evidentiary issues through diligent efforts to define and discuss such issues and limit paperwork.**

**The parties agree that:**

1. At least _____ days before the final status conference, each party will provide all other parties with a list containing a one paragraph explanation of each proposed motion in limine. Each one paragraph explanation must identify the substance of a single proposed motion in limine and the grounds for the proposed motion.

2. The parties thereafter will meet and confer, either in person or via teleconference or videoconference, concerning all proposed motions in limine. In that meet and confer, the parties will determine:

   a. Whether the parties can stipulate to any of the proposed motions. If the parties so stipulate, they may file a stipulation and proposed order with the Court.

   b. Whether any of the proposed motions can be briefed and submitted by means of a short joint statement of issues. For each motion which can be addressed by a short joint statement of issues, a short joint statement of issues must be filed with the Court 10 days prior to the final status conference. Each side's portion of the short joint statement of issues may not exceed three pages. The parties will meet and confer to agree on a date and manner for exchanging the parties' respective portions of the short joint statement of issues and the process for filing the short joint statement of issues.

3. All proposed motions in limine that are not either the subject of a stipulation or briefed via a short joint statement of issues will be briefed and filed in accordance with the California Rules of Court and the Los Angeles Superior Court Rules.

| SHORT TITLE: | CASE NUMBER: |
|---|---|

## The following parties stipulate:

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

➢ _____
(ATTORNEY FOR PLAINTIFF)

➢ _____
(ATTORNEY FOR DEFENDANT)

➢ _____
(ATTORNEY FOR DEFENDANT)

➢ _____
(ATTORNEY FOR DEFENDANT)

➢ _____
(ATTORNEY FOR _____)

➢ _____
(ATTORNEY FOR _____)

➢ _____
(ATTORNEY FOR _____)

## THE COURT SO ORDERS.

Date: _____

_____
JUDICIAL OFFICER

| Print | Save | Clear |

**FILED**

LOS ANGELES SUPERIOR COURT

MAY 1 1 2011

JOHN A. CLARKE, CLERK

BY NANCY NAVARRO, DEPUTY

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES**

General Order Re ) ORDER PURSUANT TO CCP 1054(a),
Use of Voluntary Efficient Litigation ) EXTENDING TIME TO RESPOND BY
Stipulations ) 30 DAYS WHEN PARTIES AGREE
) TO EARLY ORGANIZATIONAL
) MEETING STIPULATION
)
——————————————————)

Whereas the Los Angeles Superior Court and the Executive Committee of the

Litigation Section of the Los Angeles County Bar Association have cooperated in

drafting "Voluntary Efficient Litigation Stipulations" and in proposing the stipulations for

use in general jurisdiction civil litigation in Los Angeles County;

Whereas the Los Angeles County Bar Association Litigation Section; the Los

Angeles County Bar Association Labor and Employment Law Section; the Consumer

Attorneys Association of Los Angeles; the Association of Southern California Defense

Counsel; the Association of Business Trial Lawyers of Los Angeles; and the California

Employment Lawyers Association all "endorse the goal of promoting efficiency in

litigation, and ask that counsel consider using these stipulations as a voluntary way to

promote communications and procedures among counsel and with the court to fairly

resolve issues in their cases;"

-1-

ORDER PURSUANT TO CCP 1054(a)

Whereas the Early Organizational Meeting Stipulation is intended to encourage cooperation among the parties at an early stage in litigation in order to achieve litigation efficiencies;

Whereas it is intended that use of the Early Organizational Meeting Stipulation will promote economic case resolution and judicial efficiency;

Whereas, in order to promote a meaningful discussion of pleading issues at the Early Organizational Meeting and potentially to reduce the need for motions to challenge the pleadings, it is necessary to allow additional time to conduct the Early Organizational Meeting before the time to respond to a complaint or cross complaint has expired;

Whereas Code of Civil Procedure section 1054(a) allows a judge of the court in which an action is pending to extend for not more than 30 days the time to respond to a pleading "upon good cause shown";

Now, therefore, this Court hereby finds that there is good cause to extend for 30 days the time to respond to a complaint or to a cross complaint in any action in which the parties have entered into the Early Organizational Meeting Stipulation.  This finding of good cause is based on the anticipated judicial efficiency and benefits of economic case resolution that the Early Organizational Meeting Stipulation is intended to promote.

IT IS HEREBY ORDERED that, in any case in which the parties have entered into an Early Organizational Meeting Stipulation, the time for a defending party to respond to a complaint or cross complaint shall be extended by the 30 days permitted

-2-

1  by Code of Civil Procedure section 1054(a) without further need of a specific court

2  order.

