Todd M. Friedman (216752)
Adrian R. Bacon (280332)
Law Offices of Todd M. Friedman, P.C.
23586 Calabasas Rd., Suite 105
Calabasas, CA 91302
Phone: 323-306-4234
Fax: 866-633-0228
Email: tfriedman@toddflaw.com
Email: abacon@toddflaw.com

*Attorneys for Plaintiff*

[*Additional Counsel Listed on Signature Page*]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOSEPH LIMAS, individually and on behalf of all others similarly situated,<br>Plaintiff,<br>v.<br>WAYFAIR LLC,<br>Defendant. | Case No. 2:25-cv-11185-DMG-E<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF CALIFORNIA INVASION OF PRIVACY ACT** |

## INTRODUCTION

In argument before the United States Supreme Court on January 10, 2025, America's Solicitor General called social media app TikTok a ***"grave threat to our nation***."[1] Justice Kavanaugh went further, saying, "Just on the data collection, that seems like a huge concern for the future of the country[.]"[2]

TikTok's—and other social media giants'—ability to collect personal information from everyday Americans requires the active assistance of companies like Wayfair LLC ("Wayfair" or "Defendant"). Defendant created an online presence at **https://www.wayfair.com/** (the "Website"). Unbeknownst to its customers, Defendant begins tracking customers' journeys on the Website as soon as they land on any of its webpages through its use of various tracking pixels (the "Tracking Tools"), including those developed by TikTok, Facebook, Pinterest, Snapchat, Twitter, and Reddit (the "Tracking Entities"). Defendant tracks its customers' journeys across the web, eavesdropping on their conversations, and bombarding them with targeted advertising through its use of Tracking Tools. This tracking captures detailed interaction and behavioral data, including links, buttons, forms, and other on-page elements selected by visitors, as well as information entered into search fields. The data includes location information, viewed or requested webpages and videos, and interests, preferences, age, location, or other characteristics inferred from visitor behavior and content engagement. It also includes personal, device, and technical identifiers such as device type, operating system, browser type, persistent visitor identifiers that enable recognition across sessions and websites, visitors' email addresses, and approximate geolocation data derived from IP addresses or similar signals. Collectively, this information is referred to herein as "Sensitive Information". The California Legislature has made clear that this secret, invasive surveillance violates California law.

[1] Zach Schonfeld & Julia Shapero, *TikTok Gets Frosty Reception At Supreme Court In Fight To Stave Off Ban*, THE HILL (Jan. 10, 2025 1:42 PM), https://thehill.com/regulation/court-battles/5079608-supreme-court-tik-tok-ban/ (last visited Oct. 9, 2025).

[2] *Id.*

Joseph Limas ("Plaintiff") visited the Website, as recently as May 2025, to search for furniture, home decor, appliances, and other home goods. Defendant de-anonymized Plaintiff by using electronic impulses generated from Plaintiff's device and helped the Tracking Entities track and eavesdrop on Plaintiff's personal life. Defendant violated and continues to violate the California Invasion of Privacy Act, codified at California Penal Code §§ 631, *et seq.* Plaintiff brings this class action on behalf of similarly situated users of the Website and was surveilled as a result of Defendant's implementation of the Tracking Tools on the Website.

## JURISDICTION AND VENUE

1. As a Court of general jurisdiction, this Court has jurisdiction over all matters presented to it per the mandates of the California Constitution.

2. Venue is proper in this County because some of the Class Members' claims arose in this county.

3. Defendant is subject to jurisdiction under California's "long-arm" statute found at California Code of Civil Procedure Section 410.10 because the exercise of jurisdiction over Defendant is not "inconsistent with the Constitution of this state or the United States."

## PARTIES

4. Plaintiff Joseph Limas is a resident and citizen of California. Plaintiff is genuinely interested in the goods, services, and information on Defendant's Website. Plaintiff used Defendant's Website for its intended purpose of browsing for furniture, home decor, appliances, and other home goods. For example, Plaintiff recently used the Website to search for furniture, home decor, lighting fixtures, bedding & bath accessories, outdoor furniture, storage and organization products, and appliances. Plaintiff accessed the Website on the same devices and the same browser he accessed TikTok, Facebook, Pinterest, Snapchat, Twitter, and Reddit. Plaintiff was in California at all relevant times while using Defendant's Website. Plaintiff's personal information

was thus shared with TikTok and other third-party social media companies as a result of Defendant's implementation of Tracking Tools on the Website.

5. Defendant Wayfair LLC is in the business of selling furniture, home decor, appliances, and other home goods. Defendant operates the Website. It serves as an online marketplace offering millions of products from thousands of suppliers, enabling customers to find items for every part of their home, from the kitchen and living room to outdoor spaces to consumers across the United States. Defendant is a limited liability corporation formed in Delaware and headquartered in Boston, Massachusetts.

## FACTUAL ALLEGATIONS

### A. Legislative Background: The California Invasion of Privacy Act (CIPA)

6. The California Invasion of Privacy Act ("CIPA") was enacted in 1967 for the expressly stated purpose "to protect the right of privacy of the people of [California]."[3]

7. California legislators were concerned about emergent technologies that allowed for the "eavesdropping upon private communications," believing such technologies "created a serious threat to the free exercise of personal liabilities and cannot be tolerated in a free and civilized society."[4]

8. To protect people's privacy, California legislators broadly protected communications being sent from or received in California through the enactment of CIPA.[5] Indeed, CIPA "is a declaration of legislative finding and intent; it speaks of preventing eavesdropping and other invasions of privacy . . . ."

9. Section 638 of CIPA prohibits the installation or use of "a pen register or a trap and trace device without first obtaining a court order . . . ."[6]

10. "Pen register" is defined as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or

[3] Cal. Penal Code § 630.
[4] *Id.*
[5] Cal. Penal Code §§ 631-32.
[6] Cal. Penal Code § 638.51.

facility from which a wire or electronic communication is transmitted, but not the contents of a communication."[7]

11. "Trap and trace device" is defined as a "device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."[8]

12. Given CIPA's purpose to protect Californians' privacy, "it seems very unlikely that the state Legislature meant to permit the installation and implementation of pen registers 'so long as those devices also record the contents of third party's communications." *Gabrielli v. Haleon US Inc.*, No. 25-cv-02555-WHO, 2025 U.S. Dist. LEXIS 169503, at *34 (N.D. Cal. Aug. 29, 2025).

13. Defendant was not authorized by any court order to use Tracking Tools, including the TikTok Pixel, to record and capture Plaintiff's and Class Members' communications with the Website in violation of CIPA § 638.

**B. How Websites Function**

14. Websites are hosted on servers, in the sense that their files are stored on and accessed from servers. Websites are, in part, "run" on a user's internet browser, as the browser loads and processes the website's code to display the webpage.

15. Websites are a collection of webpages. A webpage is essentially a document containing text written in HyperText Markup Language (HTML) code.[9]

16. Each webpage has a unique address, and two webpages cannot be stored at the same address.[10]

17. When a user navigates to a webpage (by entering a URL address directly or clicking a hyperlink containing the address), that user's browser contacts the DNS

---

[7] *Id.* § 638.50(b).
[8] *Id.* § 638.50(c).
[9] *What is the difference between webpage, website, web server, and search engine?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/Web_mechanics/Pages_sites_servers_and_search_engines (last visited Oct. 9, 2025).
[10] *Id.*

(Domain Name System) server, which translates the web address of that website into a unique IP (Internet Protocol) address.[11]

18. An IP address is "a unique address that identifies a device on the internet or a local network."[12] Essentially, an IP address is:

> The identifier that allows information to be sent between devices on a network: they contain location information and make devices accessible for communication. The internet needs a way to differentiate between different computers, routers, and websites. IP addresses provide a way of doing so and form an essential part of how the internet works. *Id.*

19. When a user's browser navigates to a webpage, it sends an HTTP request to the server identified by the webpage's IP address (the "Request URL"). This request is for the specific resource located at the URL. If the server fulfils this request, it issues an HTTP response, which includes the status of the request and, typically, the requested content. This content is then transmitted in small chunks, known as data packets, and reassembled into the complete webpage upon arrival by the user's browser.[13]

20. This Request URL includes a domain name and path, which identify the specific content being accessed on a website and its location within the website's structure.

21. The Request URL typically contains parameters. Parameters are values added to a URL to transmit data to the recipient, prefaced by a question mark to signal the use of parameters. Parameters direct a web server to provide additional context-sensitive services,[14] as depicted below:

---

[11] *How the web works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited Oct. 9, 2025).

[12] *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited Oct. 9, 2025).

[13] *Id.*

[14] To see examples of how Defendant used parameters to provide additional information here, *see, infra,* Section C(2).




*Figure 1 - Mozilla's diagram of a URL, including parameters*[15]

22. Website owners or web developers write and manage the URLs for their websites.

23. URL encoding is an essential process to ensure that data is safely transmitted via URLs. URL encoding converts characters into a format that can be transmitted over the Internet.[16] For example, URLs cannot contain spaces; URL encoding normally replaces a space with a plus (+) sign or with %20.

