**DUANE MORRIS LLP**
Jennifer A. Riley (SBN 360545)
JARiley@duanemorris.com
865 South Figueroa Street, Suite 3100
Los Angeles, California 90017-5450
Telephone: +1 213 689 7400
Facsimile: +1 213 689 7401

**DUANE MORRIS LLP**
Justin R. Donoho (*pro hac vice*)
JRDonoho@duanemorris.com
Hayley H. Ryan (*pro hac vice*)
HHRyan@duanemorris.com
190 South LaSalle Street, Suite 3700
Chicago, IL 60603-3433
Telephone: +1 312 499 6700
Fax: +1 312 499 6701

Attorneys for Defendant
WAYFAIR LLC

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

JOSEPH LIMAS, individually and on behalf of all others similarly situated,

Plaintiff,

v.

WAYFAIR LLC, and DOES 1 to 20, inclusive,

Defendants.

Case No. 25-CV-11185-DMG

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANT WAYFAIR LLC'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

[Removed from Los Angeles Superior Court, Case No. 25STCV30609]

[Filed concurrently with Notice of Motion and Motion, Memorandum of Points and Authorities, Declaration of Hayley Ryan, Proposed Order, and Rule 5.1 Notice]

Hearing Date: June 5, 2026

Time: 9:30 a.m.

Judge: District Judge Dolly M. Gee

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

Pursuant to Federal Rule of Evidence 201, Defendant Wayfair LLC ("Wayfair") hereby respectfully submits this Request for Judicial Notice of the attached Exhibits 1-5 in connection with its contemporaneously filed Memorandum of Points and Authorities in Support of Wayfair's Motion to Dismiss Plaintiff's First Amended Complaint and the websites referenced in footnote 1 of Wayfair's Memorandum of Points and Authorities:

- **Exhibit 1**. Attached as Exhibit 1 is a true and correct copy of the 2015 California Assembly Bill No. 929, California 2015-2016 Regular Session Committee Report dated June 15, 2015.
- **Exhibit 2**. Attached as Exhibit 2 is a true and correct copy of the California Senate Bill 690, Report to the Committee on Public Safety dated April 29, 2025.
- **Exhibit 3**. Attached as Exhibit 3 is a true and correct copy of the web page located at: https://trends.builtwith.com/analytics/Google-Analytics.
- **Exhibit 4**. Attached as Exhibit 4 is a true and correct copy of the web page located at: https://trends.builtwith.com/analytics/Facebook-Conversion-Tracking
- **Exhibit 5**. Attached as Exhibit 5 is a true and correct copy of the web page located at: https://www.cdpinstitute.org/news/trackers-and-pixels-feeding-data-broker-data-stores/

## LEGAL STANDARD

Judicial notice is warranted. Federal Rule of Evidence 201 authorizes a court to take judicial notice of any fact if requested by a party and supplied with the necessary information, provided the fact is "not subject to reasonable dispute" and is either: (1) "generally known within the trial court's territorial jurisdiction"; or (2) capable of being "accurately and readily determined from sources whose accuracy

cannot reasonably be questioned." Fed. R. of Evid. 201(b). "A court may take judicial notice of 'matters of public record' without converting a motion to dismiss into a motion for summary judgment," as long as the noticed facts are not "subject to reasonable dispute." *Peel v. BrooksAmerica Mortg. Corp.*, 788 F.Supp.2d 1149, 1157-1158 (C.D. Cal. 2011) (internal citation omitted).

"[T]he court may properly take judicial notice of legislative history, including committee reports." *Malkin v. Fed. Ins. Co.*, 562 F. Supp. 3d 854, 861 (C.D. Cal. 2022) (quoting *Stone v. Sysco Corp.*, No. 16-CV-01145-DAD-JLT, 2016 WL 6582598, at *4 (E.D. Cal. Nov. 7, 2016)); *see, e.g.*, *Hoffman v. Life Ins. Co. of the Sw.*, 740 F. Supp. 3d 918, 924 (N.D. Cal. 2024) (granting request to take judicial notice of legislative documents including California Assembly Bill 2506 (2002), two committee reports on Assembly Bill 2506, and California Assembly Bill 2233 (2004)). Moreover, publicly accessible websites are "[p]roper subjects of judicial notice when ruling on a motion to dismiss." *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1204 (N.D. Cal. 2014); *see, e.g.*, *Wible v. Aetna Life Ins. Co.*, 375 F. Supp. 2d 956, 965-66 (C.D. Cal. 2005) (granting request for judicial notice of Amazon web pages).

Dated: February 23, 2026

Respectfully Submitted,

**DUANE MORRIS LLP**

By: */s/ Jennifer A. Riley*
Jennifer A. Riley

Attorneys for Defendant Wayfair LLC

# Exhibit 1

2015 CA A.B. 929 (NS)
2015 California Assembly Bill No. 929, California 2015-2016 Regular Session

CALIFORNIA COMMITTEE REPORT
VERSION: General
June 15, 2015
Version Date June 15, 2015
Chau.

**TEXT:**
BILL ANALYSIS

SENATE COMMITTEE ON PUBLIC SAFETY Senator Loni Hancock, Chair 2015 - 2016 Regular

Bill No: AB 929 Hearing Date: June 16, 2015

---------------------------------------------------------------- |Author: |Chau | |----------- +-----------------------------------------------------| |Version: |June 4, 2015 | ----------------------------------------------------------------- ---------------------------------------------------------------- |Urgency: |No |Fiscal: |Yes | ---------------------------------------------------------------- ---------------------------------------------------------------- |Consultant:|MK | | | | ----------------------------------------------------------------

Subject: Pen Registers: Authorized Use

HISTORY

Source: Los Angeles County District Attorney's Office Los Angeles County Sheriff's Department

Prior Legislation:None

Support: The Association for Los Angeles Deputy Sheriffs; California Civil Liberties Advocacy; California District Attorneys Association; The California Peace Officers' Association; The California Police Chiefs Association; California State Lodge, Fraternal Order of Police; California State Sheriffs' Association; California Statewide Law Enforcement Association; Long Beach Police Officers Association; Los Angeles County Professional Peace Officers Association; The Los Angeles Police Protective League; The Riverside Sheriffs Association; Sacramento County Deputy Sheriffs' Association; Santa Ana Police Officers Association

Opposition:None known

Assembly Floor Vote: 77 - 0 of ?

See Comment 5 for Amendments to be proposed in Committee

PURPOSE

The purpose of this bill is to authorize state and local law enforcement to use pen register and trap and trace devices under state law, and to permit the issuance of emergency pen registers and trap and trace devices.

Existing Constitutional law provides that the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized. (U.S. Constitution 4th Amend.; California Constitution art. I, 13.)

Existing federal law provides that, except as provided, no person may install or use a pen register or a trap and trace device without first obtaining a court order under section 3123 of this title [18 USCS 3123] or under the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1801 et seq.). (18 USCS 3121.) The prohibition does not apply with respect to the use of a pen register or a trap and trace device by a provider of electronic or wire communication service relating to the operation, maintenance, and testing of a wire or electronic communication service or to the protection of the rights or property of such provider, or to the protection of users of that service from abuse of service or unlawful use of service; or to record the fact that a wire or electronic communication was initiated or completed in order to protect such provider, another provider furnishing service toward the completion of the wire communication, or a user of that service, from fraudulent, unlawful or abusive use of service; or where the consent of the user of that service has been obtained.

A government agency authorized to install and use a pen register or trap and trace device under this chapter (18 USCS 3121 et seq) or under State law shall use of ?

technology reasonably available to it that restricts the recording or decoding of electronic or other impulses to the dialing, routing, addressing, and signaling information utilized in the processing and transmitting of wire or electronic communications so as not to include the contents of any wire or electronic communications. (18 USCS 3121 (c).)

Whoever knowingly violates the prohibition shall be fined under this title or imprisoned not more than one year, or both. . (18 USCS 3121 (a) & (b).)

Existing federal law provides that unless prohibited by state law, a state investigative or law enforcement officer may make application for an order or an extension of an order authorizing or approving the installation and use of a pen register or a trap and trace device under this chapter, in writing under oath or equivalent affirmation, to a court of competent jurisdiction of such state. (18 USCS 3122.)

Existing federal law provides that an attorney for the Government, upon an application, the court shall enter an ex parte order authorizing the installation and use of a pen register or trap and trace device anywhere within the United States, if the court finds that the attorney for the Government has certified to the court that the information likely to be obtained by such installation and use is relevant to an ongoing criminal investigation. The order, upon service of that order, shall apply to any person or entity providing wire or electronic communication service in the United States whose assistance may facilitate the execution of the order. Whenever such an order is served on any person or entity not specifically named in the order, upon request of such person or entity, the attorney for the Government or law enforcement or investigative officer that is serving the order shall provide written or electronic certification that the order applies to the person or entity being served. (18 USCS 3121 (a)(1).)

Existing federal law provides that a state investigative or law enforcement officer, upon an application made as specified, the court shall enter an ex parte order authorizing the installation and use of a pen register or trap and trace device within the jurisdiction of the court, if the court finds that the State law of ?

enforcement or investigative officer has certified to the court that the information likely to be obtained by such installation and use is relevant to an ongoing criminal investigation. (18 USCS 3121 (a)(2).)

Existing federal law provides that where the law enforcement agency implementing an ex parte order under this subsection seeks to do so by installing and using its own pen register or trap and trace device on a packet-switched data network of a provider of electronic communication service to the public, the agency shall ensure that a record will be maintained which will identify:

Any officer or officers who installed the device and any officer or officers who accessed the device to obtain information from the network; The date and time the device was installed, the date and time the device was uninstalled, and the date, time, and duration of each time the device is accessed to obtain information; The configuration of the device at the time of its installation and any subsequent modification thereof; and Any information which has been collected by the device. (18 USCS 3121(a)(3).)

Existing federal law provides to the extent that the pen register or trap and trace device can be set automatically to record this information electronically, the record shall be maintained electronically throughout the installation and use of such device. (18 USCS 3121(a)(3).)

Existing federal law states that the record maintained shall be provided ex parte and under seal to the court which entered the ex parte order authorizing the installation and use of the device within 30 days after termination of the order (including any extensions thereof). (18 USCS 3121(a)(3).)

Existing federal law provides that an order issued for installation of a pen register or track and trace device shall include:

The identity, if known, of the person to whom is leased of ?

or in whose name is listed the telephone line or other facility to which the pen register or trap and trace device is to be attached or applied; The identity, if known, of the person who is the subject of the criminal investigation; The attributes of the communications to which the order applies, including the number or other identifier and, if known, the location of the telephone line or other facility to which the pen register or trap and trace device is to be attached or applied, and, in the case of an order authorizing installation and use of a trap and trace device, the geographic limits of the order; and A statement of the offense to which the information likely to be obtained by the pen register or trap and trace device relates; and Shall direct, upon the request of the applicant, the furnishing of information, facilities, and technical assistance necessary to accomplish the installation of the pen register or trap and trace device. : (18 USCS 3121(b).)

Existing federal law provides that an order issued under this section shall authorize the installation and use of a pen register or a trap and trace device for a period not to exceed sixty days.

Extensions of such an order may be granted, but only upon an application for an order and upon the judicial finding required as specified. The period of extension shall be for a period not to exceed sixty days.