3

4  DATED: _May 11, 2011_    _Carolyn B. Kuhl_

5                            Carolyn B. Kuhl, Supervising Judge of the

6                            Civil Departments, Los Angeles Superior Court

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-3-

ORDER PURSUANT TO CCP 1054(a)

2019-GEN-014-00

**FILED**
Superior Court of California
County of Los Angeles

**MAY 03 2019**

Sherri R. Carter, Executive Officer/Clerk
By_____, Deputy
Rizalinda Mina

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

IN RE LOS ANGELES SUPERIOR COURT )
— MANDATORY ELECTRONIC FILING )
FOR CIVIL )
)
)
)
_____ )

FIRST AMENDED GENERAL ORDER

On December 3, 2018, the Los Angeles County Superior Court mandated electronic filing of all documents in Limited Civil cases by litigants represented by attorneys. On January 2, 2019, the Los Angeles County Superior Court mandated electronic filing of all documents filed in Non-Complex Unlimited Civil cases by litigants represented by attorneys. (California Rules of Court, rule 2.253(b).) All electronically filed documents in Limited and Non-Complex Unlimited cases are subject to the following:

1) DEFINITIONS

   a) **"Bookmark"** A bookmark is a PDF document navigational tool that allows the reader to quickly locate and navigate to a designated point of interest within a document.

   b) **"Efiling Portal"** The official court website includes a webpage, referred to as the efiling portal, that gives litigants access to the approved Electronic Filing Service Providers.

   c) **"Electronic Envelope"** A transaction through the electronic service provider for submission of documents to the Court for processing which may contain one or more PDF documents attached.

   d) **"Electronic Filing"** Electronic Filing (eFiling) is the electronic transmission to a Court of a document in electronic form. (California Rules of Court, rule 2.250(b)(7).)

1

e) **"Electronic Filing Service Provider"**  An Electronic Filing Service Provider (EFSP) is a person or entity that receives an electronic filing from a party for retransmission to the Court. In the submission of filings, the EFSP does so on behalf of the electronic filer and not as an agent of the Court.  (California Rules of Court, rule 2.250(b)(8).)

f) **"Electronic Signature"**  For purposes of these local rules and in conformity with Code of Civil Procedure section 17, subdivision (b)(3), section 34, and section 1010.6, subdivision (b)(2), Government Code section 68150, subdivision (g), and California Rules of Court, rule 2.257, the term "Electronic Signature" is generally defined as an electronic sound, symbol, or process attached to or logically associated with an electronic record and executed or adopted by a person with the intent to sign the electronic record.

g) **"Hyperlink"**  An electronic link providing direct access from one distinctively marked place in a hypertext or hypermedia document to another in the same or different document.

h) **"Portable Document Format"**  A digital document format that preserves all fonts, formatting, colors and graphics of the original source document, regardless of the application platform used.

2) MANDATORY ELECTRONIC FILING

a) Trial Court Records

Pursuant to Government Code section 68150, trial court records may be created, maintained, and preserved in electronic format.  Any document that the Court receives electronically must be clerically processed and must satisfy all legal filing requirements in order to be filed as an official court record (California Rules of Court, rules 2.100, et seq. and 2.253(b)(6)).

b) Represented Litigants

Pursuant to California Rules of Court, rule 2.253(b), represented litigants are required to electronically file documents with the Court through an approved EFSP.

c) Public Notice

The Court has issued a Public Notice with effective dates the Court required parties to electronically file documents through one or more approved EFSPs.  Public Notices containing effective dates and the list of EFSPs are available on the Court's website, at www.lacourt.org.

d) Documents in Related Cases

Documents in related cases must be electronically filed in the eFiling portal for that case type if electronic filing has been implemented in that case type, regardless of whether the case has been related to a Civil case.

3) EXEMPT LITIGANTS

a) Pursuant to California Rules of Court, rule 2.253(b)(2), self-represented litigants are exempt from mandatory electronic filing requirements.

b) Pursuant to Code of Civil Procedure section 1010.6, subdivision (d)(3) and California Rules of Court, rule 2.253(b)(4), any party may make application to the Court requesting to be excused from filing documents electronically and be permitted to file documents by conventional means if the party shows undue hardship or significant prejudice.