24. The American Standard Code for Information Interchange (ASCII) was designed in the early 1960s as a standard character set for computers and electronic devices.[17] Today, UTF-8 is the Internet's most common character encoding.[18]

25. URL decoding is the process of URL encoding in reverse so that the URL is in a more readable format.[19] To demonstrate:




*Figure 22 – Demonstrating URL encoding and decoding*[20]

[15] *What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Oct. 9, 2025).
[16] *Id.*
[17] *HTML ASCII Reference*, W3 SCHOOLS, https://www.w3schools.com/charsets/ref_html_ascii.asp (last visited Oct. 9, 2025).
[18] *UFT-8*, MOZILLA, https://developer.mozilla.org/en-US/docs/Glossary/UTF-8 (last visited Oct. 9, 2025).
[19] *What IS URL Decoding and URL Encoding?*, GOCHYU (Oct. 18, 2020), https://gochyu.com/blog/url-encode-decode (last visited Oct. 9, 2025).
[20] Viraj Shetty, *URL Encoding in a few minutes*, YOUTUBE (Sept. 5, 2023), https://www.youtube.com/watch?v=ru0iCHsmsLc (last visited Oct. 9, 2025).

26. Similarly, parameters and metadata can be parsed and separated into easily reviewed, searchable formats.




*Figure 33 – Sample webpage used to demonstrate a webpage URL*




*Figure 44 – Request URL of sample webpage from Figure 3, encoded for transmission (compare with decoded URL in Figure 3)*




*Figure 55 – Decoded and parsed data from Request URL in Figure 4, showing easy-to-read parameters and metadata*

27. After sending the Request URL, and after the server responds to the Request URL, the user's browser assembles the packets sent by the server back into the HTML code that of the webpage, which is then processed by the user's browser and "rendered" into a visual display according to the instructions of the HTML code.[21] This is the visible, and usually interactable, website that most people think of.

28. To provide more complex website functionalities, website developers will include more complex commands written in other computer programming languages, such as JavaScript snippets, within the HTML documents.[22]

29. In short, the Internet relies on a constant back-and-forth stream of requests.

30. Unbeknownst to users, as they browse the Website, the Tracking Tools capture and record both incoming and outgoing requests that make up their experience on the Website.

[21] *What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Oct. 9, 2025).

[22] *See JavaScript Basics*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited Oct. 9, 2025).

### C. Defendant's Website and the Tracking Tools Spy on Consumers Like Plaintiff.

31. Defendant operates the Website and has installed on the Website software created by third-party social media companies. These Tracking Tools operate invisibly, tracking Defendant's site visitors' activity surreptitiously.

32. Generally, the Tracking Tools collect information about users' site activity when events specified by Defendant—like adding a product to the shopping cart—are triggered. Parameters added to events by Defendant determine just how much data is collected, and how specific that data is.

33. Parameters are strings of text that website owners add to a URL to track and organize their webpages.[23] URL parameters include key-value pairs formatted as "key=value":

a. The "key" is what the website owner wants to adjust or track (e.g., "color" or "ev" for event)

b. The "value" is the specific setting or data for that parameter (e.g., "yellow" or "AddToCart" for a user taking the action of adding a product to their online shopping cart)




*Figure 6 - Diagram of a URL displaying how parameters function*[24]

---

[23] *URL Parameters: What They Are and How to Use Them Properly*, BACKLINKO (Mar. 13, 2025), https://backlinko.com/url-parameters (last visited Oct. 9, 2025).
[24] *Id.*

34. For instance, the Facebook Pixel (discussed and defined herein) transmission below shows that Defendant added a parameter to track events being triggered ("ev") and the event triggered here was the "AddToCart" event (*see* Section C(2)), among other parameters.




*Figure 7 - Facebook Pixel transmission displaying event parameter being collected and disclosed to Facebook*

**1. The TikTok Pixel**

35. TikTok offers software – known as a "tracking pixel" – to track users' actions, behavior, and conversions across the Website (the "TikTok Pixel").

36. The TikTok Pixel is a snippet of code that begins to collect information the moment a user lands on the Website.

37. To use the TikTok Pixel, the website operators must include the specific pixel IDs associated with their websites, which allows TikTok to link the collected data back to their individual TikTok business profiles.[25]

38. Defendant's TikTok Pixel ID is included in transmissions sent to and from users' devices, as seen in *Figures 9* and *12*—the "sdkid" parameter in Figure 9 references the TikTok Pixel code library for Defendant's Pixel ID, whereas the "code" variable in *Figure 12* identifies the TikTok Pixel ID, both of which reference the Pixel ID as "C7KTM4O68TKN71DEGAK0".

[25] *See generally Troubleshoot with Pixel Helper*, TikTok, https://ads.tiktok.com/help/article/tiktok-pixel-helper-2.0?lang=en (last visited Dec. 23, 2025) (noting that a missing or invalid Pixel ID will cause errors when using the TikTok Pixel).

39. The TikTok Pixel shares information when an action is taken on the Website, based on events set up by Defendant.[26] These events can include adding an item to a cart, making a purchase, when a specific button or element is clicked (like the search field), and when a URL with a specified keyword is visited.[27]

40. TikTok Pixel users, including Defendant, add parameters to events to collect even more data on users' activities, including parameters for the currency used for the purchase, the value of the purchase, and the type of content purchased.[28]

41. The TikTok Pixel also collects:

a. The time website actions took place;

b. The IP address (which is used to determine the geographic location of an event);

c. Device information, including make, model, operating system, and browser information);

d. Cookies that can be used to identify users; and

e. Metadata and button clicks.[29]

42. The information the TikTok Pixel collects provides Defendant with a better understanding of who its customers are and how they navigate around the Website.

43. TikTok's "Advanced Matching" features allows Defendant to "match customer information such as email and phone number along with actions people take on [the Website]."[30] Once Advanced Matching is active, the TikTok Pixel "will automatically find customer information and match it with people on TikTok."[31] TikTok then provides Defendant with custom audiences based on website visitor events, like page

---

[26] *About TikTok Pixel*, TIKTOK, https://ads.tiktok.com/help/article/tiktok-pixel (last visited Oct. 9, 2025).

[27] *About Standard and Custom events*, TIKTOK, https://ads.tiktok.com/help/article/standard-events-parameters?lang=en (last visited Oct. 9, 2025) (describing standard "events"); *How to Set Up Events and Parameters with Events Builder*, TIKTOK, https://ads.tiktok.com/help/article/how-to-set-up-events-and-parameters (last visited Oct. 9, 2025) (describing how to designate events).

[28] *How to Set Up Events and Parameters with Events Builder*, TIKTOK, https://ads.tiktok.com/help/article/how-to-set-up-events-and-parameters (last visited Oct. 9, 2025) (describing how to designate events).

[29] *About TikTok Pixel*, TIKTOK, https://ads.tiktok.com/help/article/tiktok-pixel (Sept. 25, 2025).

[30] *About Advanced Matching for Web*, TIKTOK, https://ads.tiktok.com/help/article/advanced-matching-web?lang=en (last visited Oct. 9, 2025).

[31] *How to set up Automatic Advanced Matching*, TIKTOK, https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en (last visited Oct. 9, 2025).

views or purchases, to model lookalike audiences.[32] Lookalike audiences allow Defendant to retarget users who have already visited or made purchases on the Website and serve them with relevant ads on TikTok based on how they interacted with the Website.[33]

44. Put simply, the TikTok Pixel collects as much data as it can about otherwise anonymous visitors to the Website and matches it with existing data TikTok has acquired and accumulated about hundreds of millions of Americans to improve Defendant's conversion rates and reduce overall advertising costs.[34]

45. Using the TikTok Pixel benefits Defendant by allowing Defendant to effectively track conversions, optimize the delivery of its ad campaigns, create and target its own custom audiences, and access tons of data to run successful ad campaigns.[35]

46. TikTok benefits, in turn, by using data collected by the TikTok Pixel to improve their own products and services and to generate their own benchmarking reports to share with other TikTok customers.[36]

47. According to a leading data security firm, the TikTok Pixel secretly installed on Defendant's Website is particularly invasive. The TikTok Pixel "immediately links to data harvesting platforms that pick off usernames and passwords, credit card and banking information and details about users' personal health."[37] The TikTok Pixel also collects "names, passwords and authentication codes" and "transfer the data to locations around the globe," and does so "before users have a chance to accept cookies or otherwise grant consent."[38]

---

[32] *Get started with the TikTok Pixel: a small business guide*, TIKTOK (Sept. 6, 2024), https://ads.tiktok.com/business/en-US/blog/get-started-with-tiktok-pixel (last visited Oct. 9, 2025) (benefits of using the TikTok Pixel).

[33] *See How to use TikTok Pixel: TikTok conversions tracking*, LEADSBRIDGE (May 2, 2025), https://leadsbridge.com/blog/tiktok-pixel/ (last visited Oct. 9, 2025).

[34] *Id.*

[35] *See Benefits of using the TikTok Pixel*, TIKTOK, https://ads.tiktok.com/business/en-US/blog/get-started-with-tiktok-pixel?acq_banner_version=73412989 (last visited Sept. 25, 2025).

[36] *TikTok Business Products (Data) Terms*, TIKTOK (July 29, 2024), http://ads.tiktok.com/i18n/official/policy/business-products-terms.

[37] *See* Aaron Katersky, *TikTok Has Your Data Even If You've Never Used The App: Report*, ABC NEWS (Mar. 16, 2023 1:59 PM), https://abcnews.go.com/Business/tiktok-data-app-report/story?id=97913249.