Nondisclosure of existence of pen register or a trap and trace device. An order authorizing or approving the installation and use of a pen register or a trap and trace device shall direct that the order be sealed until otherwise ordered by the court; and the person owning or leasing the line or other facility to which the pen register or a trap and trace device is attached, or applied, or who is obligated by the order to provide assistance to the applicant, not disclose the existence of the pen register or trap and trace device or the existence of the investigation to the listed subscriber, or to any other person, unless or until otherwise ordered by the court. (18 USCS 3121c).) of ?

Existing federal law provides that notwithstanding any other provision, any investigative or law enforcement officer, specially designated by the Attorney General, the Deputy Attorney General, the Associate Attorney General, any Assistant Attorney General, any acting Assistant Attorney General, or any Deputy Assistant Attorney General, or by the principal prosecuting attorney of any state or subdivision thereof acting pursuant to a statute of that state, who reasonably determines that:

an emergency situation exists that involves immediate danger of death or serious bodily injury to any person; conspiratorial activities characteristic of organized crime; an immediate threat to a national security interest; or an ongoing attack on a protected computer that constitutes a crime punishable by a term of imprisonment greater than one year; (18 USCS 3125.)

Existing federal law provides that in the absence of an authorizing order, such use shall immediately terminate when the information sought is obtained, when the application for the order is denied or when forty-eight hours have lapsed since the installation of the pen register or trap and trace device, whichever is earlier. (18 USCS 3125.)

Existing law defines a "search warrant" as an order in writing in the name of the People, signed by a magistrate, directed to a peace officer, commanding him or her to search for a person or persons, a thing or things, or personal property, and in the case of a thing or things or personal property, bring the same before the magistrate. (Penal Code 1523.)

Existing law provides that a search warrant may be issued upon any of the following grounds:

1) When the property was stolen or embezzled; 2) When the property or things were used as the means of committing a felony; 3) When the property or things are in the possession of any person with the intent to use them as a means of committing a public offense, or in the possession of another to whom he or she may have delivered them for the of ?

purpose of concealing them or preventing them from being discovered; 4) When the property or things to be seized consist of any item or constitute any evidence that tends to show a felony has been committed, or tends to show that a particular person has committed a felony; 5) When the property or things to be seized consist of evidence that tends to show that sexual exploitation of a child, or possession of matter depicting sexual conduct of a person under the age of 18 years, has occurred or is occurring; 6) When there is a warrant to arrest a person; 7) When a provider of electronic communication service or remote computing service has records or evidence, showing that property was stolen or embezzled constituting a misdemeanor, or that property or things are in the possession of any person with the intent to use them as a means of committing a misdemeanor public offense, or in the possession of another to whom he or she may have delivered them for the purpose of concealing them or preventing their discovery; 8) When the property to be seized includes evidence of a violation of specified Labor Code sections; 9) When the property to be seized includes a firearm or deadly weapon or any other deadly weapon at the scene of a domestic violence offense; 10) When the property to be seized includes a firearm or deadly weapon owned by a person apprehended because of his or her mental condition; 11) When the property to be seized is a firearm in possession of a person prohibited under the family code; 12) When the information to be received from the use of a tracking device under shows a specified violation of the Fish and Game Code or Public Resources Code; 13) When a sample of blood would show evidence of a DUI; or, 14) Starting January 1, 2016, when the property to be seized is a firearm owned by a person subject to a gun violence restraining order. (Penal Code 1524(a).)

Existing law provides that a search warrant cannot be issued but upon probable cause, supported by affidavit, naming or describing the person to be searched or searched for, and particularly describing the property, thing, or things and the of ?

place to be searched. (Penal Code, 1525.)

Existing law requires a magistrate to issue a search warrant if he or she is satisfied of the existence of the grounds of the application or that there is probable cause to believe their existence. (Pen. Code, 1528 (a).)

This bill defines "pen register" as a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication. "Pen register" does not include a device or process used by a provider or customer of a wire or electronic communication service for billing, or recording as an incident to billing, for communications services provided by such provider, or a device or process used by a provider or customer of a wire communication service for cost accounting or other similar purposes in the ordinary course of its business.

This bill defines "trap and trace device" as a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

This bill provides that in general a person may not install or use a pen register or a trap and trace device without first obtaining a court order. However, a provider of electronic or wire communication service may use a pen register or a trap and trace device for any of the following purposes:

To operate, maintain, and test a wire or electronic communication service. To protect the rights or property of the provider. To protect users of the service from abuse of service or unlawful use of service.

To record the fact that a wire or electronic communication was initiated or completed to protect the provider, another provider furnishing service toward the completion of the wire communication, or a sue of that of ?

service from fraudulent, unlawful or abusive use of service. If the consent of the user of that service has been obtained.

This bill provides that illegally installing a pen register or trap and trace device is a misdemeanor with a fine of up to $2,500 and/or up to one year in prison.

This bill specifies that a peace officer may make an application to a magistrate for an order or an extension of an order authorizing or approving the installation and use of a pen register or a trap and trace device. The application shall be in writing under oath or equivalent affirmation, and shall include the identity of the peace officer making the application and the identity of the law enforcement agency conducting the investigation. The applicant shall certify that the information likely to be obtained is relevant to an ongoing criminal investigation and shall include a statement of the offense to which the information likely to be obtained by the pen register or trap and trace device relates.

This bill states that the magistrate shall enter an ex parte order authorizing the installation and use of a pen register or a trap and trace device if he or she finds that the information likely to be obtained by the installation and the use of a pen register or a trap and trace device is relevant to an ongoing investigation and the that there is probable cause to believe that the pen register or trap and trace device will lead to any of the following:

Recovery of stolen or embezzled property Property or things used as the means of committing a felony. Property or things in the possession of a person with the intent to use them as a means of committing a public offense, or in the possession of another to whom he or she may have been delivered them for the purpose of concealing them or preventing them from being discovered. Evidence tends to show a felony has been committed or tends to show that a particular person has committed or is committing a felony. Evidence tends to show that sexual exploitation of a of ?

child or possession of a matter depicting the sexual conduct of a person under 18 years of age has occurred or is occurring. The location of a person who is unlawfully restrained or reasonably believed to be a witness in a criminal investigation or for whose arrest there is probable cause. Evidence that tends to show specified Labor Code violations. Evidence that does any of the following" o Tends to show that a felony, a misdemeanor violation of the Fish and Game Code or a misdemeanor violation of the Public Resources Code. o Tends to show that a particular person has committed or is committing a felony, a misdemeanor violation of the Fish and Game Code or a misdemeanor violation of the Public Resources Code. o Will assist in locating an individual who has committed or is committing a felony, a misdemeanor violation of the Fish and Game Code, or a misdemeanor violation of the Public Resources Code.

This bill provides that information acquired solely pursuant to the authority for a pen register or trap and trace device shall not include any information that may disclose the physical location of the subscriber, except to the extent that the location may be determined from the telephone number.

This bill provides that an order issued by a magistrate shall specify all of the following:

The identity, if known, of the person to whom is leased or in whose name is listed the telephone line to which the pen register or trap and trace device is to be attached; The identity, if known, of the person who is the subject of the criminal investigation; The number and, if known, physical location of the telephone line to which the pen register or trap and trace device is to be attached and, in the case of a trap and trace device, the geographic limits of the trap and trace order; A statement of the offense to which the information likely to be obtained by the pen register or trap and trace of ?

device relates; and The order shall direct, if the applicant has requested, the furnishing of information, facilities, and technical assistance necessary to accomplish the installation of the pen register or trap and trace device.

This bill provides that an order issued under this section shall authorize the installation and use of a pen register or a trap and trace device for a period not to exceed 60 days.

This bill provides that extensions of the original order may be granted upon a new application for an order if the officer shows that there is a continued probable cause that the information or items sought under this subdivision are likely to be obtained under the extension. The period of an extension shall not exceed 60 days.

This bill provides that the magistrate, before issuing the order, may examine on oath the person seeking the warrant and any witnesses the person may produce, and shall take his or her affidavit or their affidavits in writing, and cause the affidavit or affidavits to be subscribed by the parties making them.

This bill provides that an order or extension order authorizing or approving the installation and use of a pen register or a trap and trace device shall direct that the order be sealed until otherwise ordered by the magistrate who issued the order, or a judge of the superior court, and that the person owning or leasing the line to which the pen register or trap and trace device is attached, or who has been ordered by the court to provide assistance to the applicant, not disclose the existence of the pen register or trap and trace device or the existence of the investigation to the listed subscriber or to any other person, unless or until otherwise ordered by the magistrate or a judge of the superior court.

This bill states that upon the presentation of an order issued by a magistrate for installation of a pen register or trap and trace device, by a peace officer authorized to install and use a pen register, a provider of wire or electronic communication service, landlord, custodian, or other person shall immediately provide the peace officer all information, facilities, and of ?

technical assistance necessary to accomplish the installation of the pen register unobtrusively and with a minimum of interference with the services provided to the party with respect to whom the installation and use is to take place, if the assistance is directed by the order.

This bill provides upon the request of a peace officer authorized to receive the results of a trap and trace device, a provider of a wire or electronic communication service, landlord, custodian, or other person shall immediately install the device on the appropriate line and provide the peace officer all information, facilities, and technical assistance, including installation and operation of the device unobtrusively and with a minimum of interference with the services provided to the party with respect to whom the installation and use is to take place, if the installation and assistance is directed by the order.

This bill states that unless otherwise ordered by the magistrate, the results of the pen register or trap and trace device shall be provided to the peace officer at reasonable intervals during regular business hours for the duration of the order.

This bill provides that the magistrate before issuing the order pursuant may examine on oath the person seeking the pen register or the trap and trace device, and any witnesses the person may produce, and shall take his or her affidavit or their affidavits in writing, and cause the affidavit or affidavits to be subscribed by the parties making them.

This bill provides that except as otherwise provided, upon an oral application by a peace officer, a magistrate may grant oral approval for the installation and use of a pen register or a trap and trace device, without an order, if he or she determines all of the following:

There are grounds upon which an order could be issued under specified normal application for a pen register or trap and trace device. There is probable cause to believe that an emergency situation exists with respect to the investigation of a of ?

crime. There is probable cause to believe that a substantial danger to life or limb exists justifying the authorization for immediate installation and use of a pen register or a trap and trace device before an order authorizing the installation and use can, with due diligence, be submitted and acted upon.

This bill provides that by midnight of the second full court day after the pen register or trap and trace device is installed by oral application, a written application pursuant to Penal Code Section 638.52 shall be submitted by the peace officer who made the oral application to the magistrate who orally approved the installation and use of a pen register or trap and trace device. If an order is issued the order shall also recite the time of the oral approval and shall be retroactive to the time of the original oral approval.

This bill specifies that in the absence of an authorizing order, the use shall immediately terminate when the information sought is obtained, when the application for the order is denied, or by midnight of the second full court day after the pen register or trap and trace device is installed, whichever is earlier.

This bill provides that a provider of a wire or electronic communication service, landlord, custodian, or other person who provides facilities or technical assistance pursuant to this section shall be reasonably compensated by the requesting peace officer's law enforcement agency for the reasonable expenses incurred in providing the facilities and assistance.