4) EXEMPT FILINGS

a) The following documents shall not be filed electronically:

   i) Peremptory Challenges or Challenges for Cause of a Judicial Officer pursuant to Code of Civil Procedure sections 170.6 or 170.3;

   ii) Bonds/Undertaking documents;

   iii) Trial and Evidentiary Hearing Exhibits

   iv) Any ex parte application that is filed concurrently with a new complaint including those that will be handled by a Writs and Receivers department in the Mosk courthouse; and

   v) Documents submitted conditionally under seal. The actual motion or application shall be electronically filed. A courtesy copy of the electronically filed motion or application to submit documents conditionally under seal must be provided with the documents submitted conditionally under seal.

b) Lodgments

Documents attached to a Notice of Lodgment shall be lodged and/or served conventionally in paper form. The actual document entitled, "Notice of Lodgment," shall be filed electronically.

//

//

5) ELECTRONIC FILING SYSTEM WORKING PROCEDURES

Electronic filing service providers must obtain and manage registration information for persons and entities electronically filing with the court.

6) TECHNICAL REQUIREMENTS

a) Electronic documents must be electronically filed in PDF, text searchable format **when** technologically feasible without impairment of the document's image.

b) The table of contents for any filing must be bookmarked.

c) Electronic documents, including but not limited to, declarations, proofs of service, and exhibits, must be bookmarked within the document pursuant to California Rules of Court, rule 3.1110(f)(4). Electronic bookmarks must include links to the first page of each bookmarked item (e.g. exhibits, declarations, deposition excerpts) and with bookmark titles that identify the bookedmarked item and briefly describe the item.

d) Attachments to primary documents must be bookmarked. Examples include, but are not limited to, the following:

i) Depositions;

ii) Declarations;

iii) Exhibits (including exhibits to declarations);

iv) Transcripts (including excerpts within transcripts);

v) Points and Authorities;

vi) Citations; and

vii) Supporting Briefs.

e) Use of hyperlinks within documents (including attachments and exhibits) is strongly encouraged.

f) Accompanying Documents

Each document acompanying a single pleading must be electronically filed as a **separate** digital PDF document.

g) Multiple Documents

Multiple documents relating to one case can be uploaded in one envelope transaction.

h) Writs and Abstracts

Writs and Abstracts must be submitted as a separate electronic envelope.

i) Sealed Documents

If and when a judicial officer orders documents to be filed under seal, those documents must be filed electronically (unless exempted under paragraph 4); the burden of accurately designating the documents as sealed at the time of electronic submission is the submitting party's responsibility.

j) Redaction

Pursuant to California Rules of Court, rule 1.201, it is the submitting party's responsibility to redact confidential information (such as using initials for names of minors, using the last four digits of a social security number, and using the year for date of birth) so that the information shall not be publicly displayed.

7) ELECTRONIC FILING SCHEDULE

a) Filed Date

i) Any document received electronically by the court between 12:00 am and 11:59:59 pm shall be deemed to have been effectively filed on that court day if accepted for filing. Any document received electronically on a non-court day, is deemed to have been effectively filed on the next court day if accepted.    (California Rules of Court, rule 2.253(b)(6); Code Civ. Proc. § 1010.6(b)(3).)

ii) Notwithstanding any other provision of this order, if a digital document is not filed in due course because of: (1) an interruption in service; (2) a transmission error that is not the fault of the transmitter; or (3) a processing failure that occurs after receipt, the Court may order, either on its own motion or by noticed motion submitted with a declaration for Court consideration, that the document be deemed filed and/or that the document's filing date conform to the attempted transmission date.

8) EX PARTE APPLICATIONS

a) Ex parte applications and all documents in support thereof must be electronically filed no later than 10:00 a.m. the court day before the ex parte hearing.

b) Any written opposition to an ex parte application must be electronically filed by 8:30 a.m. the day of the ex parte hearing. A printed courtesy copy of any opposition to an ex parte application must be provided to the court the day of the ex parte hearing.

9) PRINTED COURTESY COPIES

a) For any filing electronically filed two or fewer days before the hearing, a courtesy copy must be delivered to the courtroom by 4:30 p.m. the same business day the document is efiled. If the efiling is submitted after 4:30 p.m., the courtesy copy must be delivered to the courtroom by 10:00 a.m. the next business day.

b) Regardless of the time of electronic filing, a printed courtesy copy (along with proof of electronic submission) is required for the following documents:

   i) Any printed document required pursuant to a Standing or General Order;

   ii) Pleadings and motions (including attachments such as declarations and exhibits) of 26 pages or more;

   iii) Pleadings and motions that include points and authorities;

   iv) Demurrers;

   v) Anti-SLAPP filings, pursuant to Code of Civil Procedure section 425.16;

   vi) Motions for Summary Judgment/Adjudication; and

   vii) Motions to Compel Further Discovery.

c) Nothing in this General Order precludes a Judicial Officer from requesting a courtesy copy of additional documents. Courtroom specific courtesy copy guidelines can be found at www.lacourt.org on the Civil webpage under "Courtroom Information."