[38] *Id.*

48. An image of the invasive TikTok code secretly embedded on Defendant's Website can be seen here, which shows the Website instantly sending communications to TikTok to add to its collection of user behavior:




*Figure 8 – Home page of Website*




*Figure 9 – Using a browser's "developer tools" on a Vrai webpage shows the Website loading TikTok Pixel's code onto the user's browser*




```
window[window["TiktokAnalyticsObject"]]._env = {
    "env": "external",
    "key": ""
};
window[window["TiktokAnalyticsObject"]]._variation_id = 'default';
window[window["TiktokAnalyticsObject"]]._vids = '74172069,74531382';
window[window["TiktokAnalyticsObject"]]._cc = 'US';
window[window.TiktokAnalyticsObject]._li || (window[window.TiktokAnalyticsObject]._li = {}),
window[window.TiktokAnalyticsObject]._li["C7KTM4068TKN71DEGAK0"] = "f482c599-a56e-11f0-9bd5-02001702bb40";
window[window["TiktokAnalyticsObject"]]._cde = 390;
;if (!window[window["TiktokAnalyticsObject"]]._server_unique_id)
    window[window["TiktokAnalyticsObject"]]._server_unique_id = 'f482d99a-a56e-11f0-9bd5-02001702bb40';
window[window["TiktokAnalyticsObject"]]._plugins = {
    "AdvancedMatching": true,
    "AutoAdvancedMatching": true,
    "AutoConfig": true,
    "Callback": true,
    "DiagnosticsConsole": true,
    "EnableLPV": true,
    "EnrichIpv6": true,
    "EnrichIpv6V2": true,
    "EventBuilder": true,
    "EventBuilderRuleEngine": false,
    "HistoryObserver": true,
    "Identify": true,
    "JSBridge": false,
    "Monitor": false,
    "PageData": true,
    "PerformanceInteraction": false,
    "RuntimeMeasurement": true,
    "Shopify": true,
    "WebFL": false
};
window[window["TiktokAnalyticsObject"]]._csid_config = {
    "enable": true
};
```

*Figure 10 – Defendant's TikTok Pixel code on the Website displaying the active features of the TikTok Pixel on the Website*

49. The Website instantly sends communications to TikTok when a user views the page and tracks page interactions. In the screenshots below, the sample webpage being viewed is depicted, along with the webpage code showing the various TikTok scripts being run by Defendant, and the electronic impulses being sent to TikTok to add to their collection of user behavior:




*Figure 11 – Sample product on the Website*




*Figure 12 – Information collected via the TikTok Pixel when a user visits the sample webpage from Figure 11*

50. To use the TikTok Pixel, Defendant agreed to TikTok's Business Products (Data) Terms (the "TikTok Terms").

51. The TikTok Terms inform website owners using the TikTok Pixel that their use of the TikTok Pixel shares or enables TikTok to access their website users' contact details, developer data, and/or event data.[39]

52. The TikTok Terms are transparent that TikTok will process users' data to match contact details against corresponding accounts, and subsequently match those accounts with the users' corresponding event data.[40]

53. TikTok obligates TikTok Pixel users, such as Defendant, that they "must only share with us or enable us to access Business Products Data in a manner that is transparent and lawful."[41] TikTok makes clear that the onus is on Defendant to provide

---

[39] *TikTok Business Products (Data) Terms*, TIKTOK (July 29, 2024), https://ads.tiktok.com/i18n/official/policy/business-products-terms.

[40] *Id.*

[41] *Id.*

all necessary transparency notices, and obtain all necessary rights, permissions, and lawful bases, including consent, to share information with TikTok.

54. TikTok educates or reminds TikTok Pixel users of their obligation not to share any data "from or about Children or that includes health or financial information, or other categories of sensitive information."[42]

55. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the TikTok Pixel, and ignored TikTok's warnings to safely handle its users' data and warn its users' that the Website would disclose their information in a manner that threatened their Sensitive Information.

56. The TikTok software serves essentially two main purposes: identifying visitors to a website and then tracking their activity across that website.

57. Defendant allows TikTok to track the activity of its website users for one primary purpose: advertising. Defendant allows TikTok to collect the data of its website users so that it can "match [Defendant's] website users with people on TikTok, therefore expanding audience sizes for solutions like web retargeting."[43]

58. Web retargeting is the process of using targeted online advertisements to advertise to people who have already visited Defendant's website. In other words, Defendant uses the TikTok Tracking Tools to market to people who have visited its website, but opted not to purchase something.

**a. How the TikTok Tracking Tools Identify Defendant's Website Users**

59. The TikTok Tracking Tools employ several different processes to identify the users of Defendant's website. These processes are generally known as "fingerprinting."

60. The first process is through the use of third-party cookies.

[42] *Id.*
[43] *See* https://ads.tiktok.com/help/article/advanced-matching-web?lang=en (last visited October, 2025).

61. As TikTok itself states, "[c]ookies are small text files that help match events with people who engage with your content on TikTok and can be used to enhance measurement accuracy and ad campaign optimization."[44]

62. In simple terms, whenever a person accesses the TikTok website, TikTok loads a cookie—a miniscule text file—onto the user's web browser. The cookie contains data that TikTok can use to identify that particular user. For example, if an individual logs into their TikTok account on their browser, the cookie will contain a unique user ID that is associated with their personal TikTok account. That text file containing user IDs will remain on the user's browser for up to 13 months, if it is not deleted sooner.

63. Once TikTok loads a cookie onto a user's browser, it can then use that cookie to track them across any website that utilizes its tracking software.

64. When a user connects to a website that utilizes the TikTok Tracking Tools—such as Defendant's Website—the TikTok Tracking Tools run a script that looks through the user's browser to see if there are any cookies loaded into the browser that are associated with TikTok. If they find any such cookies, they are then reloaded by the third-party website that is using the TikTok Tracking Tools.

65. In this way, TikTok is able to directly link otherwise anonymous internet users to their personal TikTok accounts, whether they want TikTok to or not.

66. The following is an illustration of how this process works from start to finish: An individual, John Doe, decides to visit the TikTok website from his personal computer. John Doe opens his Google Chrome web browser, types in www.TikTok.com, pushes the enter key, and is taken to TikTok's website. Upon connecting to the website, TikTok loads a cookie onto John Doe's Google Chrome web browser, containing a unique ID number that it has generated for him and assigned to his computer. John Doe decides to log into his personal TikTok account so he can rewatch some of the videos he has previously liked. Upon logging into his TikTok account, TikTok loads another cookie onto John Doe's Google Chrome web browser containing his unique TikTok user ID.

[44] https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en (last visited October 2025).

After scrolling through several videos on TikTok, John Doe disconnects from the website and closes his Google Chrome Browser. Later that same day, John Doe decides to visit www.wayfair.com to shop for furniture. John Doe opens his Google Chrome web browser, types in www.wayfair.com, pushes the enter key, and is taken to Defendant's website. The instant John Doe connects to Defendant's website, the TikTok Tracking Tools —which is installed on Defendant's website—deploy a script and look through his Google Chrome browser to see if there are any TikTok cookies already in his browser that it can use to identify him. Because John Doe visited TikTok and logged into his account earlier that same day, the TikTok Tracking Tools are able to locate multiple TikTok cookies and load them on Defendant's website. This information is then communicated back to TikTok through the TikTok Tracking Tools. Using the information contained in the cookies located by the TikTok Tracking Tools (such as John Doe's unique TikTok user ID), TikTok matches the identifying information with the data contained in its database to determine the identity of the person who accessed Defendant's website. TikTok is instantaneously aware that John Doe is browsing Defendant's Website. The TikTok Tracking Tools do not depend solely on the use of cookies to identify individuals browsing Defendant's website. Consider, for example, a user who has never accessed the TikTok website and never maintained a personal TikTok account. In this case, there would be no TikTok cookies loaded on the user's browser for the TikTok Tracking Tools to identify. Is TikTok nonetheless able to identify and track this person? The answer is yes.

67. This is because the TikTok Tracking Tools employ a second process to identify people who visit Defendant's Website. It collects data transmitted from the user's web browser and device to Defendant's server and then attempts to match that data against its own database to identify the user. More specifically, the TikTok Tracking Tools collect a user's IP address, device user-agent strings, device make, device model, operating system type, browser type, and unique browser ID.[45] They do so by collecting

[45] *See* https://ads.tiktok.com/help/article/tiktok-pixel?lang=en (last visited October 2025).

metadata communicated between a user's web browser and Defendant's server, known as HTTP headers.

68. When a user connects to Defendant's website, its server automatically sends a request to the user's web browser for various types of information. Among them are the IP address of the user's device, the user's device user-agent strings, the make and model of the user's device, the type of operating system the user's device utilizes, what browser the user is utilizing, and the unique browser ID for the user's web browser. The user's web browser responds by sending a package of data, called an HTTP header, containing the requested information. Once the response is sent, the TikTok Tracking Tools collect the metadata that it can use to identify the user. Then, the TikTok Tracking Tools compare this collected data to a database maintained by TikTok to find any matching entries. Successfully matching metadata collected by the TikTok Tracking Tools with data in TikTok's database allows TikTok to track a user across multiple webpages. If TikTok's database does not have a matching entry, the TikTok Tracking Tools will create a new entry and log the metadata for future matching as described above.