RECEIVERSHIP/OVERCROWDING CRISIS AGGRAVATION

For the past eight years, this Committee has scrutinized legislation referred to its jurisdiction for any potential impact on prison overcrowding. Mindful of the United States Supreme Court ruling and federal court orders relating to the state's ability to provide a constitutional level of health care to its inmate population and the related issue of prison overcrowding, this Committee has applied its "ROCA" policy as a of ?

content-neutral, provisional measure necessary to ensure that the Legislature does not erode progress in reducing prison overcrowding.

On February 10, 2014, the federal court ordered California to reduce its in-state adult institution population to 137.5% of design capacity by February 28, 2016, as follows:

143% of design bed capacity by June 30, 2014; 141.5% of design bed capacity by February 28, 2015; and, 137.5% of design bed capacity by February 28, 2016.

In February of this year the administration reported that as "of February 11, 2015, 112,993 inmates were housed in the State's 34 adult institutions, which amounts to 136.6% of design bed capacity, and 8,828 inmates were housed in out-of-state facilities. This current population is now below the court-ordered reduction to 137.5% of design bed capacity."( Defendants' February 2015 Status Report In Response To February 10, 2014 Order, 2:90-cv-00520 KJM DAD PC, 3-Judge Court, Coleman v. Brown, Plata v. Brown (fn. omitted).

While significant gains have been made in reducing the prison population, the state now must stabilize these advances and demonstrate to the federal court that California has in place the "durable solution" to prison overcrowding "consistently

demanded" by the court. (Opinion Re: Order Granting in Part and Denying in Part Defendants' Request For Extension of December 31, 2013 Deadline, NO. 2:90-cv-0520 LKK DAD (PC), 3-Judge Court, Coleman v. Brown, Plata v. Brown (2-10-14). The Committee's consideration of bills that may impact the prison population therefore will be informed by the following questions:

Whether a proposal erodes a measure which has contributed to reducing the prison population; Whether a proposal addresses a major area of public safety or criminal activity for which there is no other reasonable, appropriate remedy; Whether a proposal addresses a crime which is directly dangerous to the physical safety of others for which there is no other reasonably appropriate sanction; Whether a proposal corrects a constitutional problem or legislative drafting error; and Whether a proposal proposes penalties which are of ?

proportionate, and cannot be achieved through any other reasonably appropriate remedy.

COMMENTS

1. Need for This Bill

According to the author:

As technology advances, criminals are becoming more and more sophisticated in their use of technology to commit crimes and avoid law enforcement. As a result, law enforcement officials have a variety of electronic tools to counter this and help them apprehend criminals in this age of rapidly changing technology.

One of the tools available to law enforcement is called a "pen register" which allows law enforcement officers to record all outgoing numbers from a particular telephone line. In addition, another tool law enforcement uses is called a "trap and trace device" which allows them to record what numbers have called a specific telephone line, i.e. all incoming phone numbers. Both pen registers and trap and trace devices do not record audio or text messages and cannot be used to obtain real-time location data on a cellular telephone. But these tools are extremely useful for law enforcement in situations such as gang and narcotic investigations.

Federal law (18 USC 3123(a)(1)) allows law enforcement agencies to use pen register and trap and trace devices, but they must obtain a court order from a judge prior to the installation of the device. However, during an emergency situation, they may use these devices without a court order if they obtain the court order within 48 hours of the use of the device. Law enforcement agencies must demonstrate that there is reasonable suspicion that the use of the device is relevant to an ongoing criminal investigation and will lead to obtaining evidence of a crime for a judge to authorize the use. Though federal law authorizes states and local law enforcement officers to use pen register and trap and trace devices by obtaining a court order first, it does not allow them to obtain an emergency order unless there is a state statute authorizing and creating a process for states and local law enforcement officers to do so.

of ?

AB 929 would authorize state and local law enforcement officers to use pen register and trap and trace devices, including during emergency situations. This bill would authorize a judge to issue a court order to install a pen register/trap and trace device upon finding that the use of a pen register/trap and trace device is relevant to an ongoing criminal investigation, and that there is probable cause to believe that the pen register or trap and trace device will lead to obtaining evidence of a crime.

This higher standard of proof (probable cause vs. reasonable suspicion) is more restrictive than under federal law and is more consistent with California law governing search warrants. The bill would prohibit the installation and use of the device for longer than 60 days, but would permit an extension if there is proof of continuing probable cause to a judge.

2. Background on Pen Registers

Federal law allows law enforcement agencies to use pen register and trap and trace devices, but they must obtain a court order from a judge prior to the installation of the device. However, during an emergency situation, law enforcement agencies may use these devices without a court order if they obtain the court order within 48 hours of the use of the device. Law enforcement agencies must demonstrate that there is reasonable suspicion that the use of the device is relevant to an ongoing criminal investigation and will lead to obtaining evidence of a crime for a judge to authorize the use.

Though federal law authorizes states and local law enforcement officers to use pen registers and trap and trace devices by obtaining a court order first, it does not allow them to obtain an emergency order unless there is a state statute authorizing and creating a process for states and local law enforcement officers to do so. To date, California does not have a state statute authorizing the use of pen registers or trap and trace devices.

Pen registers and track and trace devices generally track incoming and outgoing telephone calls. They are often utilized by law enforcement to track which people in an investigation are communicating with one another and at what times. Unlike a of ?

wiretap authorization, pen registers and track and trace devices do not provide law enforcement with the content of the messages which are transmitted. Wiretap authorizations are therefore subject to a much higher standard of scrutiny than the orders contained within this bill. Under federal law, these authorizations can be granted on a reasonable suspicion standard, while search warrants are subject to a higher standard of probable cause.

3. Installation of a Pen Register or Trap and Trace Device Upon a Showing of Probable Cause

This bill generally prohibits a person from installing or using a pen register or trap and trace device except by court order or by the provider of electronic or wire communication under specified circumstances.

Under this bill, a peace officer may make an application to a magistrate for an order authorizing the installation and use of a pen register or a trap and trace device under specified circumstances. The application shall be in writing under oath. The applicant shall certify that the information likely to be obtained is relevant to an ongoing criminal investigation and shall include a statement of the offense to which the information likely be obtained by the pent register or trap and trace device.

Though the federal standard for the issuance of a pen register or a trap and trace device is "reasonable suspicion" California law arguably requires a higher "probable cause" standard. (86 Ops.Cal.Atty.Gen 198 (2003).) In 2003, the California Attorney General's Office issued an opinion concluding that the "federal statutes governing the installation of pen registers and trap and trace devices do not provide authority for issuance of a state court order permitting a state law enforcement officer to install or use pen registers and trap and trace devices" because the federal pen register statute requires less than probable cause. (86 Ops.Cal.Att.Gen 198 (2003).) This bill imposes the probable cause standard and is therefore compliant with both state and federal law.

4. Support of ?

The sponsor of this bill, the Los Angeles County District Attorney's Office states:

Under federal law, law enforcement agencies must obtain a court order from a judge prior to the installation of a pen register or trap and trace device. According to Section 3123(a)(1) of Title 18 of the United States Code, the court shall enter an ex parte order authorizing the installation and use of a pen register or trap and trace device anywhere within the United States, if the court (state or federal) finds that the attorney for the Government has certified to the court that the information likely to be obtained by such installation and use is relevant to an ongoing criminal investigation.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

Once obtained, a pen register or trap and trace device order cannot exceed 60 days in duration. As opposed to a wiretap, a pen register/trap and trace device only records the numbers dialed to or from a particular phone number. It does not record audio or text messages, and cannot be used to obtain real-time location data on a cellular telephone. (47 U.S.C. 1002(a)(2)(B).)

Section 3125 of Title 18 of the United States Code authorizes the installation and use of a pen register/trap and trace device for 48 hours without a court order if an emergency situation exists, including one that involves "immediate danger of death or serious bodily injury to any person." An emergency order can be obtained if grounds exist to obtain a written order, but the emergency situation requires the installation and use of a pen register or a trap and trace device before an order authorizing such installation and use can, with due diligence, be obtained. Within 48 hours after the installation has occurred, or begins to occur, an order approving the installation or use in accordance with section 3123 must be obtained.

Section 3125 of Title 18 of the United States Code authorizes any investigative or law enforcement officer, specially designated by enumerated prosecutorial agencies, to obtain an emergency pen of ?

register/trap and trace device. However, there is no enabling statute in California that allows California District Attorneys to utilize section 3125.

Emergency/warrantless pen registers are lawful in only six states (AL, FL, GA, IA, TX, and WA) which possess emergency state statutes in accordance with section 3125. Notwithstanding, some law enforcement agencies in the remaining 44 states utilize warrantless emergency declarations. The result is that the requesting agency will unlawfully receive pen register or trap and trace data. This is a misdemeanor under federal law (18 U.S.C. 3121). The individuals who improperly access the information may incur civil liability.

Assembly Bill 929 would authorize state and local law enforcement officers to use pen register and trap and trace devices under state law. AB 929 would also authorize the issuance of emergency pen registers and trap and trace devices. Under the provisions of AB 929 a California court could issue a court order authorizing the use of a pen register and/or a trap and trace device upon a showing of probable cause which is a higher standard than the reasonable suspicion standard required under federal law.

In 2003, the CA Attorney General's Office issued an opinion concluding that the "federal statutes governing the installation of pen registers and trap and trace devices do not provide authority for issuance of a state court order permitting a state law enforcement officer to install or use pen registers and trap and trace devices" because the federal pen register statute requires less than probable cause. (86 Ops.Cal.Att.Gen 198 (2003).) Our office's 2013 Search Warrant Manual cites this opinion and advises state law enforcement officers to establish probable cause in the affidavit seeking the installation or use of a pen register under the applicable federal statute.

AB 929 would create a comprehensive pen register/ trap and trace device statute in the Penal Code to cover all requests for pen registers and trap and trace devices in California, including emergency pen registers.

of ?

5. Author's amendments to be offered in Committee.

The author will be offering the following amendments to address some issues raised by the ACLU:

Amendment #1 On page 4, line 19 delete the (1)

Amendment #2 On page 5, delete lines 29-38.

Amendment #3 On page 8, delete line 5

-- END -

2015 CA A.B. 929 (NS)

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 2

# SENATE COMMITTEE ON PUBLIC SAFETY

**Senator Jesse Arreguín, Chair**

**Bill No:** SB 690 **Hearing Date:** April 29, 2025

**Author:** Caballero

**Version:** March 24, 2025

**Urgency:** No **Fiscal:** Yes

**Consultant:** CA

**Subject:** ***Crimes: invasion of privacy***

## HISTORY

Source: Alliance for Legal Fairness

Prior Legislation: SB 1272 (Becker), Ch. 27, Stats. 2022

Support: Apartment Owners Association of California; Berkeley Chamber of Commerce; Calasian Chamber of Commerce; CalBroadband; California Black Chamber of Commerce; California Chamber of Commerce; California Hispanic Chamber of Commerce; California News Publishers Association; California Restaurant Association; California Retailers Association; Civil Justice Association of California; Ecommerce Innovation Alliance; Independent Insurance Agents & Brokers of California, INC.; Internet.works; LA South Chamber of Commerce; National Federation of Independent Business; News Media Alliance; Silicon Valley Leadership Group; State Privacy and Security Coalition, INC.; TechNet

Opposition: AFM Local 7; California Civil Liberties Advocacy; Consumer Attorneys of California; Economic Security California Action; Electronic Frontier Foundation; Electronic Privacy Information Center; Oakland Privacy; Privacy Rights Clearinghouse; TechEqiuty Action

## PURPOSE

***The purpose of this bill is to protect businesses from vexatious litigation by exempting "commercial business purpose" from civil and criminal liability under the California Invasion of Privacy Act (CIPA) which prohibits wiretapping, eavesdropping on or recording confidential communications, intercepting and recording cellular communications, or using a pen register or trap and trace device.***

*Existing law* provides, pursuant to the California Constitution, that all people are by nature free and independent and have inalienable rights. Among these the fundamental right to privacy. (Cal. Const. art. I, § 1.)