10) WAIVER OF FEES AND COSTS FOR ELECTRONICALLY FILED DOCUMENTS

a) Fees and costs associated with electronic filing must be waived for any litigant who has received a fee waiver. (California Rules of Court, rules 2.253(b)(), 2.258(b), Code Civ. Proc. § 1010.6(d)(2).)

b) Fee waiver applications for waiver of court fees and costs pursuant to Code of Civil Procedure section 1010.6, subdivision (b)(6), and California Rules of Court, rule 2.252(f), may be electronically filed in any authorized action or proceeding.

11) SIGNATURES ON ELECTRONIC FILING

For purposes of this General Order, all electronic filings must be in compliance with California Rules of Court, rule 2.257. This General Order applies to documents filed within the Civil Division of the Los Angeles County Superior Court.

This First Amended General Order supersedes any previous order related to electronic filing, and is effective immediately, and is to remain in effect until otherwise ordered by the Civil Supervising Judge and/or Presiding Judge.

DATED: May 3, 2019



KEVIN C. BRAZILE
Presiding Judge



*Superior Court of California, County of Los Angeles*
**ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION PACKAGE**

**THE PLAINTIFF MUST SERVE THIS ADR INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT.**

**CROSS-COMPLAINANTS MUST SERVE THIS ADR INFORMATION PACKAGE ON ANY NEW PARTIES NAMED TO THE ACTION WITH THE CROSS-COMPLAINT.**

**WHAT IS ADR?**

Alternative Dispute Resolution (ADR) helps people find solutions to their legal disputes without going to trial. The Court offers a variety of ADR resources and programs for various case types.

**TYPES OF ADR**

- **Negotiation.** Parties may talk with each other about resolving their case at any time. If the parties have attorneys, they will negotiate for their clients.

- **Mediation.** Mediation may be appropriate for parties who want to work out a solution but need help from a neutral third party. A mediator can help the parties reach a mutually acceptable resolution. Mediation may be appropriate when the parties have communication problems and/or strong emotions that interfere with resolution. Mediation may not be appropriate when the parties want a public trial, lack equal bargaining power, or have a history of physical or emotional abuse.

- **Arbitration.** Less formal than a trial, parties present evidence and arguments to an arbitrator who decides the outcome. In "binding" arbitration, the arbitrator's decision is final; there is no right to trial. In "nonbinding" arbitration, any party can request a trial after the arbitrator's decision.

- **Settlement Conferences.** A judge or qualified settlement officer assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. Mandatory settlement conferences may be ordered by a judicial officer. In some cases, voluntary settlement conferences may be requested by the parties.

**ADVANTAGES OF ADR**

- **Save time and money.** Utilizing ADR methods is often faster than going to trial and parties can save on court costs, attorney's fees, and other charges.
- **Reduce stress and protect privacy.** ADR is conducted outside of a courtroom setting and does not involve a public trial.
- **Help parties maintain control.** For many types of ADR, parties may choose their ADR process and provider.

**DISADVANTAGES OF ADR**
- **Costs.** If the parties do not resolve their dispute, they may have to pay for ADR, litigation, and trial.
- **No Public Trial.** ADR does not provide a public trial or decision by a judge or jury.

**WEBSITE RESOURCES FOR ADR**
- **Los Angeles Superior Court ADR website:** www.lacourt.org/ADR
- **California Courts ADR website:** www.courts.ca.gov/programs-adr.htm

**Los Angeles Superior Court ADR Programs for Unlimited Civil (cases valued over $35,000)**

Litigants should closely review the requirements for each program and the types of cases served.

- **Civil Mediation Vendor Resource List.** Litigants in unlimited civil cases may use the Civil Mediation Vendor Resource List to arrange voluntary mediations without Court referral or involvement. The Resource List includes organizations that have been selected through a formal process that have agreed to provide a limited number of low-cost or no-cost mediation sessions with attorney mediators or retired judges. Organizations may accept or decline cases at their discretion. Mediations are scheduled directly with these organizations and are most often conducted through videoconferencing. The organizations on the Resource List target active civil cases valued between $50,000-$250,000, though cases outside this range may be considered. *For more information and to view the list of vendors and their contact information, download the Resource List Flyer and FAQ Sheet at www.lacourt.org/ADR/programs.html.*
  **RESOURCE LIST DISCLAIMER:** The Court provides this list as a public service. The Court does not endorse, recommend, or make any warranty as to the qualifications or competency of any provider on this list. Inclusion on this list is based on the representations of the provider. The Court assumes no responsibility or liability of any kind for any act or omission of any provider on this list.