69. The following is an illustration of how this process works from start to finish: an individual, John Doe, decides to visit an ecommerce website that uses the TikTok pixel from his personal computer. John Doe opens his Google Chrome web browser, types in the web address for the ecommerce site, pushes the enter key, and is taken to the ecommerce website. Upon connecting to the website, the website's server requests metadata from John Doe's Google Chrome web browser. John Doe's Google Chrome web browser sends a package of metadata back to the server, which includes his IP address, his computer's user-agent strings, the make and model of John Doe's personal computer, the type of operating system John Doe's computer uses, data indicating he is using Google Chrome, and the unique ID associated with John Doe's Google Chrome browser. This metadata is collected by the TikTok Tracking Tools and compared against TikTok's database. Suppose that TikTok does not have any entries that match the

metadata collected by the TikTok Tracking Tools. The TikTok Tracking Tools then create a new entry in the database, including all of the metadata captured by the TikTok Tracking Tools, and assign it a unique identifying number. Later that same day, John Doe decides to visit www.wayfair.com to shop for furniture. John Doe opens his Google Chrome web browser, types in www.wayfair.com, pushes the enter key, and is taken to Defendant's website. The instant John Doe connects to Defendant's website, Defendant's server requests metadata from John Doe's Google Chrome web browser. John Doe's Google Chrome web browser sends a package of metadata back to Defendant's server, which includes his IP address, his computer's user-agent strings, the make and model of John Doe's personal computer, the type of operating system John Doe's computer uses, data indicating he is using Google Chrome, and the unique ID associated with John Doe's Google Chrome browser. The TikTok Tracking Tools capture this metadata and compares it against TikTok's database. This time, the data matches an entry already in the database—the entry created earlier the same day. TikTok matches these data entries and records that John Doe has visited Defendant's website. TikTok is instantaneously aware that John Doe is browsing Defendant's website. Both of the processes described in paragraphs 57 through 70 occur simultaneously.

70. Both of the processes described in paragraphs 57 through 70 occur instantaneously upon connecting to Defendant's website, before any privacy policy or cookie banner is presented to the user.

**b. The TikTok Tracking Tools Track a User's Activity Across Defendant's Website**

71. Once a user has been identified, the TikTok Software tracks their entire interaction on Defendant's website.

72. The TikTok Tracking Tools track what pages on a website a user visits, what buttons they click on, what products they select, what products they purchase (if any), and what ads they click on (if any).

73. The TikTok Tracking Tools then catalog this information in its database to keep a record of a user's website behavior.

74. This data is then used to push targeted advertising to website users based on their online browsing activity, allowing Defendant to publish ads on TikTok for particular products by telling TikTok to push a specific advertisement to any individual that it has a record of clicking on the webpage for that product.

75. For example, consider if John Doe clicked on the link for Defendant's Leonardo Modern End Table,[46] but opted not to purchase the product upon his first visit to Defendant's Website. TikTok, after having identified John Doe as described above, would keep a record of John Doe having visited that particular page on Defendant's Website. If Defendant opted to run an ad campaign through TikTok targeting any people who clicked on, but did not buy, their Leonardo Modern End Table, TikTok would then use its record of John Doe having visited the Website to push Defendant's ads to him the next time he logs in to TikTok.

**2. The Facebook Pixel**

76. Facebook offers its own tracking pixel (the "Facebook Pixel") to website owners for the purpose of monitoring user interactions on their websites, which can then be shared with Facebook.

77. The Facebook Pixel is a marketing tool that can only be added to a webpage by website developers. A website operator must sign up for a business account or link a related Facebook account with its Pixel, and then add code to the website to make use of the Pixel.[47]

[46] *See* https://www.wayfair.com/furniture/pdp/etta-avenue-leonardo-modern-end-table-w002349301.html (last visited February 2026).

[47] *Set up and install the Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited Oct. 9, 2025).

78. Upon creating a Pixel, a Pixel ID (also called a DataSet ID by Meta), is generated.[48] This Pixel ID is used to initialize the Pixel, either by allowing Meta to fetch a pre-determined library of code related to that ID, or otherwise by identifying the website owner's Facebook account used receive the collected data when programming the Pixel directly into a website.[49]

79. This Pixel ID must match "a known Pixel ID" in Meta's system,[50] and is transmitted by the Meta Pixel.[51]

80. As Facebook notes, the Pixel must be added to each individual page that a website owner wishes to be tracked.[52]

81. Once added to a webpage, the Pixel begins intercepting information as soon as a user visits the webpage and the Pixel loads onto the user's browser.[53]

82. The Pixel is employed by Defendant to gather, collect, and then share user information with Facebook.[54] Receiving this information enables Facebook and Defendant to build valuable personal profiles for Website users to inform their targeted advertising campaigns, enhance marketing effectiveness, and increase the chance of converting users into paying customers.[55]

83. The harvested data improves Defendant's advertising by pinpointing audience demographics by interests, gender, or location, and finding the people who are most likely to take action and view content.[56]

---

[48] *Id.*

[49] *Get Started*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Dec. 23, 2025) ("To install the Pixel, add its base code . . . on every page where you will be tracking website visitor actions.").

[50] *Pixel Helper*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/support/pixel-helper (last visited Dec. 23, 2025)

[51] *Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited Dec. 23, 2025).

[52] *Get Started*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Oct. 9, 2025) ("To install the Pixel, add its base code . . . on every page where you will be tracking website visitor actions.").

[53] *See* Mario Neto, *What is the Facebook Pixel – Different ways to collect data to boost your ads performance*, BIRCH BLOG (May 13, 2025), https://bir.ch/blog/what-is-the-facebook-pixel#:~:text=Putting%20it%20simply%2C%20the%20Meta,all%20from%20a%20single%20snippet.

[54] The Facebook Pixel allows websites to track visitor activity by monitoring user actions ("events") that websites want tracked and share a tracked user's data with Facebook. *See Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited Oct. 9, 2025).

[55] *See Meta Pixel*, FACEBOOK, https://www.facebook.com/business/tools/meta-pixel (last visited Oct. 9, 2025).

[56] *See Audience ad targeting*, FACEBOOK, https://www.facebook.com/business/ads/ad-targeting (last visited Oct. 9, 2025).

84. Once implemented on a website, the Facebook Pixel begins to share users' information the moment a user lands on the website.

85. When a Facebook user logs onto Facebook, tracking cookies, including the c_user cookie, the data cookie, and the fr cookie, are automatically created and stored on the user's device.[57] These cookies allow Facebook to link the data it receives through the Facebook Pixel to individual Facebook users.

86. The c_user cookie, for example, contains a series of numbers (the user's Facebook ID, or "FID") to identify a user's profile.




*Figure 13 – Sample c_user cookie, containing FID of test account created by Plaintiff's counsel to investigate the Facebook Pixel*

87. The FID can simply be appended to www.facebookcom/ to navigate to the user's profile (e.g., www.facebook.com/[FID]). Using the FID from *Figure 13*, appending it to the Facebook URL in a standard internet browser (here, www.facebook.com/100091959850832) will redirect the webpage straight to the Facebook profile associated with the FID, as depicted below:

[57] *Cookies Policy: What are cookies, and what does this policy cover?*, FACEBOOK (Dec. 12, 2023), https://www.facebook.com/policy/cookies/.




*Figure 14 – Sample Facebook account created by Plaintiff's counsel to investigate the Facebook Pixel, with FID highlighted in URL*

88. The Pixel tracks user activity on web pages by monitoring events,[58] which, when triggered, cause the Pixel to automatically send data – here, users' Sensitive Information – directly to Facebook.[59] Examples of events utilized by websites include: (i) a user loading a page with a Pixel installed (the "PageView event");[60] (ii) when a user views pre-designated content, like products for sale (the "ViewContent" event);[61] (iii) when a user clicks a pre-designated button, like "Add to Cart" and adds a product to their

---

[58] *About Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Oct. 9, 2025).

[59] *See generally id.*

[60] *Specifications for Meta Pixel standard events*, FACEBOOK, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Oct. 9, 2025).

[61] *Reference: standard events*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/reference/ (last visited Oct. 9, 2025).

shopping cart (the "AddToCart" event, collectively with PageView event, and ViewContent event, the "Pixel Events").[62] The Website utilizes all four Pixel Events.[63]

89. Defendant's use of the Pixel also transmits Defendant's unique Pixel ID via the "id" parameter. Here, Defendant's Pixel ID of "1425809677719680" is transmitted by its use of the Pixel.

90. Defendant uses the Facebook Pixel to monetize its Website users' Ssensitive Information.

91. Facebook independently benefits from the data collected through the Facebook Pixel by using the harvested data to sell targeted advertising services. Through the use of users' Sensitive Information, Facebook refines its marketing algorithms, profiting from the ability to more accurately target potential customers.

92. Defendant's nefarious use of the Facebook Pixel on the Website is demonstrated by the screenshots below, which follow a user's journey to purchasing the sample product on the Website from *Figure 11*.

[62] *Id.*

[63] The presence of Pixel events can be confirmed by using the publicly available and free Meta Pixel Helper tool. *See About the Meta Pixel Helper*, FACEBOOK, https://www.facebook.com/business/help/198406697184603?id=1205376682832142 (last visited Oct. 9, 2025).