*Existing law* establishes the California Consumer Privacy Act (CCPA), which grants consumers certain rights with regard to their personal information, including enhanced notice, access, and disclosure; the right to deletion; the right to restrict the sale of information; and protection from discrimination for exercising these rights. It places attendant obligations on businesses to respect those rights. (Civ. Code § 1798.100 et seq.)

*Existing law* establishes the California Privacy Rights Act of 2020 (CPRA), which amends the CCPA and creates the Private Protection Agency (PPA), which is charged with implementing these privacy laws, promulgating regulations, and carrying out enforcement actions. (Civ. Code § 1798.100 et seq.; Proposition 24 (2020).)

*Existing law* provides consumers the right to request that a business delete any personal information about the consumer which the business has collected from the consumer. (Civ. Code § 1798.105, subd. (a).)

*Existing law* requires a business that collects a consumer's personal information to, at or before the point of collection, inform consumers of the following:

> The categories of personal information to be collected and the purposes for which the categories of personal information are collected or used and whether that information is sold or shared. A business shall not collect additional categories of personal information or use personal information collected for additional purposes that are incompatible with the disclosed purpose for which the personal information was collected without providing the consumer with notice;
>
> The business collects sensitive personal information, the categories of sensitive personal information to be collected and the purposes for which the categories of sensitive personal information are collected or used, and whether that information is sold or shared. A business shall not collect additional categories of sensitive personal information or use sensitive personal information collected for additional purposes that are incompatible with the disclosed purpose for which the sensitive personal information was collected without providing the consumer with notice; and,
>
> The length of time the business intends to retain each category of personal information, including sensitive personal information, or if that is not possible, the criteria used to determine that period provided that a business shall not retain a consumer's personal information or sensitive personal information for each disclosed purpose for which the personal information was collected for longer than is reasonably necessary for that disclosed purpose. (Civ. Code § 1798.100, subd. (a).)

*Existing law* grants a consumer the right to request that a business that collects personal information about the consumer disclose to the consumer the following:

> The categories of personal information it has collected about that consumer;
>
> The categories of sources from which the personal information is collected;
>
> The business or commercial purpose for collecting, selling, or sharing personal information;
>
> The categories of third parties with whom the business shares personal information; and,
>
> The specific pieces of personal information it has collected about that consumer. (Civ. Code § 1798.110.)

*Existing law* provides consumers the right to request that a business that sells or shares the consumer's personal information, or that discloses it for a business purpose, disclose to the consumer specified information, including the categories of personal information collected, shared, sold, and disclosed and the categories of third parties receiving the information. (Civ. Code § 1798.115.)

*Existing law* provides a consumer the right, at any time, to direct a business that sells or shares personal information about the consumer to third parties not to sell or share the consumer's personal information. It requires such a business to provide notice to consumers, as specified, that this information may be sold or shared and that consumers have the right to opt out of the sale or sharing of their personal information. (Civ. Code § 1798.120.)

*Existing law* provides that these provisions do not restrict a business' ability to collect, use, retain, sell, share, or disclose consumers' personal information that is deidentified or aggregate consumer information. (Civ. Code § 1798.145, subd. (a)(6).)

*Existing law* defines "personal information" as information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household. The CCPA provides a nonexclusive series of categories of information deemed to be personal information, including biometric information, geolocation data, and "sensitive personal information." It does not include publicly available information or lawfully obtained, truthful information that is a matter of public concern. (Civ. Code § 1798.140, subd. (v).)

*Existing law* extends additional protections to "sensitive personal information," which is

defined as personal information that reveals particularly sensitive information such as genetic data and the processing of biometric information for the purpose of uniquely identifying a consumer. (Civ. Code § 1798.140, subd. (ae).)

*Existing law* provides various exemptions from the obligations imposed by the CCPA, including where they would restrict a business' ability to comply with federal, state, or local laws. (Civ. Code § 1798.145.)

*Existing law* establishes the Privacy Agency, vested with full administrative power, authority, and jurisdiction to implement and enforce the CCPA. (Civ. Code § 1798.199.10.)

*Existing law* establishes the California Invasion of Privacy Act. (Pen. Code, § 630 *et. seq*.)

*Existing law* prohibits tapping into a telephonic communication system (wiretapping), as specified, without the consent of all parties. (Pen. Code, § 631, subd. (a).)

*Existing law* makes a violation of this provision a wobbler (alternatively misdemeanor or felony) punishable by a fine not exceeding $2,500, or by imprisonment in the county jail up to one year, or by imprisonment in the county jail for 16 months, two years, or three years, or by both a fine and imprisonment. (Pen. Code, § 631, subd. (a).)
*Existing law* authorizes an increased fine not exceeding $10,000 for a violation of wiretapping if the person has previously been convicted of violating these provisions or other specified statutes. (Pen. Code, § 631, subd. (a).)
*Existing law* provides that the general prohibition against wiretapping does not apply to the following:

> A public utility, or telephone company, engaged in the business of providing communication services and facilities, or to their employees or agents, for the purpose of construction, maintenance, conduct or operation of the services and facilities of the public utility or telephone company;
>
> The use of any instrument, equipment, facility, or service furnished and used pursuant to the tariffs of a public utility; or,
>
> Any telephonic communication system used or communication exclusively within a state, county, city and county, or city correctional facility. (Pen. Code, § 631, subd. (b)(1)-(3).)

*This bill* exempts a commercial business purpose from the general prohibition against wiretapping.

*Existing law* makes it a crime to intentionally and without the consent of all parties

eavesdrop or record a confidential communication. (Pen. Code, § 632, subd. (a).)
*Existing law* makes a violation of this provision a wobbler punishable by a fine not exceeding $2,500, or by imprisonment in the county jail up to one year, or by imprisonment in the state prison for 16 months, two years, or three years, or by both a fine and imprisonment. (Pen. Code, § 632, subd. (a).)

*Existing law* authorizes an increased fine not exceeding $10,000 for violation of eavesdropping or recording a confidential communication if the person has previously been convicted of violating these provisions or other specified statutes. (Pen. Code, § 632, subd. (a).)
*Existing law* defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering or in any legislative, judicial, executive or administrative proceeding open to the public, or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded." (Pen. Code, § 632, subd. (c).)
*Existing law* provides that the general prohibition against eavesdropping or recording a confidential communication does not apply to the following:

> A public utility engaged in the business of providing communication services and facilities, or to their employees or agents, for the purpose of construction, maintenance, conduct or operation of the services and facilities of the public utility;
>
> The use of any instrument, equipment, facility, or service furnished and used pursuant to the tariffs of a public utility;
>
> Any telephonic communication system used or communication exclusively within a state, county, city and county, or city correctional facility; or,
>
> The use of hearing aids and similar devices, by persons afflicted with impaired hearing, for the purpose of overcoming the impairment to permit the hearing of sounds ordinarily inaudible to the human ear. (Pen. Code, § 632, subd. (e)(1)-(4).)

*This bill* exempts a commercial business purpose from the general prohibition against eavesdropping or recording a confidential communication.

*Existing law* prohibits, without the consent of all parties, intercepting or receiving and intentionally recording a communication between two cellular phones. (Pen. Code, § 632.7, subd. (a).)
*Existing law* makes a violation of this provision a wobbler punishable by a fine not exceeding $2,500, or by imprisonment in the county jail up to one year, or by

imprisonment in the state prison for 16 months, two years, or three years, or by both a fine and imprisonment. (Pen. Code, § 632.7, subd. (a).)

*Existing law* authorizes an increased fine not exceeding $10,000 for violation of intercepting or receiving and intentionally recording a cellular radio communication if the person has previously been convicted of violating these provisions or other specified statutes. (Pen. Code, § 632.7, subd. (a).)

*Existing law* provides that the general prohibition against intercepting or receiving and intentionally recording a cellular radio communication does not apply to the following:

> A public utility, or telephone company, engaged in the business of providing communication services and facilities, or to their employees or agents, for the purpose of construction, maintenance, conduct or operation of the services and facilities of the public utility or telephone company;
>
> The use of any instrument, equipment, facility, or service furnished and used pursuant to the tariffs of a public utility; or,
>
> Any telephonic communication system used or communication exclusively within a state, county, city and county, or city correctional facility. (Pen. Code, § 632.7, subd. (b)(1)-(3).)

*This bill* exempts a commercial business purpose from the general prohibition against intercepting or receiving and intentionally recording a cellular radio communication.

*Existing law* authorizes a person who has been injured by a violation of these prohibitions to bring an action against the person who committed the violation to enjoin and restrain the violation, as well as to bring an action for monetary damages, as specified. (Pen. Code, § 637.2.)

*This bill* specifies that this authorization does not apply to the processing of personal information for a commercial business purpose.

*Existing law* prohibits the interception of electronic communications and prohibits the installation or use of a pen register or a trap and trace device without first obtaining a court order, except as specified. (Pen. Code, § 638.51, subds. (a) & (b).)

*Existing law* makes a violation punishable by a fine not exceeding $2,500, or by imprisonment in the county jail not exceeding one year, or by imprisonment in the county jail for 16 months, two years, or three years, or by both that fine and imprisonment. (Pen. Code, § 638.51, subd. (c).)

*Existing law* defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication but not the contents of a communication. (Pen. Code, § 638.50, subd. (c).)

*This bill* specifies that a trap and trace device does not include a device or process that is used in a manner consistent with a commercial business purpose.

*Existing* law defines a "pen register" for these purposes to mean a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted but not the contents of a communication, with specified exceptions. (Pen. Code, § 638.50, subd. (b).)

*This bill* specifies that a pen register does not include a device or process used in a manner consistent with a commercial business purpose.

*This bill* defines a "commercial business purpose" to mean the processing of personal information either performed to further a business purpose or subject to a consumer's opt-out rights.

*This bill* makes its provisions retroactive and applicable to any case pending as of January 1, 2026.

## COMMENTS

### 1. Need for This Bill

According to the author:

> SB 690 would stop abusive shake down lawsuits for standard online business activities against California businesses and nonprofits filed under the California Invasion of Privacy Act (CIPA) enacted in 1967, long before the internet was developed. Online business activity is regulated by the California Consumer Privacy Act (CCPA), and is California's omnibus privacy law which is the guiding statute for online privacy protections including data protections. Despite the enactment of CCPA, vexatious litigation using CIPA prey on small business owners and non-profits who cannot afford to defend themselves even though they are in compliance with existing law. SB 690 would clarify that online businesses that comply with CCPA opt-out requirements cannot be punished under CIPA.