- **Mediation Volunteer Panel (MVP).** Unlimited civil cases referred by judicial officers to the Court's Mediation Volunteer Panel (MVP) are eligible for three hours of virtual mediation at no cost with a qualified mediator from the MVP. Through this program, mediators volunteer preparation time and three hours of mediation at no charge. If the parties agree to continue the mediation after three hours, the mediator may charge their market hourly rate. When a case is referred to the MVP, the Court's ADR Office will provide information and instructions to the parties. The Notice directs parties to meet and confer to select a mediator from the MVP or they may request that the ADR Office assign them a mediator. The assigned MVP mediator will coordinate the mediation with the parties. *For more information or to view MVP mediator profiles, visit the Court's ADR webpage at www.lacourt.org/ADR or email ADRCivil@lacourt.org.*

- **Mediation Center of Los Angeles (MCLA) Referral Program.** The Court may refer unlimited civil cases to mediation through a formal contract with the Mediation Center of Los Angeles (MCLA), a nonprofit organization that manages a panel of highly qualified mediators. Cases must be referred by a judicial officer or the Court's ADR Office. The Court's ADR Office will provide the parties with information for submitting the case intake form for this program. MCLA will assign a mediator based on the type of case presented and the availability of the mediator to complete the mediation in an appropriate time frame. MCLA has a designated fee schedule for this program. *For more information, contact the Court's ADR Office at ADRCivil@lacourt.org.*

- **Resolve Law LA (RLLA) Virtual Mandatory Settlement Conferences (MSC).** Resolve Law LA provides three-hour virtual Mandatory Settlement Conferences at no cost for personal injury and non-complex employment cases. Cases must be ordered into the program by a judge pursuant to applicable Standing Orders issued by the Court and must complete the program's online registration process. The program leverages the talent of attorney mediators with at least 10 years of litigation experience who volunteer as settlement officers. Each MSC includes two settlement officers, one each from the plaintiff and defense bars. Resolve Law LA is a joint effort of the Court, Consumer Attorneys Association of Los Angeles County (CAALA), Association of Southern California Defense Counsel (ASCDC), Los Angeles Chapter of the American Board of Trial Advocates (LA-ABOTA), Beverly Hills Bar Foundation (BHBF), California Employment Lawyers Association (CELA), and Los Angeles County Bar Association (LACBA). *For more information, visit https://resolvelawla.com.*

- **Judicial Mandatory Settlement Conferences (MSCs).** Judicial MSCs are ordered by the Court for unlimited civil cases and may be held close to the trial date or on the day of trial. The parties and their attorneys meet with a judicial officer who does not make a decision, but who instead assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. For more information, visit https://www.lacourt.org/division/civil/CI0047.aspx.

**Los Angeles Superior Court ADR Programs for Limited Civil (cases valued below $35,000)**
Litigants should closely review the requirements for each program and the types of cases served.

- **Online Dispute Resolution (ODR).** Online Dispute Resolution (ODR) is a free online service provided by the Court to help small claims and unlawful detainer litigants explore settlement options before the hearing date without having to come to court. ODR guides parties through a step-by-step program. After both sides register for ODR, they may request assistance from trained mediators to help them reach a customized agreement. The program creates settlement agreements in the proper form and sends them to the Court for processing. Parties in small claims and unlawful detainer cases must carefully review the notices and other information they receive about ODR requirements that may apply to their case. *For more information, visit https://my.lacourt.org/odr.*

- **Dispute Resolution Program Act (DRPA) Day-of-Hearing Mediation.** Through the Dispute Resolution Program Act (DRPA), the Court works with county-funded agencies, including the Los Angeles County Department of Consumer & Business Affairs (DCBA) and the Center for Conflict Resolution (CCR), to provide voluntary day-of-hearing mediation services for small claims, unlawful detainer, limited civil, and civil harassment matters. DCBA and CCR staff and trained volunteers serve as mediators, primarily for self-represented litigants. There is no charge to litigants. *For more information, visit https://dcba.lacounty.gov/countywidedrp.*

- **Temporary Judge Unlawful Detainer Mandatory Settlement Conference Pilot Program.** Temporary judges who have been trained as settlement officers are deployed by the Court to designated unlawful detainer court locations one day each week to facilitate settlement of unlawful detainer cases on the day of trial. For this program, cases may be ordered to participate in a Mandatory Settlement Conference (MSC) by judicial officers at Stanley Mosk, Long Beach, Compton, or Santa Monica. Settlement rooms and forms are available for use on the designated day at each courthouse location. There is no charge to litigants for the MSC. *For more information, contact the Court's ADR Office at ADRCivil@lacourt.org.*