*Figure 15 – Facebook Pixel tracking a user landing on the webpage from Figure 11 through the "PageView" event*




*Figure 16 – Facebook Pixel tracking a user viewing the product from Figure 11 through the "ViewContent" event*




*Figure 17 – Facebook Pixel tracking a user adding the product from Figure 11 to their cart through the "AddToCart" event*

93. When a business applies with Facebook to use the Facebook Pixel, it is provided with detail about its functionality, including with respect to Sensitive Information.[64]

94. To make use of the Facebook Pixel, Defendant agreed to Facebook's Business Tool Terms (the "Facebook Terms").

95. The Facebook Terms inform website owners using Facebook's Pixel that the employment of the Pixel will result in data sharing, including with Facebook, through the automatic sharing of Pixel Event information and contact information.[65]

---

[64] *See Get Started*, META, https://developers.facebook.com/docs/meta-pixel/get-started (last visited Oct. 9, 2025) (The Pixel "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts. Once matched, we can their actions in the Facebook Ads Manager so you can use the data . . . . By default, the Pixel will track URLs visited [and] domains visited . . . .").

[65] *Meta Business Tools Terms*, FACEBOOK (Apr. 25, 2023), https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited Oct. 9, 2025).

96. The Facebook Terms are transparent that Meta will use the Pixel Event information and contact information "to match the contact information against user IDs, as well as to combine those user IDs with corresponding [Pixel Event information]."[66]

97. Facebook directs parties implementing the Facebook Pixel—here, Defendant—to encrypt request information[67] before data can be shared.[68]

98. Facebook further provides Facebook Pixel users, such as Defendant, guidance on responsible data handling and details how data is acquired, used, and stored, including which information is shared with Facebook.

99. Facebook educates or reminds Facebook Pixel users of their responsibility to inform their users of their website's data sharing, and specifically guides website owners to obtain the requisite rights, permissions, or consents, before sharing information with any third party.[69]

100. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Facebook Pixel, and ignored Facebook's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' Sensitive Information.

**3. The Pinterest Tag**

101. Defendant has also installed a tracking pixel on its Website created by the social media site, Pinterest (the "Pinterest Tag").

102. The Pinterest Tag is a piece of code that can be added to a website by a website owner to track visitors on the website and record the actions they take, and later target these visitors with ads on Pinterest.[70]

---

[66] *Id.*

[67] This contrasts with Facebook's JavaScript Pixel, which automatically encrypts the data being sent. Defendant has specifically chosen the Facebook Pixel method which makes users' information visible. *See id.*

[68] *Id.*

[69] *Best practices for privacy and data use for Meta Business Tools*, META, https://www.facebook.com/business/help/363303621411154?id=818859032317965 (last visited Oct. 9, 2025).

[70] *Install the Pinterest tag*, PINTEREST, https://help.pinterest.com/en/business/article/install-the-pinterest-tag (last visited Oct. 9, 2025).

103. Once a website owner adds the base code of the Pinterest Tag, website owners can add "event codes" so the Pinterest Tag can track specific actions that visitors take on their websites, such as viewing a page, viewing a video, checking out, and other specified events.[71]

104. Website owners like Defendant then send the collected information to Pinterest. Pinterest recommends that website owners transmit the IP address of website visitors for all conversion events.[72]

105. Without the implementation of any other features, the Pinterest Tag tracks and transmits the URL currently being viewed by the website visitor. Additionally, the Pinterest Tag reads and uses first-party cookies to identify the Pinterest user currently viewing the website through a personalized Pinterest "User ID," even when the user is logged out of Pinterest.[73]

106. Website owners can also, in conjunction with the Pinterest Tag, enable a feature known as "automatic enhanced match" to determine the exact identity of Pinterest users who visit the website.[74]

107. When used in conjunction with automatic enhanced match, the Pinterest Tag collects and transmits to Pinterest users':

a. Emails;

b. First and last names;

c. Phone numbers;

d. Genders;

e. Birth dates;

f. External IDs; and

---

[71] *Add event* codes, PINTEREST, https://help.pinterest.com/en/business/article/add-event-codes (last visited October 09, 2025).

[72] *Track conversion events*, PINTEREST, https://developers.pinterest.com/docs/api-features/track-conversion-events/ (last visited Oct. 9, 2025).

[73] *View tag parameters and cookies*, PINTEREST, https://help.pinterest.com/en/business/article/pinterest-tag-parameters-and-cookies (last visited Oct. 9, 2025).

[74] *Enable automatic enhanced match*, PINTEREST, https://help.pinterest.com/en/business/article/automatic-enhanced-match (last visited Oct. 9, 2025).

g. Cities, States, zip codes, and countries.[75]

108. This data can be used by Pinterest to "match more of [a] website['s] visitors and conversions to people on Pinterest, which can lead to improvements in [ad] campaign performance . . . and audience reach." [76]

109. Pinterest uses this data to help advertisers like Defendant gauge the effectiveness of their ad campaigns, optimize the return on their ad spending, and broaden their audience reach.[77]

110. The Pinterest tag also sends the "tid" parameter, which identifies the website owner's Pinterest tag ID.[78] Here, the "tid" parameter in Pinterest Tag transmissions from Defendant's Website contains Defendant's Pinterest tag ID of "2612729865245". This data is intercepted the moment users send communications to or receive communications from the Website.

111. Additionally, unless websites make use of a specific "limited data processing flag," Pinterest employs this data, such as names, phones numbers, emails and IP addresses, to conduct research on Pinterest usage and to market its own services.[79]

112. Pinterest also sends the data to its business partners and other vendors.[80]

113. Defendant's use of the Pinterest tag on the Website is demonstrated below:

[75] *Id.*
[76] *Id.*
[77] *Id.*
[78] Pinterest tag parameters and cookies, , https://help.pinterest.com/en/business/article/pinterest-tag-parameters-and-cookies (last visited Dec. 23, 2025). *Pinterest tag parameters and cookies*, PINTEREST, https://help.pinterest.com/en/business/article/pinterest-tag-parameters-and-cookies (last visited Dec. 23, 2025).
[79] *Limited data processing*, PINTEREST, https://help.pinterest.com/en/business/article/limited-data-processing (last visited Oct. 9, 2025).
[80] *California Privacy Statement and Notice at Collection*, PINTEREST, https://policy.pinterest.com/en/notice-at-collection (last visited Oct. 9, 2025).




*Figure 18 – Pinterest Tag tracking a user landing on the webpage for the sample product from Figure 11*




*Figure 19 - Pinterest Tag tracking a user adding the sample product from Figure 4 to their online shopping cart through the "addtocart" event*

114. When a website owner applies with Pinterest to use the Pinterest Tag, the website owner must agree to Pinterest's Developer and API Terms of Service (the "Pinterest Terms"), part of which requires agreeing that Pinterest may collect and use website users' information.[81]

115. The Pinterest Terms further provide Pinterest Tag users, like Defendant, guidance on their responsibilities regarding privacy.

116. Pinterest directs parties implementing the Pinterest Tag, such as Defendant, to clearly disclose its data practices and obtain its users' consent where required by law.[82]

117. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Pinterest Tag, and ignored Pinterest's warnings to safely

[81] *Developer and API Terms of Service*, PINTEREST, https://developers.pinterest.com/terms/ (last visited Oct. 9, 2025).
[82] *Id.*

handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' Sensitive Information.

**4. The Snap Pixel**

118. Defendant also installed code on the Website created by Snapchat that tracks Website visitors' actions, behavior, and conversions across the Website (the "Snap Pixel").

119. To make use of the Snap Pixel, Defendant must create a Snapchat Ads manager account, create a pixel, select the information to be collected, follow specific guides for integration with third-party software like Spotify or Google Tag Manager, and determine whether to enable automated matching for the Snap Pixel.[83]

120. The Snap Pixel is a piece of JavaScript code provided by Snapchat that allows advertisers, such as Defendant, to track user actions and behavior on websites for the purpose of measuring ad performance, optimizing ad campaigns, and building targeted audiences for better advertising results.[84]

121. This software may be automatically or manually added to a website's webpages, but in either case, the software must be added to each webpage being tracked.[85]

122. Key features of the Snap Pixel include tracking user actions ("events") designated by advertisers, such as page views, add-to-cart actions, purchases, and sign-ups.[86] Advertisers, such as Defendant, can add additional parameters to these events for

[83] *Getting Started with Enabling the Pixel*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/pixel-website-install?language=en_US&r=692&ui-knowledge-components-aura-actions.KnowledgeArticleVersionCreateDraftFromOnlineAction.createDraftFromOnlineArticle=1 (last visited Oct. 9, 2025).

[84] *Using the Snap Pixel*, SNAPCHAT (July 11, 2023), https://forbusiness.snapchat.com/blog/the-snap-pixel-how-it-works-and-how-to-install-it; *see also Snapchat Pixels*, SPRINKLR, https://www.sprinklr.com/help/articles/snapchat-pixel/snapchat-pixels/640739d87517d84a3aaf2d26 (last visited Oct. 9, 2025); Marialuisa Aldeghi, *How to set up the Snap Pixel: A step-by-step guide*, LEADSBRIDGE (Dec. 18, 2024), https://leadsbridge.com/blog/snap-pixel/.

[85] *See Directly Implement the Pixel On Your Website*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/pixel-direct-implementation?language=en_US (last visited Oct. 9, 2025).