### 2. Background – CIPA Claims Being Filed

In August of 2024, the American Bar Journal published an article discussing the "recent wave of lawsuits and arbitration demands under the California Invasion of Privacy Act (CIPA)." (https://www.americanbar.org/groups/business_law/resources/business-law-today/2024-august/californias-invasion-privacy-act/ [as of April 17, 2025].) As noted in the article, both large and small companies operating websites visited by California consumers have been receiving letters threatening litigation or lawsuits. In addition to criminal penalties for a violation of CIPA, CIPA allows an injured person to bring a cause of action for damages. (Pen. Code, §§ 631, subd.

(a), 632, subd. (a), 632.7, subd. (a), 637.2.)

To understand why these lawsuits are being file now, the authors note:

> The California Consumer Privacy Act (CCPA), amended by the California Privacy Rights Act (CPRA), pioneered broad privacy rights for consumers in the United States. Following California's lead, more than a dozen states have enacted similar comprehensive privacy laws. However, most of these state laws, including California's, do not provide a private right of action for violations except for data breaches under the CCPA. Critics argue that without a private right of action, these laws lack the necessary enforcement mechanisms to ensure compliance. In response, plaintiffs' attorneys in California have sought alternative legal strategies.
> One such strategy involves invoking the CIPA, a decades-old criminal statute enacted in 1967 to prevent eavesdropping on telephone calls. This approach represents a novel attempt to bypass the limitations of the CCPA by leveraging a law designed for different circumstances, thus giving it a modern application in the digital age….

(https://www.americanbar.org/groups/business_law/resources/business-law-today/2024-august/californias-invasion-privacy-act/, *supra*.) "The new CIPA cases focus on the alleged unlawful use of website tracking technologies, such as cookies, pixels, tags, and beacons, to collect and use personal information of people who visit these websites." (*Ibid*.) They argue for example, that website tracking technologies are illegal pen registers under CIPA. (*Ibid*.)

According to the article, these CIPA threatening letters, demands for arbitration, and claims do not appear to discriminate based on the company size or type of industry. Several recommendations are included for what companies can do while courts grapple with these cases and issues – e.g., ensuring that their websites and notices, including website privacy notices comply with the state's data protection laws; and assessing their transparency regarding cookies and website tracking technologies, to include which ones are used and how website users can block them or opt out. It is also suggested that "companies should consider using an opt-in mechanism for tracking technologies for California users. One of the key considerations in … cases is whether visiting a website constitutes consent for data collection. By asking for explicit consent (i.e., an opt-in for tracking technologies like cookies), companies could potentially provide an affirmative defense against allegations that an unlawful pen register was deployed, as consent is an exception to the prohibition on the use of pen registers."
(https://www.americanbar.org/groups/business_law/resources/business-law-

today/2024-august/californias-invasion-privacy-act/, *supra*.)

### 3. Exempting Commercial Business Purposes from CIPA Provisions

CIPA prohibits wiretapping, eavesdropping or recording a confidential telephone communication, or intercepts and records a cellular communication without the consent of all parties. Existing law exempts specified communication, including those in a correctional institution and those required for utility maintenance purposes. A violation of these provisions is punishable as either a misdemeanor or a felony. (Pen. Code, §§ 631, 632, 632.7.)

This bill also exempts a "commercial business purpose" from these CIPA prohibitions. The bill defines a commercial business purpose to mean the processing of personal information either performed to further a business purpose, as defined, or subject to a consumer's opt-out rights.

CIPA prohibits the interception of electronic communications and prohibits the installation or use of a pen register or a trap and trace device without first obtaining a court order, except as specified. A violation is punishable as a felony or a misdemeanor. (Pen. Code, § 638.51.)

This bill specifies that under CIPA, a pen register or trap and trace device does not include a device or process used in a manner consistent with a commercial business purpose.

This bill also provides that the authority of a person who has been injured by a violation of CIPA prohibitions to bring an action against the person who committed the violation to enjoin and restrain the violation, as well as to bring an action for monetary damages (Pen. Code, § 637.2), does not apply to the processing of personal information for a commercial business purpose.

Lastly, this bill would make its provisions retroactive and applicable to any case pending as of January 1, 2026.

This bill has raised a number of concerns, some of which are laid out in the opposition to this bill below. Importantly, this bill applies broadly to commercial businesses including large companies like Google and Facebook, not just the small businesses it seeks to insulate from costly law suits.

While these commercial businesses would still be subject to CCPA provisions, the CCPA does not contain the same consumer protections as CIPA. For example, unlike CIPA, it contains no private right of action for consumers and instead its provisions are enforced by the PPA. (Civ. Code § 1798.199.10.) This leaves consumers without a voice when they are the subject of a violation.

Additionally, this bill defines a "commercial business purpose" to mean the processing of personal information either performed to further a business purpose or subject to a consumer's opt-out rights. Because consumers may not

be aware that they are being tracked, they may not be able to make an informed decision about whether to opt-out (versus being given a choice to opt-in).

Retroactive application raises concerns that this bill will undermine active litigation.

Lastly, while the bill is directed at protecting businesses from vexatious civil litigation, it goes beyond this by also exempting "commercial business purpose" from the criminal offense(s) and penalties under CIPA. This appears unrelated to the problem this bill is trying to solve.

**Related Legislation**

SB 361 (Becker), of the 2025-2026 Legislative Session, requires data brokers registering with the CPPA to indicate whether they collect the following information on consumers: account login or account number in combination with any required security code, access code, or password that would permit access to a consumer's account with a third party; drivers' license number, California identification card number, tax identification number, social security number, passport number, military identification number, or other unique identification number issued on a government document commonly used to verify the identity of a specific individual; citizenship data, including immigration status; union membership status; sexual orientation status; or biometric data. SB 361 was passed by the Senate Judiciary Committee on April 2, 2025, and is set to be heard in Senate Appropriations on April 21, 2025.

AB 1355 (Ward), of the 2025-2026 Legislative Session, prohibits an entity covered under the CCPA to collect or process location information of an individual unless doing so is necessary to the goods or services requested by that individual and imposes various other restrictions with regard to location information. AB 1355 would make a covered entity liable for damages in an action brought by the Attorney General or other public prosecutors. AB 1355 requires a business, as defined by the CCPA, to comply with these provisions. AB 1355 is pending hearing in the Assembly Privacy and Consumer Protection Committee.

**4. Argument in Support**

According to the Alliance for Legal Fairness, the sponsor of this bill:

> This bill is necessary to stop the thousands of shakedown letters and lawsuits against California businesses of all sizes for typical business activities, like website analytics or online advertising that are already governed by the California Consumer Privacy Act (CCPA). In the last 18 months, trial lawyers have sued over 1,500 businesses using the California Invasion of Privacy Act's private right of action, arguing that

these typical business activities constitute “wiretapping” or an illegal “pen register,” necessitating “opt-in” consent before the business can, for example, save an online shopping cart or show an ad.

However, in 2018 the California Legislature specifically and unanimously decided that these business activities should be regulated by the CCPA, which is an “opt-out” consent regime. In 2020, the California voters added to the CCPA via ballot initiative, confirming their support of a system of “opt-out” consent, and, with it, further limits on data collection and use. The ballot initiative also added additional protections for certain categories of “sensitive data,” such as health data, location data, and biometric data. The newly created California Privacy Protection Agency (Privacy Agency) has drafted over 150 pages of regulations on how businesses must implement this “opt-out” privacy regime. The Legislature is considering further legislation this year. Moreover, both the Privacy Agency and the Attorney General are empowered to enforce the statute, and the Attorney General’s office has initiated enforcement actions against companies for violating these opt-out requirements. The Privacy Agency is also sponsoring legislation to further strengthen this opt-out regime. CIPA, a 1967 criminal wiretapping statute that requires consent before recording phone calls, was never intended to apply to this type of activity. These lawsuits are unfair and must be stopped.

**The CCPA Governs Online Business Activity – Not CIPA**

Again, the Legislature unanimously passed the CCPA in 2018 to govern how businesses collect, use, and share consumers’ information for typical business activity, such as website analytics and online advertising, and created an “opt-out” consent privacy regime. The Legislature considered and declined to follow Europe’s GDPR privacy law’s “opt-in” consent structure because of the cumbersome requirements necessary to click through before visiting every website. Subsequently, many other states followed California’s first-in-the-nation privacy law.

Voters strengthened the CCPA in 2020 via ballot initiative to add heightened protections for sensitive information such as precise geolocation data and health-related data, and to expand the ability for consumers to use tools to opt-out of the sale/sharing of their personal information. The law provides a comprehensive regulatory framework that mandates clear notice and opt-out rights for consumers, ensuring that data privacy protections are enforced in a consistent and predictable manner. Businesses that comply with the CCPA follow stringent requirements regarding data collection, retention, and

disclosure—yet, due to a handful of trial lawyers subverting the intent of CIPA, they are still being targeted with costly lawsuits for conduct that already falls within the CCPA's governance.

Moreover, the CCPA is highly specific in its treatment of sensitive data. The CCPA provides consumers with the ability to – and requires businesses to provide tools on their homepage that allow them to - limit the use of their sensitive data, which includes health data, biometric data, and precise geolocation data, offering strong privacy protections tailored to modern digital practices.

When it comes to this type of data and the use of common web technologies on websites, the legislature and the voters of this state intentionally chose to regulate those activities through the CCPA, and not to have a private right of action as an enforcement mechanism for violations of the law. Instead, it is actively enforced by two separate regulatory bodies:

> The California Privacy Protection Agency, which was created to implement and enforce the CCPA. The Privacy Agency is empowered to oversee business compliance, issue regulations, and impose penalties on organizations that violate the law.
>
> The California Attorney General retains authority to investigate and enforce violations of the CCPA, ensuring that companies adhere to the statute's robust consumer protections.

These enforcement mechanisms were specifically designed by the Legislature and California voters to regulate the exact types of data collection and digital interactions that are now the subject of opportunistic CIPA lawsuits. Allowing CIPA to be misapplied in this manner creates regulatory duplication, uncertainty, and unnecessary financial burdens for businesses that are already in compliance with an expansive and expensive privacy regime.

Businesses need certainty as to how to comply with privacy laws. Businesses have spent significant resources to comply with the CCPA, the Privacy Agency's hundreds of pages of regulation, and guidance from the Privacy Agency and AG. It makes no sense – and is completely unfair – to require them to somehow implement a conflicting, 1967 criminal wiretapping statute designed for telephone wiretapping because of a handful of trial lawyers churning out lawsuits.

Without this clarity, businesses will continue to face unpredictable and inconsistent legal risks, hampering compliance efforts and innovation.

**CIPA's Private Right of Action is Being Abused in Ways Never Intended by the Statute.**

Beyond regulatory inconsistency, the unchecked barrage of CIPA lawsuits has done nothing to protect consumer privacy. Instead, these demand letters and lawsuits have created significant costs for California businesses, particularly small and mid-sized businesses – and non-profits – that lack the resources to defend against these claims. Trial lawyers have targeted businesses for using common digital tools such as chatbots—tools that are widely used to enhance user experience and do not constitute unlawful wiretapping or eavesdropping as originally intended under CIPA.