[86] *Pixel Event Examples*, SNAPCHAT, https://businesshelp.snapchat.com/s/topic/0TO8b000000P8xxGAC/pixel-event-examples?language=en_US (last visited Oct. 9, 2025).

more granular insights, like purchase value or product type information.[87] The information is collected immediately as users land on the website where the pixel is installed. [88]

123. The Snap Pixel also allows cross-device tracking, enabling tracking across multiple devices to provide a comprehensive view of a customer's journey.[89]

124. The Snap Pixel collects:

a. The time the website actions occurred;[90]

b. Device information such as the hardware model, operating system, and browser type used;[91]

c. Cookies;[92]

d. Metadata such as button clicks, time spent on the site, conversations, and page visits;[93] and

e. IP addresses for general geographic data.[94]

125. The Snap Pixel enables website owners, such as Defendant, to understand how users navigate to their site. This data helps Defendant refine their advertising strategies by identifying high-performing campaigns and optimizing ad spending.[95]

126. The information the Snap Pixel collects provides Defendant with a better understanding of who its customers are and how they navigate around the Website.

---

[87] *Additional Parameters Example*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/additional-parameters?language=en_US (last visited Oct. 9, 2025).

[88] *Using the Snap Pixel*, SNAPCHAT (July 11, 2023), https://forbusiness.snapchat.com/blog/the-snap-pixel-how-it-works-and-how-to-install-it; *see also* Marialuisa Aldeghi, *How to set up the Snap Pixel: A step-by-step guide*, LEADSBRIDGE (Dec. 18, 2024), https://leadsbridge.com/blog/snap-pixel/.

[89] *About Snap Pixel*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/snap-pixel-about?language=en_US#:~:text=The%20Snap%20Pixel%20is%20a,to%20manage%20your%20privacy%20settings.

[90] *Snap Pixel: Power Your Ad Performance*, SNAPCHAT, https://forbusiness.snapchat.com/advertising/snap-pixel (last visited Oct. 9, 2025).

[91] *Privacy Policy*, SNAP (Apr. 21, 2025), https://values.snap.com/privacy/privacy-policy.

[92] *Cookie information*, SNAP (Apr. 8, 2025), https://www.snap.com/privacy/cookie-information.

[93] Ate Keurentjes, *How do you install the Snap Pixel via Google Tag Manager*, TAGGRS (Oct. 23, 2025), https://taggrs.io/en/snap-pixel/.

[94] *Directly Implement the Pixel On Your Website*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/pixel-direct-implementation?language=en_US (last visited Oct. 9, 2025); *see also Privacy Policy*, SNAP (Apr. 21, 2025), https://values.snap.com/privacy/privacy-policy; *Data Processing* Agreement, SNAP (July 25, 2025), https://www.snap.com/terms/data-processing-agreement.

[95] Marialuisa Aldeghi, *How to set up the Snap Pixel: A step-by-step guide*, LEADSBRIDGE (Dec. 18, 2024), https://leadsbridge.com/blog/snap-pixel/

127. Snap also independently benefits from non-customer list audience information.[96]

128. The harvested data collected by the Snap Pixel is used by Defendant to create custom audiences.[97] Defendant can retarget users who viewed specific pages or made purchases and build lookalike audiences to reach new users with similar characteristics.[98]

129. Put simply, the Snap Pixel collects as much data as it can about otherwise anonymous visitors to the Website and matches it with existing data Snapchat has acquired and accumulated about millions of Americans to improve Defendant's conversion rates and reduce overall advertising costs.

130. Snap Pixel requires advertisers, such as Defendant, to integrate code into their website's header or use tools like Google Tag Manager for a seamless setup.[99] Advertisers, such as Defendant, are encouraged to use tools like Snap Pixel Helper to verify proper installation, ensure accurate event tracking, and track user activity.[100]

131. Defendant, through the Snap Pixel, uses data and cookies to track users and serve them relevant ads on Snapchat based on how they interact with the Website.[101] The data received from Snapchat conversion tracking allows Defendant to serve highly targeted ad campaigns to the right people.[102]

132. Using Snap Pixel helps Defendant collect important information about the people who buy from them so that Defendant, in turn, can benefit. Here are some of the biggest benefits:

---

[96] *See Privacy Policy*, *Section 2(g),* SNAP (Apr. 21, 2025), https://values.snap.com/privacy/privacy-policy.

[97] Marialuisa Aldeghi, *How to set up the Snap Pixel: A step-by-step guide*, LEADSBRIDGE (Dec. 18, 2024), https://leadsbridge.com/blog/snap-pixel/

[98] *Id.*

[99] *Id.*

[100] *Snap Pixel: Power Your Ad Performance*, SNAPCHAT, https://forbusiness.snapchat.com/advertising/snap-pixel (last visited Oct. 9, 2025).

[101] *Id.*

[102] *Id.*

a. Measure conversion events that matter: See all the actions users take on the Website, across all devices, and attribute conversions back to ad campaigns.

b. Reach the perfect audience: Defendant can create custom audiences and lookalike audiences based on the specific actions users have taken on the Website.

c. Optimize advertising campaigns: Use real-time insights to optimize delivery of Defendant's campaigns for more effective results.[103]

133. An image of the invasive Snap Pixel code secretly embedded on Defendant's Website can be seen here:




*Figure 20 - Snap Pixel active on the Website*

134. When the Snap Pixel triggers, it captures the relevant data and sends a transmission to Snapchat's servers as depicted in the picture above, which shows Defendant's Snap Pixel instantly sending communications to Snapchat as users take certain actions on the Website, like viewing a page.

135. The Snap Pixel's functionality is not disclosed on the Website.

136. By using the Snap Pixel and providing Snapchat with users' information, Defendant had to agree to Snapchat's Personal Data Terms (the "Snap Terms"), among other agreements governing the use of the Snap Pixel.

[103] *Benefits of Using the Snap Pixel*, SNAPCHAT, https://forbusiness.snapchat.com/blog/the-snap-pixel-how-it-works-and-how-to-install-it (last visited Oct. 9, 2025).

137. By agreeing to the Snap Terms, Defendant represented and warranted that the personal data it shares with Snapchat will not contain any information about individuals under the age of 13 or any Sensitive Information or special category data.[104]

138. The Snap Terms further require Snap Pixel users, such as Defendant, of their responsibility to secure and maintain "all necessary rights, licenses and consents required to provide or make available the personal data" shared through the Snap Pixel.[105]

139. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from the use of the Snap Pixel, and ignored Snapchat's warnings to safely handle its users' data and to warn its users that the Website would disclose their information in a manner that threatened their Sensitive Information.

**5. The Twitter Pixel**

140. X Corp. f/k/a Twitter ("Twitter") also offers its own website tag that can be implemented into websites to track users' site actions or conversions (the "Twitter Pixel").

141. To make use of the Twitter Pixel, website owners, such as Defendant, must take several affirmative steps: They must generate the Twitter Pixel and create events to track, implement the Twitter Pixel base code across their website, and implement event code in key locations on their website, like when a user makes a purchase.[106]

142. With each event, website owners like Defendant can select the user action they want to track and the parameters to share about the action.

143. Events can include viewing a page, making a purchase, adding an item to the shopping cart, using the search bar, adding a product to the wish list, adding payment information, and customizing a product.[107]

---

[104] *Snap Business Tools Terms*, SNAP (Nov. 1, 2021), https://www.snap.com/terms/snap-business-tools.
[105] *Id.*
[106] *X Pixel*, X BUSINESS, https://business.x.com/en/help/campaign-measurement-and-analytics/conversion-tracking-for-websites (last visited Oct. 9, 2025).
[107] *Event Types and Parameters*, X BUSINESS, https://business.x.com/en/help/campaign-measurement-and-analytics/conversion-tracking-for-websites (last visited Oct. 9, 2025).

144. Parameters can include the contents of the action, the search terms used on the website, the email address of the user taking the action, the value of the product purchased, and the currency the purchase was made in.[108]

145. As soon as the Twitter Pixel is placed on a website, it begins to collect information, including the cookie IDs of users, to match them to Twitter users for the purpose of developing custom audiences to market and advertise to.[109]

146. Twitter allows website owners, such as Defendant, to create "Website Activity Audiences," a type of custom audience, which enables Twitter to collect and analyze user activity for users who have visited or taken certain actions on Defendant's website. Once an audience is created and the Twitter Pixel collects 100 Twitter users, the audience will be ready to use for targeting in ad campaigns.[110]

147. The data collected by the Twitter Pixel informs both Defendant and Twitter how best to optimize target custom audiences with advertising based on the geo, gender, age, and device criteria specified by Defendant.[111]

148. An image of the invasive Twitter code secretly embedded on Defendant's Website can be seen here, which shows the Website instantly sending communications to Twitter to add to its collection of user behavior when a user visits the sample webpage in *Figure 11*:




*Figure 21 - Twitter Pixel active on the Website*

[108] *Id.*

[109] *Website Activity Custom Audiences*, X BUSINESS, https://business.x.com/en/help/campaign-setup/campaign-targeting/custom-audiences/website-activity (last visited Oct. 9, 2025).

[110] *Id.*

[111] *Id.*

149. To use the Twitter Pixel, Defendant agreed to Twitter's policies for conversion tracking and custom audiences (the "Twitter Terms").

150. The Twitter Terms are transparent that Twitter will process users' data to match contact details against corresponding accounts and subsequently match those accounts with the users' corresponding event data.[112]

151. Twitter obligates Twitter Pixel users, such as Defendant, that they "must provide their application customers with legally sufficient notice that they are working with third parties to collect customer data through their application for purposes of conversion tracking and serving ads targeted to customers' interests and obtain legally sufficient consent from their customers for these activities."[113]

152. Twitter makes clear that the onus is on Defendant to provide all necessary transparency notices, and obtain all necessary rights, permissions, and lawful bases, including consent, to share information with Twitter.