Trial lawyers have sued **over 1,500 businesses since 2022**, and have sent thousands more demand letters.

**Failing to enact SB 690 will allow these lawsuits to proceed unchecked, allowing trial lawyers to force businesses into practices that conflict with the CCPA and create regulatory chaos in California.**

These lawsuits exploit the broad private right of action under CIPA to force businesses into costly settlements, diverting resources away from innovation and true consumer privacy protections. By ensuring that activities governed by the CCPA remain within the jurisdiction of the CCPA, SB 690 will restore legislative intent, prevent regulatory overreach, and protect businesses from abusive litigation tactics.

No California businesses is safe from these lawsuits. The trial lawyers have sued large and small businesses – and non-profits too. Our coalition of support includes news media, restaurants, broadband providers, retailers, and many small businesses. The broad scope of these lawsuits demonstrates that the misuse of CIPA affects the entire business community.

### 5. Argument in Opposition

According to the Consumer Attorneys of California:

SB 690 exempts commercial business purposes from the California Invasion of Privacy Act (CIPA) fundamentally undermining the purpose for which the law was enacted, eviscerates one of the strongest consumer tools privacy advocates currently use to challenge illegal and invasive practices, and would set dangerous precedent by retroactively gutting the

rights of California's consumers.

CAOC met with the author prior to the introduction of SB 690 and expressed a willingness to address amendments to CIPA necessary to ensure the law operates as originally intended. We submitted amendments for the author and proponents' consideration on March 21st and met with the author's staff today to discuss our concerns and proposed amendments. Based on our discussions we will be taking another look at language and resubmitting. We welcome continued conversations to find a productive solution to the harms the proponents raise. However, big tech must be held accountable violating consumer privacy rights.

**I. SB 690's Commercial Business Exception to CIPA Runs Counter to Both the Statute's Intent and a Decade of Judicial Interpretation**

When passed in 1967, CIPA was designed as a forward-looking protection against the full spectrum of technological intrusions into private life. The legislative history demonstrates a clear intention to address and regulate the growing threat of electronic surveillance. These concerns are consistent with the now ubiquitous and invasive commercial practices of internet-based tracking, profiling, and data commodification. CIPA was intended to be robust, technology-neutral, and protective of Californians' right to control their private communications, regardless of the surveillance medium. The argument advanced by SB 690—that CIPA was intended to be limited to traditional wiretaps—is contradicted by the legislative record, which reveals a sophisticated understanding of, and alarm at, the ever increasing sophistication of private surveillance systems that propelled their vision past the 1960s and into the future.

a. *Commercial Business Purposes Exclusion Immunizes Big Tech*

SB 690's attempt to insert a broad exemption for "commercial business purposes" would retroactively gut the judicial recognition that CIPA applies to commercial surveillance activities, particularly that body of law regarding the emerging ubiquity of illegal online surveillance. Courts have long affirmed that commercial actors, including tech giants like Meta and Google, can be held liable under CIPA for secretly intercepting and recording user interactions without proper consent. Courts have also embraced a broad interpretation of CIPA that reflects its purpose, which is to safeguard the privacy of electronic communications in the face of advancing technologies. This bill, supported by the tech giants violating the law, reverses these protections by enshrining an exception precisely where the need for scrutiny and restraint is currently greatest: the invasive

collection and exploitation of personal data.

b. *CCPA Does Not Replace CIPA*

SB 690 seeks to wipe out the historical protections of consumers afforded by CIPA through a misapplication of the California Consumer Privacy Act's (CCPA) sectoral regulations, which would have its largely opt-out framework displace CIPA's consent-based protections. The CCPA was explicitly designed to augment, not replace, existing privacy protections—a fact enshrined in the unambiguous language of the statute itself that the CCPA was:

> "intended to further the constitutional right of privacy and to *supplement* existing laws relating to consumers' personal information." Cal. Civ. Code § 1798.175. As such, "in the event of a conflict between other laws and the provisions of this title, the provisions of the law that afford the greatest protection for the right of privacy for consumers shall control." *Id.*

The CCPA thus sets a *floor*—not a ceiling—for privacy rights. It offers no private right of action for any violations, other than data breach, and relies entirely on regulatory enforcement by state authorities.

In its current form, CIPA, by contrast, empowers individuals to seek redress in court for unauthorized surveillance. Without CIPA's private enforcement mechanism, Californians would be left without a central tool for combating abusive surveillance by commercial actors. The commercial exemption proposed in SB 690 would eviscerate this accountability structure, effectively granting tech companies and data brokers a blanket license to engage in covert real-time surveillance of every communication between consumers and any business in the state, so long as they claim it is done for a "business purpose." This carveout would render CIPA a hollow shell, leaving the most pervasive and invasive forms of surveillance beyond the reach of civil and criminal enforcement.

## II. CIPA's Role in Landmark Privacy Litigation

CIPA has played a vital role in holding powerful commercial actors accountable for invasive data collection practices. **Over the past decade, CIPA has been at the heart of landmark litigation that has not only exposed egregious privacy violations but also compelled meaningful reform within the tech industry**. These cases demonstrate that CIPA is an essential legal tool for the protection of Californians' privacy rights. The following cases highlight how consumers have relied on CIPA to confront covert tracking and data exploitation practices that SB 690 would shield from scrutiny and accountability.

Facebook – Tracking Users Even After Logging Out

*In re Facebook, Inc. Internet Tracking Litigation*, No. 12-MD-02314-EJD (N.D. Cal.), filed in 2012, the Ninth Circuit held that Facebook's continued tracking of users even after logging out—via cookies embedded on third-party websites—violated users' reasonable expectations of privacy and constituted a potential violation of CIPA and the federal Wiretap Act. The case recognized that Facebook's pervasive off-site tracking potentially amounted to unauthorized interception of communications. The plaintiffs' ability to sue under CIPA and leverage its statutory damages provisions was critical to holding Facebook accountable, leading to justice for consumers and reforms to Facebook's data practices. **This important appellate ruling represented a judicial shift away from tolerating mass surveillance under the guise of standard business practices, and reinforced CIPA's role as a vital check on invasive commercial surveillance.**

Google – Collected and Tracked Users' Private Browsing History Without Consent

In *Brown v. Google*, No. 4:20-cv-03664-YGR (N.D. Cal), filed in 2020, the plaintiffs alleged that Google intercepted users' private browsing activity—even in "Incognito Mode"—without their consent, using analytics scripts and tracking pixels. The court denied Google's motion to dismiss and rejected Google's arguments that its data collection practices were justified as "ordinary business conduct." The plaintiffs successfully obtained class certification for injunctive relief, with the court noting that the relief plaintiffs sought "would be important changes to reflect transparency in the system." **The case ultimately resulted in a court-approved settlement requiring significant structural changes to Google's tracking practices. Without the CIPA claims, plaintiffs would have lacked a powerful statutory hook for challenging Google's covert and deceptive tracking practices.**

Oracle – Intercepted User Interactions With Websites Without Consent

In *Katz-Lacabe v. Oracle*, No. 22-cv-04792 (N.D. Cal.), filed in 2022, the plaintiffs challenged Oracle's construction of massive digital dossiers through its embedded tracking technologies and data broker practices. Under CIPA, the case targeted Oracle's interception of user interactions with web sites, arguing that the company's surveillance infrastructure enabled the non-consensual collection of sensitive data in violation of wiretap statutes and constitutional privacy guarantees. The plaintiffs

successfully survived multiple motions to dismiss and ultimately achieved justice for consumers and, significantly, a **change in practice where Oracle shut down its entire adtech and data broker business—an unparalleled result in privacy litigation.** As confirmed by news reports, Oracle's decision to exit the adtech sector was directly influenced by the legal and reputational pressures created by the *Katz-Lacabe* case, making it the **most impactful CIPA litigation to date and an affirmation of the statute's ongoing importance in confronting invasive internet surveillance practices.**

**III. SB 690's Retroactive Provisions Are Contrary to Legislative Policy**

The retroactive application of SB 690 would eliminate a host of critically important, ongoing privacy class actions that were developed based on past violations of CIPA. These pending cases—many of which have already survived motions to dismiss—invoke CIPA's well-established applicability to commercial internet surveillance to protect consumers.

*John Doe I, et al. v. Google LLC*, No. 3:23-cv-02431(N.D. Cal.) (Class action alleging that Google's use of Pixel tracking tools on healthcare websites violated CIPA by intercepting confidential communications between patients and providers);

*In re Meta Pixel Healthcare Litigation*, No. 3:22-cv-03580-WHO (N.D. Cal.) (Class action alleging CIPA violations based on Meta's unauthorized interception of confidential patient-healthcare communications through the Meta Pixel tracking tool embedded on hospital websites).

*Kolotinsky v. Amazon.com Inc.*, filed in the U.S. District Court for the Northern District of California, case number 25-00931 (Class-action lawsuit filed in January 2025 accuses Amazon of covertly tracking and selling consumers' sensitive data—including geolocation, religious beliefs, sexual orientation, and medical history—without consent, potentially exposing individuals to significant privacy harms.

Riga*nian v. LiveRamp Holdings Inc., Case No. 3:25-cv-00471* (Class-action lawsuit accuses LiveRamp, formerly Acxiom and one of the largest data brokers in the world, of illegally collecting and selling detailed "Identity Profiles" on nearly 700 million consumers without consent, alleging that its data tracking methods may constitute the use of a pen register under CIPA. Critics argue that LiveRamp operates one of the most invasive surveillance networks, secretly compiling and selling personal details—such as online activity, locations, and purchasing history—to advertisers and data brokers, exposing consumers to mass privacy violations.

By retroactively stripping individuals of their right to bring claims for already-committed acts of unlawful data interception, SB 690 would pull the rug out from under consumers and courts midstream, denying redress for past harms and rewarding defendants precisely because they were caught violating the law and then went to the legislature to gut the law they violated. This approach offends basic principles of due process and is traditionally frowned upon in the California Legislature. If enacted, SB 690 would send a dangerous message that even clear statutory rights can be erased overnight to shield powerful corporate interests from accountability.

**IV. Vote No on SB 690**

In sum, SB 690 represents a serious threat to Californians' privacy rights and would destroy one of the most effective tools currently available to challenge invasive and often deceptive commercial surveillance practices. It would gut enforcement under the CIPA at the very time in which enforcement is most critically needed.

**-- END –**

# Exhibit 3

# Google Analytics Usage Statistics




## Google Analytics

Google Analytics offers a host of compelling features and benefits for everyone from senior executives and advertising and marketing professionals to site owners and content developers.

https://google.com/analytics

Analytics and Tracking · Application Performance · Audience Measurement · Visitor Count Tracking

## Google Analytics · Customers

Get access to data on 86,355,773 websites that are Google Analytics Customers. We know of 31,675,784 live websites using Google Analytics and an additional 54,679,989 sites that used Google Analytics historically and 685,370 websites in France

Download Lead List

## Popular Complementary Technologies

| Technologies | Total |
| --- | --- |
| WooCommerce Checkout sites using Google Analytics<br>Sites that are using both Google Analytics and WooCommerce Checkout | 1,034,429 |
| Shopify sites using Google Analytics<br>Sites that are using both Google Analytics and Shopify | 712,118 |
| Magento sites using Google Analytics<br>Sites that are using both Google Analytics and Magento | 70,794 |
| Salesforce sites using Google Analytics<br>Sites that are using both Google Analytics and Salesforce | 25,867 |
| Marketo sites using Google Analytics<br>Sites that are using both Google Analytics and Marketo | 5,030 |

Technology Awards

🥇 1st in Visitor Count Tracking - Analytics and Tracking growth in the last 7 days.