153. Twitter educates or reminds Twitter Pixel users of their obligation to be honest with their consumers and not to select "targeting criteria that could reveal sensitive information" about consumers.[114]

154. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Twitter Pixel, and ignored Twitter's warnings to safely handle its users' data and warn its users that the Website would disclose their information in a manner that threatened their Sensitive Information.

***6. The Reddit Pixel***

155. Additionally, Defendant installed a tracking pixel on its Website created by social media platform, Reddit (the "Reddit Pixel").

---

[112] *Policies for conversion tracking and custom audiences*, X BUSINESS, https://business.x.com/en/help/ads-policies/campaign-considerations/policies-for-conversion-trackin…. (last visited Oct. 9, 2025).
[113] *Id.*
[114] *Id.*

156. The Reddit Pixel is a piece of code that can be added to a website by a website owner to track visitors on the website and record the actions the visitors take.[115] The harvested data is subsequently used by the website owner to serve targeted ads to website visitors on Reddit.

157. The Reddit Pixel is also used in conjunction with Reddit's Conversion API to track specific actions that visitors take on the websites ("events"), such as viewing a page, submitting a search in the website's search bar, adding a product to the visitor's cart, checking out, and other specified events.[116]

158. In Defendant's use of the Reddit Pixel, Defendant configured the Reddit Pixel to include a parameter called "id" which identifies Defendant's Reddit Pixel IDs as "t2_m39joufo" and "t2_1kuo86x1". This data is sent both when receiving communications from the Website, as the moment users send communications to or receive communications from the Website.

159. Website owners, like Defendant, can enable a feature of the Reddit Pixel known as "Auto-Advanced Matching" to determine the exact identity of Reddit users who visit the website.

160. Auto-Advanced Matching automatically scrapes a website for any email addresses typed or inserted by a visitor and sends that email information to Reddit.[117]

161. In addition to email addresses, a website owner can enable the Reddit Pixel and the Conversion API to send additional personal information to Reddit, known as "match keys," to identify website visitors.[118]

162. IP addresses are match keys that website owners are *required* to send to Reddit, while other match keys are optional, including:

---

[115] *About the Reddit Pixel*, REDDIT, https://business.reddithelp.com/s/article/reddit-pixel (last visited Apr. 9, 2025); *Install the Reddit Pixel Directly*, REDDIT, https://business.reddithelp.com/s/article/Install-the-Reddit-Pixel-on-your-website (last visited Apr. 9, 2025).

[116] *Conversion Events*, REDDIT, https://business.reddithelp.com/articles/Knowledge/supported-conversion-events (last visited Apr. 9, 2025).

[117] *Auto-Advanced Matching*, REDDIT, https://business.reddithelp.com/s/article/automated-advanced-matching (last visited Apr. 9, 2025).

[118] *About Match Keys*, REDDIT, https://business.reddithelp.com/s/article/about-match-keys#customer-match-keys-and-identifiers (last visited Apr. 9, 2025).

a. Email addresses;

b. Phone numbers;

c. Mobile Advertising IDs (a unique identifier for a mobile user);

d. Reddit Click IDs (to attribute click conversions more accurately);

e. External IDs (an advertiser-assigned identifier that enhances match accuracy);

f. Reddit UUIDs (a unique ID generated by the Reddit Pixel);

g. User Agents (which identifies the software the user is using to access the website); and

h. The visitor's screen dimensions.[119]

163. This data can be used by Reddit to match an otherwise anonymous website visitor to their Reddit account, or even to identify them outright, associating their identity with their activity on the website.

164. Reddit uses this data to help advertisers, including Defendant, gauge the effectiveness of their ad campaigns, improve their ability to attribute activity to specific ad campaigns, track visitors across devices, and help them create more precisely targeted ad campaigns.[120]

165. Additionally, Reddit employs this data to optimize its own ad placements and to develop new services.[121]

166. Defendant's nefarious use of the Reddit Pixel on the Website is demonstrated by the screenshots below, which follow a user's journey to purchasing a product on the Website.

---

[119] *Id*

[120] *Id.*

[121] *Reddit Privacy Policy*, REDDIT (Aug. 16, 2024), https://www.reddit.com/policies/privacy-policy#policy-h2-4.




*Figure 23 – Reddit Pixel tracking a user visiting the webpage from Figure 11 through the "PageVisit" event*




*Figure 16 – Reddit Pixel tracking a user viewing the product from Figure 11 through the "ViewContent" event*




*Figure 17 – Reddit Pixel tracking a user adding the product from Figure 11 to their cart through the "AddToCart" event*

167. To utilize the Reddit Pixel, Defendant agreed to Reddit's Business Tool Terms (the "Reddit Terms").

168. The Reddit Terms informs website owners, such as Defendant, that the employment of the Reddit Pixel will result in data sharing, including with Reddit, of

users' website actions, email addresses, cookie IDs, and device IDs, among other "matching parameters."[122]

169. The Reddit Terms make clear that the onus was on Defendant to provide all necessary transparency notices, and obtain all necessary rights, permissions, and lawful bases, including consent, to share information with Reddit.

170. The Reddit Terms explicitly conditions the use of the Reddit Pixel on website owners' warranties that they: (i) provide "prominent and legally-sufficient notice" of the Reddit Pixel's data sharing to users; (ii) provide "clear, prominent and legally sufficient instructions regarding how to opt out of data collection and use of such data collection and use;" and (iii) do not share "any data related to users who have not provided consent[.]"[123]

171. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Reddit Pixel, and ignored Reddit's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' Sensitive Information.

**D. The Tracking Tools are Pen Registers or Trap and Trace Devices.**

172. California law defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

173. A "trap and trace device" is defined as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

---

[122] *Reddit Business Tool Terms*, REDDIT (Jan. 1, 2025), https://business.reddithelp.com/s/article/Reddit-Business-Tool-Terms.
[123] *Id.*

174. The Tracking Tools are processes to record and identify the source of electronic communication by capturing incoming and outgoing electronic impulses and identifying dialing, routing, addressing, and signaling information generated by users, who are never informed that the website is collaborating with the Tracking Entities to obtain their phone number and other identifying information.

175. The Tracking Tools are "reasonably likely" to identify the source of incoming electronic impulses. In fact, it is designed specifically for that purpose.

176. Defendant did not obtain Plaintiff's express or implied consent to be subjected to data sharing with the Tracking Tools for the purposes of fingerprinting and de-anonymization.

177. CIPA imposes civil liability and statutory penalties for the installation of pen register or trap and trace software without a court order. California Penal Code § 637.2; *see Greenley v. Kochava*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023). No court order to install a pen register or trap and trace device via the Tracking Tools was obtained by Defendant.

178. Defendant did not obtain Plaintiff's or Class Members' express or implied consent to be subjected to data collecting and data sharing with the Tracking Entities for the purposes of fingerprinting and de-anonymization, nor did Defendant obtain a court order.

**E. Defendant facilitated the unauthorized interception of or access to the contents of Plaintiff's communications.**

179. CIPA § 631(a) prohibits "three distinct and mutually independent patterns of conduct: (1) intentional wiretapping, (2) willfully attempting to learn the contents or meaning of a communication in transit over a wire, and (3) attempting to use or communicate information obtained as a result of engaging in either of the two previous activities." *Rodriguez v. Ford Motor Company*, 722 F. Supp. 3d 1104, 1113 (S.D. Cal. 2024) (citations omitted). Section 631(a)(iv) contains a fourth basis for liability for anyone "who aids, agrees with, employs, or conspires with any person or persons to

unlawfully do, or permit, or cause to be done any of the other three bases for liability." *Id.*

180. The analysis for a violation of CIPA is the same as that under the federal Wiretap Act. *Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020).

181. The Ninth Circuit has held that the "contents" of an online communication under federal wiretap law "refers to the intended message conveyed by the communication, and does not include record information regarding the characteristics of the message that is generated in the course of the communication." *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014).

182. Transmitted URLs that include both the path and the query string concern the intended message, or the substance of a communication. *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 796 (N.D. Cal. 2022).

183. Here, the network requests intercepted by the Tracking Entities include Request URLs that include the names of the products users browse and/or purchase.

184. The contents of Plaintiff's communications with Defendant were intercepted by the Tracking Entities while communicating with Defendant in real time. The Tracking Tools begin intercepting information to the Tracking Entities as soon as the Tracking Tools load onto users' browsers.[124] The Tracking Tools send information to the Tracking Tools contemporaneously with users submitting the information via their browsers.