🥇 1st in Visitor Count Tracking - Analytics and Tracking growth in the last 14 days.

🥇 1st in Visitor Count Tracking - Analytics and Tracking growth in the last 30 days.

🥇 1st in Visitor Count Tracking - Analytics and Tracking growth in the last 60 days.

🥇 1st in Visitor Count Tracking - Analytics and Tracking growth in the last 90 days.

🥈 2nd in Application Performance - Analytics and Tracking growth in the last 7 days.

🥈 2nd in Application Performance - Analytics and Tracking growth in the last 14 days.

🥈 2nd in Application Performance - Analytics and Tracking growth in the last 30 days.

Most popular technology in the Top 1000 sites under Analytics and Tracking.

Most popular technology in the Top 10k sites under Analytics and Tracking.

Most popular technology in the Top 100k sites under Analytics and Tracking.

Most popular technology in the Top 1 Million sites under Analytics and Tracking.

Most popular technology □□□□ under Analytics and Tracking.

Most popular technology □□□□ under Analytics and Tracking.

Investor Center

Competitors and Similar Technologies

- Cloudflare Insights — 15,777,611 live sites
- Cloudflare Web Analytics — 15,221,542 live sites
- Global Site Tag — 33,791,356 live sites
- Baidu Analytics — 5,171,254 live sites
- Yandex Metrika — 3,282,643 live sites
- Facebook Pixel — 5,496,191 live sites
- 51.la — 1,820,890 live sites
- Snowplow — 1,651,722 live sites
- Fastly — 1,633,211 live sites
- Facebook Conversion Tracking — 4,772,479 live sites
- Microsoft Clarity — 1,392,665 live sites
- Facebook Domain Insights — 3,356,996 live sites
- Google Conversion Linker — 3,348,018 live sites
- Hotjar — 1,069,079 live sites
- Google Conversion Tracking — 2,299,775 live sites
- Cloudflare Rocket Loader — 680,973 live sites
- New Relic — 663,334 live sites
- Plausible Analytics — 597,129 live sites
- Matomo — 552,061 live sites
- Klaviyo — 562,084 live sites
- Facebook Signal — 1,061,864 live sites
- FullStory — 340,856 live sites
- Brevo — 931,199 live sites
- CNZZ — 926,499 live sites
- Fingerprint Pro — 292,547 live sites
- TikTok Conversion Tracking Pixel — 861,681 live sites
- StatCounter — 277,269 live sites
- HighLevel — 777,366 live sites
- Histats — 213,357 live sites
- ProLayers LeadConnector — 580,890 live sites

Download Lead List

Get a list of 35,769,452 websites using Google Analytics which includes location information, hosting data and contact details. The list includes 31,675,784 live websites and 4,093,668 websites redirecting to those sites. 685,370 of these sites are in France.

We also know of 54,679,989 sites that have used Google Analytics previously.

Site Totals

| | |
|---|---|
| Total Live | 31,675,784 |

4,093,008 additional website redirects*.

| | |
|---|---|
| Expired | 54,679,989 |
| French Live Sites | 685,370 |
| Live and Expired | 86,355,773 |
| Expired | 54,679,989 |

| Traffic | |
|---|---|
| Top 1m | 560,663 |
| Top 100k | 54,456 |
| Top 10k | 5,458 |
| Top 1000 | 483 |
| Outside Top 1m | 30,856,978 |

| Technology Spend | |
|---|---|
| $100+ | 10,731,006 |
| $500+ | 7,809,656 |
| $1000+ | 6,232,794 |
| $5k+ | 545,768 |
| $10k+ | 169,688 |

| Social Followers | |
|---|---|
| 10+ | 3,190,728 |
| 100+ | 2,640,943 |
| 500+ | 1,830,928 |
| 1000+ | 1,403,466 |
| 5000+ | 581,317 |
| 10k+ | 378,630 |
| 100k+ | 60,843 |
| 1m+ | 7,478 |

| Sales Revenue | |
|---|---|
| $100 | 3,769,883 |
| $500 | 3,636,138 |
| $1000 | 3,368,030 |
| $5000 | 2,953,646 |
| $10k | 1,864,867 |
| $100k | 289,122 |
| $1m | 61,718 |
| $10m | 16,587 |
| $100m | 4,500 |

| SKU Products | |
|---|---|
| 10+ | 1,307,008 |
| 50+ | 600,618 |
| 500+ | 235,519 |
| 100+ | 139,689 |
| 5000+ | 24,151 |
| 10k+ | 10,278 |
| 100k+ | 374 |

Live Country Totals

| | |
|---|---|
| France | 685,370 |
| United States | 14,171,735 |
| United Kingdom | 1,428,528 |
| Brazil | 913,108 |
| Japan | 829,635 |
| Germany | 755,486 |
| Netherlands | 735,251 |
| India | 685,836 |
| Italy | 650,865 |
| Russia | 588,870 |
| Australia | 568,910 |
| Canada | 533,303 |
| Canada | 505,700 |
| Spain | 479,748 |
| Poland | 424,657 |
| Sweden | 300,359 |
| Indonesia | 296,738 |

| | |
|---|---|
| Czech Republic | 281,890 |
| Switzerland | 229,214 |
| Belgium | 214,744 |
| Turkey | 178,204 |
| .co | 172,964 |
| Vietnam | 171,747 |
| Hungary | 150,712 |
| Mexico | 148,829 |
| Ukraine | 132,895 |
| South Africa | 132,786 |
| Denmark | 131,436 |
| Greece | 127,480 |
| Argentina | 123,801 |
| China | 121,707 |
| Israel | 120,216 |
| European Union | 116,662 |
| Panama | 113,638 |
| New Zealand | 113,219 |
| Austria | 109,534 |
| Romania | 108,723 |
| Portugal | 104,193 |
| Gabon | 98,430 |
| Morocco | 96,439 |
| Slovakia | 93,884 |
| Taiwan | 93,237 |
| New Caledonia | 92,142 |
| .io | 91,542 |
| Finland | 89,800 |
| South Korea | 89,705 |
| Belarus | 83,597 |
| Vatican City | 81,015 |
| .co | 79,593 |
| Norway | 78,460 |

Google Analytics Variations

| | |
|---|---|
| Google Analytics Anonymize IP | 339,453 |
| Google Analytics Beta Tracking | 0 |
| SSL Google Analytics | 1,585 |
| Google Analytics Enhanced Link Attribution | 68,360 |
| Google Analytics Multiple Trackers | 60,638 |
| Google Universal Analytics | 11,792,519 |
| Google Analytics Enhanced Ecommerce | 158,080 |
| Google Analytics Ecommerce | 22,360 |
| AutoTrack | 333 |
| Google Analytics Custom Variables | 8,608 |
| Google Analytics Event Tracking | 434,663 |
| Google Analytics Classic | 2,842,784 |
| Google Analytics Social Interactions | 1,036 |
| Google Analytics Tasks | 163 |
| Google Analytics Timings | 4,646 |
| Google Analytics Forced SSL | 28,535 |
| Google Universal Analytics Debug | 419 |
| Google Analytics 360 Suite | 3 |
| Google Analytics Enchanced Ecommerce Product Impression | 15,518 |
| Google Analytics 4 | 13,432,631 |

Live Region Totals

| | |
|---|---|
| North America | 14,677,435 |
| Europe | 8,595,530 |
| Western Europe | 4,237,780 |
| Central Europe | 2,075,631 |
| Southern Europe | 1,546,782 |
| South America | 1,355,655 |

| | |
|---|---|
| East Asia | 1,166,319 |
| CHAPS | 1,060,677 |
| Benelux Union | 962,890 |
| Northern Europe | 775,124 |
| South Asia | 755,270 |
| Balkan States | 631,706 |
| Nordics | 609,294 |
| Scandinavia | 510,255 |
| Western Asia | 419,632 |

Live Financial Totals

| | |
|---|---|
| AUKUS | 16,169,173 |
| AMER | 16,052,541 |
| EMEA | 9,033,581 |
| APAC | 3,437,949 |
| ASEAN+6 | 3,057,288 |
| ASEAN+5 | 2,935,581 |
| CANZUK | 2,616,357 |
| BRICS | 2,442,307 |
| BRIC | 2,309,521 |
| ANZUK | 2,110,657 |
| BASIC | 1,853,437 |
| FRITES | 1,815,983 |
| ASEAN+3 | 1,689,323 |
| LATCAR | 1,598,947 |
| LATAM | 1,532,168 |

Live Group Totals

| | |
|---|---|
| Organisation for Economic Co-operation and Development | 24,224,265 |
| Club de Paris | 23,690,576 |
| Development Assistance Committee | 23,460,558 |
| G20 Nations | 22,891,579 |
| International Solar Alliance | 21,858,571 |
| North Atlantic Treaty Organization | 21,610,409 |
| G7 Nations | 19,027,319 |
| Asia-Pacific Economic Cooperation | 18,006,333 |
| Organization of American States | 16,213,875 |
| Sovereign states and dependent territories of North America | 14,927,351 |
| G2 Nations | 14,293,442 |
| Council of Europe | 8,544,063 |
| Assembly of European Regions | 6,656,890 |
| European Union, European Economic Area and Switzerland | 6,066,500 |
| Eastern Partnership | 5,935,372 |

# Exhibit 4

# Facebook Conversion Tracking Usage Statistics




Facebook Conversion Tracking

Conversion tracking functionality from Facebook, allows a user to track advertisement clicks.

https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking/

Analytics and Tracking · Conversion Tracking · Conversion Optimization

Facebook Conversion Tracking · Customers

Get access to data on 12,906,475 websites that are Facebook Conversion Tracking Customers. We know of 4,772,479 live websites using Facebook Conversion Tracking and an additional 8,133,996 sites that used Facebook Conversion Tracking historically and 52,273 websites in France

Download Lead List

Popular Complementary Technologies

| Technologies | Total |
| --- | --- |
| Shopify sites using Facebook Conversion Tracking<br>Sites that are using both Facebook Conversion Tracking and Shopify | 125,690 |

Technology Awards

- 1st in Conversion Tracking - Analytics and Tracking growth in the last 7 days.
- 1st in Conversion Optimization - Analytics and Tracking growth in the last 7 days.
- 1st in Conversion Optimization - Analytics and Tracking growth in the last 30 days.
- 1st in Conversion Tracking - Analytics and Tracking growth in the last 14 days.
- 1st in Conversion Optimization - Analytics and Tracking growth in the last 14 days.
- 1st in Conversion Optimization - Analytics and Tracking growth in the last 60 days.

1st in Conversion Optimization - Analytics and Tracking growth in the last 90 days.

2nd in Conversion Tracking - Analytics and Tracking growth in the last 30 days.

Most popular technology □□□□□ under Analytics and Tracking.