185. The interception, duplication, and sending to the Tracking Entities occurred inside Plaintiff's browser before reaching any destination, therefore occurring while in

---

[124] *See* Aaron Katersky, *TikTok has your data even if you've never used the app: Report*, ABCNEWS (Mar. 16, 2023, 1:59 PM), https://abcnews.go.com/Business/tiktok-data-app-report/story?id=97913249#:~:text=Webpages%20associated%20with%20everything%20from,consent%2C%20the%20Feroot%20report%20said; Mario Neto, *What is the Facebook Pixel – Different ways to collect data to boost your ads performance*, BIRCH BLOG (May 13, 2025), https://bir.ch/blog/what-is-the-facebook-pixel#:~:text=Putting%20it%20simply%2C%20the%20Meta,all%20from%20a%20single%20snippet; *Pinterest tag*, PINTEREST, https://developers.pinterest.com/docs/api-features/pinterest-tag/#:~:text=The%20Pinterest%20Tag%20allows%20you,Pinterest%20Tag%20has%20two%20components: (last visited Oct. 9, 2025).

transit. *See Esparza v. UAG Escondido A1 Inc.*, Case No. 23cv0102 DMS(KSC), 2024 U.S. Dist. LEXIS 24429, at *9 (S.D. Cal. Feb. 12, 2024).

186. The Tracking Entities were third parties to Plaintiff's communications with Defendant.

187. Defendant's use of the Tracking Tools enabled the Tracking Entities to intercept Request URLs that specify the content users accessed on webpages on the Website in violation of CIPA.

188. "[A] conversationalist is betrayed equally by a wiretapper and by the willing conversation participant who surreptitiously allows that third party to wiretap." *Yoon v. Lululemon USA, Inc.*, 549 F. Supp. 3d 1073, 1083 (C.D. Cal. 2021) (citing *Revitch v. New Moosejaw, LLC*, No., 2019 WL 5485440, at *2 (N.D. Cal. Oct. 23, 2019)).

189. Defendant did not obtain Plaintiff's express or implied consent to allow the Tracking Entities to intercept the contents of their communications with the Website.

190. Section 631(a) requires the prior consent of all parties to the communication. *Javier v. Assurance IQ, LLC*, No. 21-16351, 2022 WL 1744107, at *2 (9th Cir. May 31, 2022).

191. Investigation by Plaintiff's Counsel revealed that the Website's cookie settings were set to allow tracking by default. Therefore, unbeknownst to users, users are being tracked as soon as they land on the Website home page.

192. Plaintiff visited the Website while its default settings were set by Defendant to track users before obtaining prior consent.

193. Defendant and the Tracking Entities benefitted from the interception of Plaintiff's communications by reading and subsequently using the intercepted communications to build detailed profiles based on Plaintiff's browsing habits, and using that profile to target Plaintiff with advertising.[125]

---

[125] *See About Advanced Matching for Web*, TIKTOK, https://ads.tiktok.com/help/article/advanced-matching-web?lang=en (last visited Oct. 9, 2025); *Meta Pixel*, FACEBOOK, https://www.facebook.com/business/tools/meta-pixel (last visited Oct. 9, 2025); *Enable automatic enhanced match*, PINTEREST, https://help.pinterest.com/en/business/article/automatic-enhanced-match (last visited Oct. 9, 2025).

194. The Tracking Entities independently benefit from the interception of Plaintiff's communications by using data collected by the Tracking Tools to improve their own products and advertising services, and marketing those advertising capabilities to other potential businesses seeking to market to users, including Plaintiff.[126]

## CLASS ALLEGATIONS

195. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

> All California citizens who visited Defendant's Website while physically in California and whose personal information was shared with the Tracking Entities or other third parties by Defendant without effective and informed prior consent.

196. Specifically excluded from the Class is Defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

197. Plaintiff reserves the right to amend the Class definition above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

198. NUMEROSITY: At this time, Plaintiff does not know the number of Class Members but believes the number to be at least fifty, given the popularity of Defendant's Website. The number of persons within the Class is believed to be so numerous that joinder of all members is impractical. The exact identities of Class Members may be ascertained by the records maintained by Defendant.

[126] *See, e.g., TikTok Business Products (Data) Terms*, TIKTOK (July 29, 2024), http://ads.tiktok.com/i18n/official/policy/business-products-terms; *Meta Business Tools Terms*, FACEBOOK (Apr. 25, 2023), https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr.

199. COMMONALITY: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class Members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

a. Whether Defendant shared Class Members' personal information with the Tracking Entities or other third parties;

b. Whether Defendant obtained effective and informed consent to do so;

c. Whether Class Members are entitled to statutory penalties; and

d. Whether Class Members are entitled to injunctive relief.

200. TYPICALITY: As a person who visited Defendant's Website and whose personal information was shared by Defendant, Plaintiff is asserting claims that are typical of the Class.

201. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in the class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

202. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. If Class treatment of these claims is not available, Defendant will likely continue their wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION
**Violation of the California Invasion of Privacy Act**
**Cal. Penal Code § 631**

203. Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

204. Plaintiff brings this cause of action on behalf of herself and all Class Members.

205. CIPA was enacted to curb "the invasion of privacy resulting from the continual and increasing use of" certain technologies determined to pose "a serious threat to the free exercise of personal liberties." CIPA extends civil liability for various means of surveillance using technology.

206. CIPA provides that a person is liable to another where, "by means of any machine, instrument, contrivance, or in any other manner," committed any of the following: (i) intentionally tapped, or made any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, cable, or instrument of any internal telephonic communication system; or (ii) willfully and without consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state; or (iii) uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or (iv) aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit or cause to be done any of the acts or things mentioned above in this section. Cal. Penal Code § 631(a).

207. The Ninth Circuit has confirmed that one of the purposes of wiretapping statutes is to "prevent the acquisition of the contents of a message by an unauthorized

third-party . . . ." *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020). In dealing specifically with CIPA, the California Supreme Court has similarly concluded that the objective of CIPA is to protect a person's communications "from a situation where the other person on the other end of the line permits an outsider" to monitor the communication. Ribas v. Clark, 38 Cal. 3d 355, 364 (1985); *see Smith v. LoanMe*, 11 Cal. 5th 183, 200 (2021).

208. The Website, including the Tracking Tools placed upon it, is a "machine, instrument, contrivance, or . . . other manner" used to engage in the prohibited conduct at issue here.

209. Within the relevant time period, Defendant, without the consent of all parties to the communication, or in any unauthorized manner, willfully read or attempted to read or learn the contents or meaning of electronic communications of Plaintiff and Class Members, contemporaneous with the communications transit through or passing over any wire, line or cable or with the communications sending from or being received at any place within California.

210. The information collected by the Tracking Tools, including the TikTok Pixel, was not for the sole benefit of Defendant.

211. Within the relevant time period, Defendant aided, agreed with, conspired with, and employed the Tracking Entities to implement the Tracking Tools and to violate CIPA § 631.

212. Within the relevant time period, Defendant aided, agreed with, conspired with, and employed the Tracking Entities, including the TikTok Pixel, to accomplish the wrongful conduct at issue here.

213. Plaintiff and Class Members did not authorize or consent to the tracking, interception, and collection of any of their electronic communications.

214. The violation of section 631 constitutes an invasion of privacy sufficient to confer Article III standing.

**<u>SECOND CAUSE OF ACTION</u>**
**Violation of the California Invasion of Privacy Act**
**Cal. Penal Code § 638.51**

215. Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

216. Plaintiff brings this cause of action on behalf of herself and all Class Members.

217. California's Pen Register and Trap and Trace Law is part of the California Invasion of Privacy Act ("CIPA") codified at Cal. Penal Code 630, et seq.

218. A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." California Penal Code § 638.50(b).

219. A "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." California Penal Code § 638.50(c).

220. "Process" includes "software that identifies consumers, gathers data, and correlates that data through unique 'fingerprinting.'" Greenley v. Kochava, Inc., 684 F.Supp.3d 1024, 1050 (S.D. Cal. 2023).

221. California Penal Code § 638.51 provides that "a person may not install or use a pen register or a trap and trace device without first obtaining a court order…" § 638.51(a). No court order to install trap and trace devices via the Tracking Tools was obtained by Defendant.

222. Defendant uses pen register and trap and trace processes on its Website by deploying the Tracking Tools on its Website, because the Tracking Tools are designed to capture the phone number, email, routing, addressing, and other signaling information

of website visitors. The Tracking Tools identify the source of the incoming electronic and wire communications to the Website.

223. Defendant was not authorized by any court order to use trap and trace devices to track Plaintiff's and Class Members' activity on the Website.

224. Defendant did not obtain consent from Plaintiff and Class Members before using pen register or trap and trace technology to identify users of its Website, and has violated Section 638.51.

225. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members suffered losses and were damaged in an amount to be determined at trial.

CIPA imposes civil liability and statutory penalties for violations of § 638.51.

226. Therefore, Plaintiff and Class Members are entitled to the relief set forth below.

**PRAYER**

WHEREFORE, Plaintiff prays for the following relief against Defendant:

a. An order certifying the class and making all appropriate class management orders;

b. Statutory damages pursuant to CIPA;

c. Reasonable attorneys' fees and costs; and

d. All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

**PLAINTIFF HEREBY REQUESTS A TRIAL BY JURY**

Dated: February 9, 2026 **LAW OFFICES OF TODD M. FRIEDMAN, P.C**.

By: *<u>/s/Todd M. Friedman</u>*
Todd M. Friedman (216752)
Adrian R. Bacon (280332)
Law Offices of Todd M. Friedman, P.C.
23586 Calabasas Rd., Suite 105
Calabasas, CA 91302
Phone: 323-306-4234
Fax: 866-633-0228
Email: tfriedman@toddflaw.com
Email: abacon@toddflaw.com

Michael N. Pollack*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: 212-363-7500
Facsimile: 212-363-7171
Email: mpollack@zlk.com

*Counsel for Plaintiff*

**pro hac vice* forthcoming