Most popular technology □□□ under Analytics and Tracking.

Most popular technology □□□□ under Analytics and Tracking.

Most popular technology □□□□ under Analytics and Tracking.

Most popular technology □□□ under Analytics and Tracking.

Most popular technology □□□□ under Analytics and Tracking.

Investor Center

Competitors and Similar Technologies

- Yandex Metrika — 3,282,643 live sites
- Google Conversion Tracking — 2,299,775 live sites
- Baidu Analytics — 5,171,254 live sites
- Facebook Pixel — 5,496,191 live sites
- Facebook Domain Insights — 3,356,996 live sites
- Google Conversion Linker — 3,348,018 live sites
- Hotjar — 1,069,079 live sites
- TikTok Conversion Tracking Pixel — 861,681 live sites
- 51.la — 1,820,890 live sites
- Matomo — 552,061 live sites
- Bing Universal Event Tracking — 567,827 live sites
- Klaviyo — 562,084 live sites
- Snowplow — 1,646,018 live sites
- Fastly — 1,623,681 live sites
- Cloudflare Web Analytics — 15,221,542 live sites
- Cloudflare Insights — 15,777,611 live sites
- Microsoft Clarity — 1,392,665 live sites
- LinkedIn Insights — 392,548 live sites
- Facebook Signal — 1,061,864 live sites
- Twitter Conversion Tracking — 334,510 live sites
- Brevo — 931,199 live sites
- CNZZ — 926,499 live sites
- Pinterest Conversion Tracking — 276,069 live sites
- HighLevel — 777,366 live sites
- Google Analytics — 31,675,784 live sites
- Global Site Tag — 33,791,356 live sites
- Cloudflare Rocket Loader — 671,786 live sites
- New Relic — 663,334 live sites
- Plausible Analytics — 597,129 live sites
- ProLayers LeadConnector — 580,890 live sites

Download Lead List

Get a list of 5,462,709 websites using Facebook Conversion Tracking which includes location information, hosting data and contact details. The list includes 4,772,479 live websites and 690,230 websites redirecting to those sites. 52,273 of these sites are in France.

We also know of 8,133,996 sites that have used Facebook Conversion Tracking previously.

Site Totals

| | |
|---|---|
| **Total Live**<br>690,230 additional website redirects[2]. | 4,772,479 |
| **Expired** | 8,133,996 |
| French Live Sites | 52,273 |
| Live and Expired | 12,906,475 |
| Expired | 8,133,996 |
| **Traffic** | |
| Top 1m | 143,076 |
| Top 100k | 12,825 |
| Top 10k | 1,391 |

| | |
|---|---|
| Top 1000 | 189 |
| Outside Top 1m | 4,574,248 |

**Technology Spend**

| | |
|---|---|
| $100+ | 2,354,422 |
| $500+ | 1,648,341 |
| $1000+ | 1,290,237 |
| $5k+ | 176,875 |
| $10k+ | 77,796 |

**Social Followers**

| | |
|---|---|
| 10+ | 857,434 |
| 100+ | 741,606 |
| 500+ | 558,220 |
| 1000+ | 448,845 |
| 5000+ | 203,112 |
| 10k+ | 133,442 |
| 100k+ | 21,060 |
| 1m+ | 3,279 |

**Sales Revenue**

| | |
|---|---|
| $100 | 1,001,576 |
| $500 | 958,672 |
| $1000 | 884,592 |
| $5000 | 764,249 |
| $10k | 529,316 |
| $100k | 81,449 |
| $1m | 14,590 |
| $10m | 4,947 |
| $100m | 1,205 |

**SKU Products**

| | |
|---|---|
| 10+ | 327,277 |
| 50+ | 150,480 |
| 500+ | 58,647 |
| 100+ | 34,929 |
| 5000+ | 6,785 |
| 10k+ | 2,790 |
| 100k+ | 102 |

Live Country Totals

| | |
|---|---|
| France | 52,273 |
| United States | 2,058,529 |
| Brazil | 301,122 |
| United Kingdom | 141,750 |
| Australia | 109,912 |
| Italy | 108,752 |
| India | 93,220 |
| Canada | 89,394 |
| Germany | 85,186 |
| Canada | 80,726 |
| Poland | 75,457 |
| Russia | 74,624 |
| Netherlands | 59,095 |
| Spain | 58,295 |
| Argentina | 51,849 |
| South Korea | 39,900 |
| Czech Republic | 36,624 |
| .co | 35,558 |
| Mexico | 33,963 |
| Hungary | 33,735 |
| Ukraine | 30,428 |
| Turkey | 28,872 |
| Romania | 27,268 |
| Vietnam | 27,207 |
| Israel | 26,475 |
| Japan | 26,259 |

| | |
|---|---|
| Denmark | 24,073 |
| Indonesia | 23,831 |
| Belgium | 22,295 |
| Greece | 21,830 |
| South Africa | 21,540 |
| Sweden | 20,235 |
| Chile | 20,225 |
| Switzerland | 19,732 |
| Israel | 19,024 |
| Panama | 18,041 |
| Gabon | 17,757 |
| Portugal | 17,676 |
| New Zealand | 17,025 |
| New Caledonia | 14,923 |
| Slovakia | 14,489 |
| Taiwan | 14,120 |
| .co | 13,755 |
| Morocco | 13,619 |
| Austria | 13,541 |
| Bulgaria | 13,491 |
| Vatican City | 13,219 |
| Malaysia | 13,138 |
| Azerbaijan | 12,491 |

Live Region Totals

| | |
|---|---|
| North America | 2,139,255 |
| Europe | 1,088,600 |
| South America | 426,630 |
| Western Europe | 404,948 |
| Central Europe | 285,095 |
| Southern Europe | 236,359 |
| CHAPS | 173,846 |
| Balkan States | 119,533 |
| South Asia | 112,313 |
| Northern Europe | 103,255 |
| East Asia | 97,506 |
| Western Asia | 85,436 |
| Benelux Union | 82,459 |
| Middle East | 80,907 |
| Southern Cone | 77,055 |

Live Financial Totals

| | |
|---|---|
| AMER | 2,570,627 |
| AUKUS | 2,310,191 |
| EMEA | 1,184,760 |
| BRICS | 502,415 |
| BRIC | 480,875 |
| LATCAR | 476,489 |
| LATAM | 466,818 |
| APAC | 445,829 |
| BASIC | 427,791 |
| ASEAN+6 | 386,076 |
| ASEAN+5 | 374,167 |
| CANZUK | 349,413 |
| ANZUK | 268,687 |
| MIKTA | 236,478 |
| IMEA | 221,817 |

Live Group Totals

| | |
|---|---|
| Club de Paris | 3,356,382 |
| Organisation for Economic Co-operation and Development | 3,350,507 |
| G20 Nations | 3,347,619 |
| International Solar Alliance | 3,186,135 |
| Development Assistance Committee | 3,180,165 |
| North Atlantic Treaty Organization | 3,019,199 |
| Organization of American States | 2,606,492 |
| Asia-Pacific Economic Cooperation | 2,585,937 |
| G7 Nations | 2,553,475 |
| Sovereign states and dependent territories of North America | 2,190,361 |
| G2 Nations | 2,070,438 |
| Council of Europe | 1,079,694 |
| Assembly of European Regions | 799,226 |
| Eastern Partnership | 786,713 |
| Euronest Parliamentary Assembly | 781,732 |

# Exhibit 5

# CDP Institute

Login **Join Now**
Toggle Menu

- About
  Open
  - About The CDP Institute
    - The CDP Institute Backstory
    - CDPI Staff
    - Request a Speaker
    - Frequently Asked Questions
    - Chapters
- Learning Center
  Open
  - What is a CDP?
    - CDP Definition
    - Types of CDPs
    - RealCDP Definition
  - Knowledge Hubs
    - Composable CDP
    - Vendor Selection
    - Use Cases
    - Expert Knowledge
  - What is a CDP used for?
    - Select Use Case
    - Build a Use Case
    - Follow a Template
    - Read Case Studies
  - Training
    - Online Course: Evaluating Vendors
    - Online Course: Use Case Creation
    - Online Course: Build Buy Compose
    - Online Course: Identity Resolution
    - Pre-Purchase Workshop
    - Post-Purchase Workshop
- Vendors
- Resources
  Open
  - For CDP Buyers
    - Download the Vendor Comparison
    - Find CDP Vendors
    - Find Service Providers
    - Generate a Vendor List and RFP
    - Build a Use Case
  - For CDP Vendors
    - Benefits of Sponsoring
    - Apply for Sponsorship
    - RealCDP Certification
  - For Service Providers
    - Benefits of Sponsoring
    - Apply for Sponsorship
  - Library
- Library
- News
- Events
- Blog

Search
Search the CDP Institute

We use cookies to improve your experience on our site. By using our site, you consent to cookies.

Preferences

Reject

Accept All

- CDPI Privacy Newsletter
- Press Releases & Coverage
- Dates
  - February 2026
  - January 2026
  - December 2025
  - November 2025
  - October 2025
  - September 2025
  - August 2025
  - July 2025
  - June 2025
  - May 2025
  - April 2025
  - March 2025


Search News
Search

# Trackers and pixels feeding data broker data stores

Beyond buying and selling data, the data broker infrastructure also accrues data via feeds from third-party trackers, tags and pixels. A new report from privacy and security company, Lokker, looked at web privacy across more than 3,400 sites and shows broad use of these identifiers with 47% of websites using Meta Pixel, including 55% of S&P 500, 58% of retail, 42% of financial, and 33% of healthcare.

Read Full Article

CDP
PRIVACY NEWSLETTER

We use cookies to improve your experience on our site. By using our site, you consent to cookies.

Next Article

## IT'S THE LAW (04/16/2024)

April 16, 2024

Ethiopia is another country moving ahead with federal privacy legislation. Its House of Representatives passed the Personal Data Protection Proclamation (PDPP) to safeguard the data of individuals and legislate data collection and processing. This is being done in tandem with plans to issue digital IDs to all categories of citizens, including refugees.

CDPI Privacy Newsletter

Previous Article

## Children's Privacy: Meta to use AI to find & blur nude photos…protect children

April 16, 2024

Upping the game to protect minors, Meta is developing an AI "nudity protection" tool to use on Instagram. This after the company faced legal charges of exploiting young users to encourage use of their platforms despite knowledge that it harms mental health. The "sexploitation" protection mechanism will find and blur images containing nudity that were sent to minors, and then let recipients choose whether to see the images. Not sure this is reassuring….

CDPI Privacy Newsletter

Featured Article

## Reltio Achieves Microsoft Azure Certification, Accelerating Trusted Data Delivery for Enterprise AI and Digital Transformation

February 23, 2026

Reltio said it earned the Azure Certified Software designation for its data platform. For platform owners, certifications increasingly function like procurement shortcuts, reducing security review time for "agent-ready" data foundations.

CDPI Newsletter

**CDP Institute**

**Join Now**

- Terms
- Privacy
- Sitemap
- Contact Us

Stay up to date

- Linkedin
- Twitter
- Slack

© 2026 CDP Institute. All Rights Reserved. Site Design By: DaddyDesign.com

We use cookies to improve your experience on our site. By using our site, you consent to cookies.